77 Cal.Rptr.2d 25 (1998)
959 P.2d 183
The PEOPLE, Plaintiff and Respondent,
v.
Jerry Grant FRYE, Defendant and Appellant.
No. S007198.
Supreme Court of California.
July 30, 1998.
As Modified on Denial of Rehearing September 23, 1998.
*39 David A. Lane, Denver, CO, and Marianne Wesson, Boulder, CO, under appointments by the Supreme Court, for Defendant and Appellant.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.
BROWN, Justice.
A jury convicted defendant Jerry Grant Frye of two counts of first degree murder (Pen.Code, ง 187; all further statutory references are to this code unless noted otherwise), first degree robbery (ง 211), residential burglary (ง 459), and the unlawful driving and taking of a vehicle (Veh.Code, ง 10851). The jury also found true the allegations that defendant was armed with a firearm and personally used a firearm during the commission of these offenses (งง 12022, subd. (a); 12022.5). Having found true the special circumstance allegations that defendant committed multiple murders (ง 190.2, subd. (a)(3)), and that the murders were committed while defendant was engaged in robbery and burglary (ง 190.2, subd. (a)(17)), the jury set the penalty at death. The trial court denied defendant's motion to modify the sentence (ง 190.4, subd. (e)). This appeal is automatic (Cal. Const., art. VI, ง 11; ง 1239).
*40 For the reasons stated below, the judgment is affirmed in its entirety.

I. Facts

A. Prosecution's Case At The Guilt Phase
The prosecution's chief witness, Jennifer Warsing, testified under a grant of immunity. Warsing first met defendant in a Sacramento bar in April 1984 while she was separated from her husband of many years. A romantic relationship between Warsing and defendant quickly developed, and, in early May 1984, the couple moved in together in an apartment outside of Sacramento. On several occasions during the time they lived together, defendant assaulted Warsing.
Defendant and Warsing returned to Sacramento in December 1984 or January 1985, and resided together at the River City Motel. Defendant worked at a construction job next door to the motel. Rick Evans worked with defendant at the construction site and socialized with him outside of work. Evans testified he and defendant discussed the prospect of quitting their jobs and growing marijuana for profit instead. Evans had access to a gold mining claim in Amador County that members of his family had worked for many years.
In April 1985, defendant and Evans quit their jobs to pursue the marijuana venture. With approximately $500 between them, they purchased camping equipment and other supplies. The next day, a group comprised of defendant, Warsing, Evans and his girlfriend, and Warsing's adult son drove to the mining claim property in Amador County. In addition to the camping gear and supplies they had purchased, defendant and Evans brought along marijuana seeds, a 12-gauge shotgun, a .22-caliber semiautomatic rifle, and ammunition.
A quarter-mile down the hill from the group's campsite was a cabin occupied by an older couple, Robert and Virginia (Jane) Brandt, who worked a gold mining claim with their son, Bobby. Evans testified that before setting up camp and sowing the marijuana seeds, he sought and obtained the Brandts' permission for the group to camp on the property.
The campsite had no running water or electricity, and meals were prepared over an open campfire. Although defendant and Warsing had a car when they moved to the campsite, they sold it to Warsing's son who left the group after a couple of days. Evans and his girlfriend returned to Sacramento a week or two later, leaving only defendant and Warsing at the campsite. Before Evans departed, it was decided Evans would return to the property once or twice a week with food and supplies, and defendant would tend the marijuana plants.
About a week after moving to the campsite, Warsing met the Brandts, and became friendly with them. Warsing would occasionally accompany Jane Brandt in the Brandts' 1982 Lincoln Towncar to run errands in town. On these excursions, Warsing became aware that Mrs. Brandt carried an unusually large amount of cash with her to pay for goods and services. Rick Evans testified defendant and Warsing mentioned the Brandts' money during one of his weekly visits to the campsite. Defendant also showed Evans a small glass container filled with about a quarter-inch of gold he had scraped from the bucket of the front-end loader used by the Brandts in their mining operation.
On the morning of May 14, defendant and Warsing walked from their campsite down the hill to the Brandts' cabin. Warsing had agreed to accompany Mrs. Brandt to the dentist's office in case she did not feel well following her dental procedure.
Sometime during the late morning of May 14, an acquaintance of the Brandts, Ron Wilson, drove to the cabin. Wilson occasionally worked the Brandts' mining claim with them, receiving a percentage of the gold that was extracted. Seeing the Lincoln gone, Wilson drove by the cabin without stopping, and proceeded up another road After investigating a potential mining area, Wilson hiked to the upper part of the claim, in the vicinity of defendant's campsite. As Wilson headed back down towards the cabin to see if anyone had returned, he met defendant walking up the road.
*41 Defendant showed Wilson the marijuana-growing operation. A short time later, Wilson drove with defendant into town where Wilson bought them lunch and a couple of beers. After lunch, Wilson and defendant made several more stops. Wilson bought a carton of cigarettes for defendant, and two 12-packs of beer. Wilson also retrieved several flats of marijuana seedlings from his girlfriend's residence for defendant to tend for him, and picked up some watering equipment from a friend. During this time, defendant and Wilson each consumed several more beers.
Defendant and Wilson arrived back at the mining claim about 3:00 in the afternoon, and went up the hill to the campsite. Mrs. Brandt and Warsing arrived back at the cabin some time later. When Warsing got out of the car, Mrs. Brandt asked her to come down for coffee later in the evening. Warsing said they probably would, and set off for the campsite up the hill. When Warsing arrived at the campsite, defendant and Wilson were talking and drinking beer. Around dusk, Wilson left the campsite and drove back home.
Warsing testified that shortly after Wilson's departure, defendant said he saw the Devil moving around the campsite. He also told her he thought he was being set up, and that he would "just take what he could." Defendant then stood by the fire where Warsing was heating water for coffee, and asked her if she had ever seen people dead before. According to Warsing's testimony, defendant was going to go down and kill the Brandts, and told her if she didn't go with him, he would have to kill her too.
Hoping to run away, Warsing told defendant she needed to use the campsite's makeshift bathroom. Defendant accompanied her, shotgun in hand. When Warsing was finished, defendant took her by the arm and walked down the hill toward the cabin, still clutching the shotgun in the other hand.
When defendant and Warsing arrived at the Brandts' cabin, Mrs. Brandt greeted them, asking them to come inside. Defendant placed the shotgun against the kitchen doorway, and sat down in a chair nearby. Warsing sat at the table where Mrs. Brandt was working on an afghan and began helping her.
Defendant complained to Mr. Brandt that he had drunk too much and his head was hurting. Mr. Brandt started laughing. When Mrs. Brandt got up and offered coffee, defendant said he would like a cup. Hearing defendant joking with Mr. Brandt and asking for coffee, Warsing believed things had returned to normal, and she began to relax. Moments later, however, she heard a noise, and looked up to see defendant pointing the shotgun at Mr. Brandt who was now standing up in front of his recliner. Defendant shot Mr. Brandt, and he fell back in the chair.
Mrs. Brandt turned and moved towards defendant, with Warsing behind her. She yelled at defendant to stop, and lunged at him. Defendant shot Mrs. Brandt in the chin and face, and she fell onto the sofa. Defendant turned and shot Mr. Brandt a second time. Warsing testified she heard gurgly breathing from Mr. Brandt. Defendant told Warsing, "I am going to have to put him out of it." Warsing heard three blows, and then no more breathing.
According to Warsing's testimony, she started moving towards the door to leave, but defendant yelled at her to get the money out of Mrs. Brandt's purse, which she did. Defendant then directed Warsing to go in the bedroom and look for a suitcase containing Mrs. Brandt's gambling change. Defendant returned to where Mr. Brandt's body lay, and went through his pockets. Defendant took vials of gold from the kitchen counter, returned to the bedroom, and put the gold in Mrs. Brandt's suitcase. He ripped the gold nugget necklace from Mrs. Brandt's neck. When Warsing started walking out the door, defendant called her back inside the kitchen, and directed her to pour water over his bloody hands to clean them. Defendant took the shotgun and went out the door, ordering Warsing to get into the Brandts' Lincoln.
Defendant drove up the road leading to the campsite. He ordered Warsing to get his suitcase. Meanwhile, defendant kicked down the tents and knocked things over. The two left the campsite, with defendant driving fast *42 and recklessly in the direction of Placerville. They stopped for the night at Winnemucca, Nevada, and checked into a motel using the name Dixon, defendant's mother's maiden name. Leaving the Brandts' Lincoln in a casino parking lot, defendant and Warsing purchased a car for $600 cash and drove to Elko, Nevada, for the night. From there they traveled to Pocatello, Idaho, again registering in a motel under the name of Dixon. They went from Pocatello to Wyoming. In Rapid City, Wyoming, they traded in, their car for a green pickup truck and $150 in cash. While in Rapid City, defendant and Warsing also sold some gold to Jack Meyer, owner of Silver Mountain Coins. Defendant and Warsing continued driving until they reached Belle Fourche, South Dakota. Defendant had Warsing drive through town and back again, and told her this is where they would stay.
Warsing testified that en route from California to Belle Fourche, defendant would sit in the car and cry while she drove, and said he was sorry he had killed the Brandts because "he really liked those old people." According to Warsing, defendant said he was sorry for what he had done to her life, too, because the authorities would never believe she had nothing to do with it since her fingerprints were all over everything.
Meanwhile, on the morning of May 16, Bobby Brandt returned to his parents' cabin in Amador County. He noticed the Lincoln was gone and the doors to the cabin wide open. A dog apparently belonging to defendant and Warsing was hanging around in front of the cabin. When Bobby walked inside, he saw his father lying on his back on the floor with his pants pockets turned inside out. He then went over to where his mother was sitting on the couch, touched her, and realized she was dead. Bobby ran out of the cabin and down the lane to call police from a home nearby.
Inside the cabin, the responding officers found Mrs. Brandt on the couch slumped over to her left side, and Mr. Brandt lying face up on the floor near the recliner, blood down the front of him and on the furniture. An expended 12-gauge shotgun shell was on the floor next to Mr. Brandt's head. Two or three suitcases were also on the floor, their contents strewn about the room. Because the Amador County Sheriffs Department did not have its own forensics lab, officers called a crime scene team from the California Department of Justice to process the cabin.
The next day, Bobby Brandt returned to the cabin to identify what, if anything, was missing from his parents' home. He determined that several items had been taken, including vials of gold, $100 bills given to his mother by his father, his mother's suitcase containing silver dollars, and her necklace with the gold nuggets. He also recognized defendant's denim jacket hanging on the back of a kitchen chair.
Some time around the end of May 1985, defendant and Warsing settled in Belle Fourche, South Dakota. Under the name Dixon, they rented an apartment and got jobs, defendant skidding logs and Warsing waiting tables in a cafe. Shortly after arriving, defendant cut his hair, and grew a goatee. He had Warsing buy him long-sleeved shirts to cover his tattoos.
Around 2:30 a.m. on July 6, 1985, Belle Fourche police received a call regarding a disturbance at defendant's apartment. Warsing left with one of the officers to go to the police station. Following her departure, defendant was arrested for assault and taken to the police station four blocks away. Because the station had only one interview room, Officer Jepsen remained in the patrol car with defendant while Warsing was inside giving a statement. While sitting in the car, defendant asked the officer "Do you want a big one?" When Jepsen didn't reply, defendant said, "Have you heard of Jerry Frye?" He told the officer he was wanted in California for a double murder.
Officers received verification of California arrest warrants for defendant and Warsing. Defendant, who appeared to be intoxicated and depressed, was advised of his Miranda rights (Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694), and agreed to give a videotaped statement. Defendant indicated he did not know if he killed the Brandts or not, but Warsing had told *43 him he did, and that he had had alcoholic blackouts in the past.
Warsing was also arrested and taken into custody. At the police station, she told the Belle Fourche officers what she remembered about the night the Brandts were killed.
Belle Fourche police contacted officers in Amador County, advising them that defendant and Warsing were in custody in South Dakota. On July 7, Amador County officers arrived in Deadwood to interview them.
Defendant was extradited to California. On his return, he was permitted to talk with Warsing by telephone through a glass partition in the jail's visiting room. Warsing continued to cooperate with police. Accompanied by Amador County investigators, she retraced the route she and defendant took on their cross-country flight from the Brandts' cabin, pointing out certain items that had been discarded or left behind along the way. With Warsing's assistance, investigators recovered the murder weapon thrown out of the car window along Highway 49 in Amador County on the day of the murders. Warsing later entered into a written immunity agreement with the Amador County District Attorney.

B. Defense Case At The Guilt Phase
The defense sought to cast doubt on Warsing's account of the Brandts' deaths. Dr. Thorton, a professor of forensic science at the University of California, conducted an examination of the physical evidence aspects of the prosecution's case, making a number of visits to the Brandts' cabin following the murders. He testified that, in his opinion, the Department of Justice inadequately processed the crime scene. He also offered his expert opinion as to the sequence of events at the time the shootings took place in the Brandts' cabin, a scenario differing from the one presented by Jennifer Warsing's testimony.
Dr. Peal, a psychiatrist who both evaluated and treated defendant, testified he did not believe Warsing's account of the Brandt murders. His conclusion was based on what defendant told him of Warsing's personal history, corroborated by investigative reports. Defense counsel also presented testimony regarding defendant's neurological impairments and their effect on his ability to recapture or articulate memory.
Counsel originally intended to call defendant to testify on his own behalf. As the trial progressed, however, counsel began to question that strategy, and ultimately advised defendant to refrain from taking the stand. Defendant followed the advice of counsel and did not testify.

C. Penalty Phase

1. Prosecution evidence
The primary focus of the prosecution's case-in-aggravation was the circumstances of the crimes. (ง 190.3, factor (a).) The prosecution also offered documentary evidence of a prior felony conviction for sexual assault. (ง 190.3, factor (c).)

2. Defense evidence
In mitigation, defendant was permitted to give an allocution to the jury, expressing to them his difficulty in accepting the guilty verdicts and his belief that they had not fully considered the evidence in the case. Defendant's friend, Frank Sturgell, and several members of his family also testified, asking for leniency. Through their testimony, the jury learned about defendant's background growing up in Indiana, including the changes he went through at age 15 following his mother's departure from Indiana with his 3 younger siblings and the serious car accident he suffered shortly thereafter. Ron Stacey, a lay chaplain for the Lawrence County jail in South Dakota, testified that defendant had accepted Christ and become a changed man while incarcerated. It was stipulated that officers from the Florida Department of Corrections and the Amador County jail, respectively, would testify that defendant posed no disciplinary problems.

II. PRETRIAL AND GUILT PHASE ISSUES

A. Tension Between Statutory Right To Speedy Trial And Constitutional Right To Effective Assistance Of Counsel
Shortly after defendant's arrest and extradition to California, the trial court appointed *44 Larry Dixon to represent him. Defendant waived his right to a speedy preliminary hearing until his counsel's first appearance. Dixon represented defendant at the preliminary hearing that commenced on October 17, 1985. Soon thereafter, Dixon moved to withdraw from his appointment, citing his lack of experience in capital cases. Following a court hearing held on June 19 and June 20, 1986, the court granted the motion to withdraw. At the hearing, and in response to the court's request for assistance in securing substitute counsel for defendant, Dixon urged the court to appoint Richard Hawk to represent defendant, and indicated that defendant desired to go to trial as soon as possible. The court declined to appoint Hawk at that time. At the conclusion of the hearing, defendant agreed to waive time for two weeks for the purpose of appointing new counsel.
Over the course of the next four months, defendant repeatedly waived his right to a speedy trial. On August 27, 1986, he agreed to vacate the previously scheduled trial date of September 2 until October 6, 1986, with the understanding that the court was making every effort to appoint counsel. On September 2, when Judd Iversen was appointed to represent defendant, Iversen informed the court that although anxious to proceed with the case, defendant was willing to waive time to allow counsel to prepare for trial. At a hearing held on October 24 to consider the appointment of cocounsel, defendant indicated to the court that if Richard Hawk were also appointed to represent him, defendant would be willing to waive time in the event Hawk was not yet available because of prior commitments. The trial court appointed Hawk to serve as cocounsel in the case.
With the appointments of Iversen and Hawk in place, defendant continued to waive time. On December 10, 1986, following a successful motion to set aside the information pursuant to section 995, defendant consented to continue the date of his rearraignment until December 16. On December 18, with the concurrence of defense counsel, defendant waived his right to have his preliminary hearing held within the statutory period in order that his attorneys would have sufficient time to prepare. Following several discovery motions and other preliminary matters, defendant's second preliminary hearing commenced on February 18, 1987.
Defendant does not contest what is disclosed by the record, that he repeatedly and voluntarily waived his statutory rights to a speedy trial and prompt preliminary examination as set forth in sections 1381 and 686, respectively. (Cf. People v. Wilson (1963) 60 Cal.2d 139, 146, 32 Cal.Rptr. 44, 383 P.2d 452 [constitutional right to speedy trial and its statutory requirements may be waived].) Defendant does complain, however, that he did so solely in order to obtain the effective assistance of counsel which he had been denied due to the trial court's appointment of Larry Dixon to represent him. Defendant claims that being forced to choose between his right to effective assistance of counsel and his right to a speedy preliminary hearing and trial violated his right to due process.
Decisions of this court and the Courts of Appeal have expressly recognized the tension between two rights guaranteed to every criminal defendant, the right to a speedy trial conferred by both the federal and state Constitutions and implemented through the time requirements in statutory provisions such as sections 686, 1381, and 1382, on the one hand, and the right to the effective assistance of counsel guaranteed by the Sixth Amendment, on the other hand. (People v. Johnson (1980) 26 Cal.3d 557, 566-569, 162 Cal.Rptr. 431, 606 P.2d 738 (Johnson); Townsend v. Superior Court (1975) 15 Cal.3d 774, 782, 126 Cal.Rptr. 251, 543 P.2d 619 (Townsend); People v. Noriega (1997) 59 Cal.App.4th 311, 320, fn. 4, 69 Cal.Rptr.2d 127; see also People v. Abdel-Malak (1986) 186 Cal.App.3d 359, 370, 233 Cal.Rptr. 115 (dis. opn. of Poche, J.).) In these cases, the tension arose when the defendant's desire to invoke the right to speedy trial by refusing to waive time came into conflict with defense counsel's request for a continuance. In resolving claims based on this conflict, the decisions have reached different conclusions depending on the circumstances of the case. (Compare Johnson, supra, 26 Cal.3d at p. 568, 162 Cal.Rptr. 431, 606 P.2d 738 [counsel *45 who sought continuance due to calendar conflict may not waive unconsenting client's right to speedy trial under section 1382] with Townsend, supra, 15 Cal.3d at pp. 783-784, 126 Cal.Rptr. 251, 543 P.2d 619 [counsel may give consent to waive time under section 1382 notwithstanding client's personal refusal to waive time].) Implicit in these decisions, however, is the notion that the inherent tension between the right to a speedy trial and the right to competent, adequately prepared counsel is not, in itself, an impermissible infringement on the rights of the accused, including the right to a fair trial.
Here, the record is devoid of evidence that defendant affirmatively objected to the delay in his proceedings. In fact, it shows the opposite, that he expressly consented to every continuance. Under these circumstances, we cannot conclude there was any conflict at all between defendant's right to speedy trial and his right to competent counsel.
Nor are we persuaded by the reasoning of the two federal circuit court decisions cited by defendant in support of his argument that having to forego the right to speedy trial in order to secure effective assistance of counsel offends principles of due process. In the first case, United States ex rel. Wilcox v. Johnson (3d Cir.1977) 555 F.2d 115 (Wilcox,) the defendant sought to testify on his own behalf. Defense counsel indicated to the trial court, however, that if the defendant were permitted to testify, she would make a motion to withdraw. The trial court informed the defendant that if he testified counsel would be permitted to withdraw and he would have to represent himself for the remainder of trial. The defendant decided not to testify. (Id. at p. 117.) Later, the federal district court granted the defendant's petition for writ of habeas corpus on the ground the defendant had a constitutional right to testify which only he could waive, and the trial court's rulings deprived the defendant of his right to a fair trial. (Ibid.)
The Third Circuit affirmed the district court's grant of habeas relief. Recognizing the defendant possessed both a statutory right to testify on his own behalf and a constitutional right to be represented by counsel, the court held the threatened loss of counsel not only violated the defendant's Sixth Amendment right to counsel but impermissibly forced the defendant to forego his statutory right to testify, thus depriving the defendant of a fair trial. Significantly, the appellate court faulted the trial court for failing to accommodate both rights by permitting the defendant to take the stand and giving the defendant the option of substituting counsel if his present counsel then sought to withdraw. (Wilcox, supra, 555 F.2d at pp. 120-121.)
Unlike in Wilcox, where the trial court could have, but failed to reconcile the conflicting rights in the manner suggested by the reviewing court, the trial court here had no need to accommodate defendant's speedy trial right with his desire to be represented by competent, adequately prepared counsel. Having obtained defendant's waiver of the time requirements of sections 686 and 1381 in order to secure counsel and to prepare for trial, the trial court was under no obligation to further consider the theoretical tension between these two rights.
In United States v. Garcia (3d Cir.1976) 544 F.2d 681 (Garcia), the defendants were promised a lenient sentence for their guilty pleas in exchange for information about their cocaine source. The defendants were not guaranteed immunity from any prosecutions which might result from the information they provided. (Id. at pp. 684-685.) The Third Circuit vacated the sentences, reasoning that the choice put to the defendants โ to remain silent and lose the possibility of leniency, or divulge information and risk prosecution โ was too coercive, and violated the defendants' constitutional protection against self-incrimination. (Id. at p. 685.)
Although the Garcia court found this particular "Hobson's choice" impermissibly abridged the Fifth Amendment right against self-incrimination, the Garcia decision does not forbid all constitutional tradeoffs. (Garcia, supra, 544 F.2d at p. 685.) Some rights are mutually exclusive. For example, a criminal defendant has a right to remain silent and a right to testify on his own behalf. He cannot do both, and hard choices are not unconstitutional.

*46 Missing transcript

In a related claim, defendant asserts the omission of a September 12, 1985, hearing transcript was prejudicial. He contends the missing information is important to the claim raised (see ante, at pp. 43-46 of 77 Cal.Rptr.2d, at pp. 201-204 of 959 P.2d) that foregoing his right to speedy trial was the quid pro quo for securing effective assistance of counsel.
The People do not dispute that a transcription of the hearing held on September 12, 1985, is missing from the record. Indeed, the record suggests the September 12 proceeding was never reported. Although the clerk's minutes of the hearing indicate the presence of a court reporter, Guy Davenport, a review of Mr. Davenport's notes from September 12 that was conducted for purposes of record certification showed no record of a hearing on that day.
An incomplete record is a violation of section 190.9, which requires that all proceedings in a capital case be conducted on the record with a reporter present and transcriptions prepared. (See also Cal. Rules of Court, rule 39.51(a)(2).) Although section 190.9 is mandatory, a violation of its provisions does not require reversal of a conviction unless the defendant can show that "the appellate record is not adequate to permit meaningful appellate review." (People v. Cummings (1993) 4 Cal.4th 1233, 1334, fn. 70, 18 Cal.Rptr.2d 796, 850 P.2d 1.) Conversely, if the record does permit the reviewing court to pass on the questions raised on appeal, the defendant has not been prejudiced by an incomplete record. (Cf. People v. Roberts (1992) 2 Cal.4th 271, 326, 6 Cal.Rptr.2d 276, 826 P.2d 274; People v. Chessman (1950) 35 Cal.2d 455, 462, 218 P.2d 769.) Where the trial record can be reconstructed by other methods, the defendant must proceed with those alternatives. (People v. Hawthorne (1992) 4 Cal.4th 43, 66, 14 Cal.Rptr.2d 133, 841 P.2d 118 (Hawthorne).)
Applying these principles, we conclude defendant was not prejudiced by the omission from the record, of a verbatim transcript of the September 12, 1985, hearing. First, we find the record does not support defendant's contention that at the unreported hearing he requested a speedy preliminary hearing and trial. The reporter's transcript from an August 20, 1985, proceeding indicates defendant personally waived time until October 1985 to hold the preliminary hearing. The record also shows the preliminary hearing commenced on October 17, 1985. Moreover, the docket entry of the clerk's notes summarizing what occurred on September 12 indicates only the resolution of pretrial discovery matters. Even if defendant's recollection of the substance of the unreported hearing is correct, our resolution of defendant's due process claim is not dependent on a verbatim recitation of the September 12 proceeding. In considering defendant's claim, ante, we took into account a number of other instances in the record in which defendant indicated his desire to go to trial as soon as possible. Because the appellate record was adequate for this court to address defendant's claim, defendant was not prejudiced by the omitted transcription. For the same reason, he was not denied the federal due process right to meaningful appellate review. (Hawthorne, supra, 4 Cal.4th at p. 67, 14 Cal.Rptr.2d 133, 841 P.2d 118.)

B. Hitch Motion

On July 31, 1987, prior to the commencement of trial, defense counsel filed a motion to dismiss the special circumstance allegations on the ground the state failed to preserve exculpatory evidence in violation of People v. Hitch (1974) 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (Hitch). The court conducted a lengthy hearing on the motion. The defense called numerous witnesses, including several members of the Department of Justice investigative team who processed the crime scene. The defense also presented the testimony of its expert criminalist, Dr. John Thorton, professor of forensic science at the University of California.
Dr. Thorton testified that, in his opinion, the crime scene processing was defective. He faulted the Department of Justice criminologists' performance in several respects, including their failure to collect what was, in his view, relevant physical evidence. He particularly criticized them for having overlooked *47 shotgun casings, for declining to collect a slipper with bloodstains on the sole, and for failing to process a number of different bloodstains, dog hair, and paw prints found at the scene.
Having heard and considered the testimony presented at the hearing and the argument of counsel, the trial court denied the Hitch motion. Citing to California v. Trombetta (1984) 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (Trombetta,) the trial court found that the defense had failed to show that the complained-of evidence was material or that it would have constituted favorable evidence on the question of guilt or innocence.
Defendant claims the trial court erred in denying his motion to dismiss the special circumstance allegations. He asserts more specifically that the failure by Department of Justice investigators to collect certain pieces of physical evidence violated the federal due process standards enunciated in Trombetta, supra, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413, and Arizona v. Youngblood (1988) 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (Youngblood).
At the time of defendant's trial, the state law governing claims based on an asserted failure by authorities to preserve evidence was found in Hitch, supra, 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361. Hitch established that the prosecution's due process duty to disclose material evidence creates a corresponding obligation to preserve such evidence. (Id. at pp. 650, 652-653, 117 Cal.Rptr. 9, 527 P.2d 361.) The rule in Hitch has been superseded in California by the principles enunciated in Trombetta and Youngblood. (People v. Cooper (1991) 53 Cal.3d 771, 810-811, 281 Cal.Rptr. 90, 809 P.2d 865 (Cooper); People v. Johnson (1989) 47 Cal.3d 1194, 1233-1234, 255 Cal.Rptr. 569, 767 P.2d 1047). Under these federal decisions, a defendant claiming a due process violation based on the failure to preserve evidence must show the exculpatory value of the evidence at issue was apparent before it was destroyed, and that the defendant could not obtain comparable evidence by other reasonable means. (Trombetta, supra, 467 U.S. at p. 489, 104 S.Ct. 2528.) The defendant must also show bad faith on the part of the police in failing to preserve potentially useful evidence. (Youngblood, supra, 488 U.S. at p. 58, 109 S.Ct. 333.) "The presence or absence of bad faith by the police ... must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (Id. at p. 57, fn. *, 109 S.Ct. 333.)
It is not entirely clear that the failure to obtain evidence falls within "`what might loosely be called the area of constitutionally guaranteed access to evidence.'" (Youngblood, supra, 488 U.S. at p. 55, 109 S.Ct. 333; see id. at pp. 56-57, 109 S.Ct. 333 [emphasizing high court's unwillingness to read due process clause as imposing on police absolute duty to retain and preserve all material that might be of conceivable evidentiary value].) Although this court has suggested that there might be cases in which the failure to collect or obtain evidence would justify sanctions against the prosecution at trial, we have continued to recognize that, as a general matter, due process does not require the police to collect particular items of evidence. (See People v. Daniels (1991) 52 Cal.3d 815, 855, 277 Cal.Rptr. 122, 802 P.2d 906; People v. Farmer (1989) 47 Cal.3d 888, 911, 254 Cal.Rptr. 508, 765 P.2d 940; People v. Hogan (1982) 31 Cal.3d 815, 851, 183 Cal. Rptr. 817, 647 P.2d 93 [duty to preserve material evidence already obtained does not include duty to obtain evidence or to conduct certain tests on it].) Even if the failure to collect evidence comes within the scope of Trombetta and Youngblood, however, defendant fails to make the requisite showing.
First, the record does not support defendant's assertion that the uncollected evidence would have been exculpatory. For example, defendant asserts that a bloody slipper found outside the Brandts' cabin should have been collected and blood typed. Citing to Dr. Thorton's testimony that blood smeared only on the sole of the slipper looked very much like someone had walked in blood, defendant claims that blood typing might have revealed the perpetrator of the murders. However, Dr. Thorton's testimony was entirely speculative. His suppositions as to the value of this piece of evidence do not establish materiality *48 in the constitutional sense. (People v. Stansbury (1993) 4 Cal.4th 1017, 1055, 17 Cal.Rptr.2d 174, 846 P.2d 756, revd. on other grounds in Stansbury v. California (1994) 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (Stansbury); People v. Fauber (1992) 2 Cal.4th 792, 829, 9 Cal.Rptr.2d 24, 831 P.2d 249 (Fauber).)
Moreover, in light of the state criminologist's equally reasonable belief that the bloody slipper had been dragged outside the cabin by a dog, the exculpatory value of this piece of evidence, assuming there would have been some, is not likely to have been apparent to members of the investigative team at the time they processed the crime scene. (See Trombetta, supra, 467 U.S. at p. 489, 104 S.Ct. 2528.)
The same holds true for the two other items of bloodstain evidence defendant asserts should have been collected. Dr. Thorton testified that with proper processing, bloodstains in the vicinity of Robert Brandt and in the southeast corner of the cabin would have enabled further reconstruction of the murders. This testimony, even if believed, does not suggest the results of this reconstruction would have been exculpatory. Moreover, there were extensive bloodstains at the scene, many of which were photographed for purposes of crime reconstruction. Like the failure to collect and process the bloody slipper, it is unlikely the state criminologists saw anything of particular value in the bloodstain evidence defendant now complains should have been collected. (Cf. People v. Bradley (1984) 159 Cal.App.3d 399, 408, 205 Cal.Rptr. 485 (Bradley) [police had no duty to collect bloodstained articles found at scene of crime to preserve them for defendant's use].)
Nor does defendant show bad faith on the part of the state's criminologists who processed the crime scene. Defendant points to nothing in the record indicating investigators perceived any exculpatory value to the uncollected evidence. (Youngblood, supra, 488 U.S. at p. 57, 109 S.Ct. 333.) The trial court did not err in denying defendant's Hitch motion.

Asserted curtailment of Dr. Thorton's testimony at trial
In a related claim, defendant contends the trial court's repeated curtailment of Dr. Thorton's testimony at the guilt phase denied him the right to a defense in violation of the federal Constitution. Pointing to a number of instances in which the trial court curtailed the testimony of Dr. Thorton by sustaining the People's objection to a line of questioning, defendant asserts more specifically that the trial court's rulings made it impossible for him to present evidence regarding deficiencies in the investigation to try to discredit the People's case against him.
In one such ruling, defense counsel showed Dr. Thorton a crime scene photograph featuring what appeared to be Mexican pesos and sought to elicit his opinion as to whether a criminologist processing a crime scene in California would have collected such evidence. The prosecutor objected to the evidence as immaterial and the trial court sustained the objection, noting that the decision whether or not to collect certain pieces of evidence is dependent on the particular circumstances of each case. Defendant argues that this testimony was necessary to show that the crime scene was not properly catalogued.
As a general proposition, the ordinary rules of evidence do not infringe on a defendant's right to present a defense. (People v. Babbitt (1988) 45 Cal.3d 660, 682-683, 248 Cal.Rptr. 69, 755 P.2d 253 (Babbitt).) Trial courts possess the "traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (People v. Hall (1986) 41 Cal.3d 826, 834, 226 Cal.Rptr. 112, 718 P.2d 99.) The trial court's rulings in this regard will not be overturned on appeal unless it can be shown that the trial court abused its discretion. (Cooper, supra, 53 Cal.3d at p. 816, 281 Cal.Rptr. 90, 809 P.2d 865.) Nonetheless, the trial court's discretion is not without limits, particularly if it operates to hamper defense counsel's ability to present evidence. (Ibid.)
Because the proffered opinion testimony was of limited probative value to the investigation *49 of the Brandts' murders, the trial court could reasonably find it potentially confusing. (Evid.Code, ง 352.) It was thus a proper exercise of the trial court's discretion to exclude it.
As for the other rulings sustaining the prosecutor's objections to Dr. Thorton's testimony, in each instance, the trial court could reasonably have found the proffered testimony irrelevant or cumulative. Moreover, the record indicates the defense did present a substantial amount of evidence relating to the adequacy of the investigation, including Dr. Thorton's expert opinion that the crime scene had been poorly processed. In addition, the defense elicited on cross-examination a concession from one member of the Department of Justice's investigation unit that his team did no blood typing and took no measurements of the cabin. Given the scope of the testimony that was presented to the jury, we conclude the trial court's rulings did not hamper defense efforts to probe the inadequacies of the investigation or otherwise unduly limit defendant's ability to present a defense. No error occurred.

C. Curtailment Of Defense Cross-Examination
Defendant claims the trial court erroneously sustained a number of objections during cross-examination of prosecution witnesses in violation of his right to confront the witnesses against him guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.
"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, `to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" (Delaware v. Van Arsdall (1986) 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (Van Arsdall,) quoting Davis v. Alaska (1974) 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347.) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (Van Arsdall, supra, 475 U.S. at pp. 678-679, 106 S.Ct. 1431; see Cooper, supra, 53 Cal.3d at p. 817, 281 Cal.Rptr. 90, 809 P.2d 865.) California law is in accord. (See People v. Belmontes (1988) 45 Cal.3d 744, 780, 248 Cal. Rptr. 126, 755 P.2d 310.) Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" (Van Arsdall, supra, 475 U.S. at p. 680, 106 S.Ct. 1431), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. (Cooper, supra, 53 Cal.3d at p. 817, 281 Cal. Rptr. 90, 809 P.2d 865.)
According to defendant, a number of the trial court's rulings prevented the defense from showing the jury that certain witnesses were biased or untruthful. For example, defendant complains the trial court improperly curtailed the cross-examination of Ron Wilson. Wilson testified on direct examination that on the day of the murders he drove past the Brandts' cabin to explore a mining interest of his own further up the property. As he headed back towards the cabin to see if the Brandts were home, Wilson met defendant walking up the road. Defendant showed Wilson his marijuana-growing operation. Later that afternoon, defendant accompanied Wilson into town, where they drank beer together and discussed drip irrigation systems for the marijuana. On cross-examination, defense counsel questioned Wilson about various aspects of marijuana cultivation, and sought to elicit from him where he had "learn[ed] about weed." Finding the question immaterial, the trial court sustained the prosecutor's objection.
We find no error. The trial court could reasonably find the proffered line of cross-examination was not relevant to any disputed fact of consequence to the question of defendant's guilt of the charged crimes, or to Wilson's veracity. (Evid.Code, ง 210.) To *50 the extent Wilson's involvement with marijuana had any bearing on his credibility as a witness, the source of his knowledge on marijuana would have added little to defense counsel's efforts to discredit him on this basis. The jury was presented with evidence that Wilson was growing marijuana in flats kept at his girlfriend's house and that he had asked defendant to care for the plants. Because defendant cannot show that the introduction of the excluded line of cross-examination would have produced a significantly different impression of Wilson's credibility (Van Arsdall, supra, 475 U.S. at p. 680, 106 S.Ct. 1431), we conclude the trial court's ruling did not violate defendant's rights under the Sixth Amendment.
As to the remainder of the rulings cited by defendant, none show an abuse of discretion by the trial court. In each of the rulings, the trial court could reasonably find the evidence lacking in relevance and, in some instances, potentially prejudicial. Moreover, defendant fails to show how any of the prohibited cross-examination might reasonably have produced a significantly different impression of the witnesses' credibility. (Cooper, supra, 53 Cal.3d at p. 818, 281 Cal.Rptr. 90, 809 P.2d 865.)
Because the prosecutor's opening statement made reference to the Brandts' kindness, defendant contends it was error for the trial court to prohibit defense counsel from soliciting evidence on cross-examination regarding the Brandts' possible involvement in drug smuggling.[1]
During a break in cross-examination of the victims' son, the prosecutor made a motion in limine to prevent defense counsel from attempting to elicit from the witness information regarding his brother's conviction of a drug-related offense. The prosecutor argued that because there was no evidence of drug involvement in the present case, such testimony was irrelevant. Defense counsel responded that he had information the witness had a boat business in Florida while the elder Brandts were residing there, and the boats were used by the other brother in his drug-smuggling operation. Counsel argued that certain property transfers by the victims indicated the father may have had some financial involvement in his son's drug operation which would be relevant to the substantial amounts of cash the victim carried prior to and at the time of the murders. Finding the amount and source of the victim's money irrelevant to the charges and the focus of the proposed inquiry prejudicial, the court granted the prosecutor's motion to prohibit this line of questioning.
As previously noted, the ordinary rules of evidence, including the application of Evidence Code section 352, do not infringe on the accused's due process right to present a defense. (Babbitt, supra, 45 Cal.3d at pp. 682-683, 248 Cal.Rptr. 69, 755 P.2d 253; People v. Reeder (1978) 82 Cal.App.3d 543, 553, 147 Cal.Rptr. 275.) Moreover, this court will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless it is shown the trial court exercised its discretion "`in an arbitrary, capricious or patently absurd manner.'" (People v. Sanders (1995) 11 Cal.4th 475, 512, 46 Cal.Rptr.2d 751, 905 P.2d 420 (Sanders); Cooper, supra, 53 Cal.3d at p. 816, 281 Cal.Rptr. 90, 809 P.2d 865.) Here, the trial court could reasonably *51 find the connection between the victims and their son's illicit activities highly attenuated, thus posing a risk of diverting the jury's attention to extraneous matters. (Evid.Code, ง 352.) We conclude the trial court acted within its discretion in prohibiting defense counsel from delving into the drug-smuggling operation and conviction of the victims' son.

D. Failure Of The Trial Court To Suspend Proceedings And Order A Competency Hearing During The Guilt Phase
The defense strategy at the outset of the guilt phase called for defendant to testify on his own behalf. During opening statements, counsel told the jury defendant wanted to take the witness stand to tell what he remembered. Counsel also informed jurors they would hear expert witnesses testify that defendant suffers neurological and psychiatric impairments affecting his ability to recapture or articulate memory.
One of the expert witnesses, Dr. McGuire, administered a series of neurological tests. At trial, he testified that, in his opinion, defendant suffers from "static encephalopathy." According to Dr. McGuire, this type of impairment may result in personality problems, intolerance of stress, lack of initiative or self-drive, and difficulty with memory. Thus, it would affect an individual's ability to testify because the stress of doing so may result in patchy memory, much in the same way stage fright affects some individuals. Dr. McGuire characterized defendant's memory deficits as relatively mild.
Dr. Peal, a psychiatrist, was originally retained by Larry Dixon to determine whether defendant required treatment and whether there was any basis for a section 1368 competency hearing or a psychiatric defense. Over a two-and-a-half-year period, he conducted more than twenty interviews with defendant. According to Dr. Peal, the interviews were challenging because although defendant could answer questions concerning facts or events, he could not relate them to each other in a time frame and had difficulty thinking abstractly.
In addition to his many hours interviewing defendant, Dr. Peal examined defendant's medical and jail records, and reviewed the videotaped statement defendant gave to Belle Fourche police. Dr. Peal testified that, in his opinion, defendant was brain damaged due to an automobile accident occurring when he was 15 years old that resulted in a fracture at the base of defendant's skull which led to 5 episodes of meningitis. The residual effects of the meningitis left defendant with certain psychological and neurological defects.
According to Dr. Peal's testimony, the impairment in defendant's brain functions manifests itself in stressful situations, and results in a clouded consciousness. This condition does not mean defendant is insane, pathological or psychotic. Rather, when under stress or the influence of drugs or alcohol, defendant's ability to think and recall, as well as his emotional control and behavior are impaired. Dr. Peal found the stress defendant felt while waiting in jail resulted in memory problems, depression, agitation, and suspicion.
As the guilt phase of the trial progressed, the defense team began to question their original strategy to call defendant to testify on his own behalf. While preparing defendant for testifying, counsel found that defendant was having difficulty "pulling information from memory." They believed defendant could not retain information long enough for them to properly prepare him to testify. On April 21, 1988, towards the end of the defense case-in-chief, defense counsel and defendant met with the trial court in chambers, outside the prosecutor's presence, to discuss their concerns. Lead counsel Iversen stated to the court as follows:
"[A]s we were preparing for testimony, you would go through the various events. You would then come back and generally, if you had a question, you would expect an answer. You would expect certain information in that answer, [ถ] He has difficulty pulling that same information from memory. In other words, he is not trying to lie or change his story in any way; but rather, he somehow has difficulty bringing out from *52 memory what is there that he should have in response to his โ to that question. Basically, I think it's, he can't retain material long enough for us to properly prepare him to testify. [ถ] When we spoke to Dr. Peal when he was here testifying, Dr. Peal, on the witness stand, expressed reservations about a number of problems that [defendant] would have testifying. [ถ] In private we spoke to [Dr. Peal]. He indicated that one of the problems, in addition to the other ones he talked about, is that the meningitis decreased the strength of the blood vessels to the brain and that there is a problem sometimes with blood getting to the brain. [ถ] Dr. Peal was concerned not only with what he spoke about here, but also the potential that [defendant] could have a stroke because of the problem with getting blood to the brain, based on the pressure and stress he is under now, plus the stress that he would be under if he testified on the witness stand. [ถ] It is a matter of some concern to me, putting him on the witness stand, because of not only what has been testified to, but these additional problems. But also, I think, because of his physical and mental problems he has been having, he really can't assist me in terms of preparing him to testify, because he, one, can't bring things up from his memory to tell me about them, and secondly, we can't rely, if you ask the same question two days in a row, that you will get all the information. You may certainly get part of it."
Acknowledging the existence of a juvenile record, assaultive conduct, and other circumstances militating against having defendant testify, counsel continued:
"[Mr. Iversen:] I believe and I have told Mr. Frye that despite the many hours of preparation, I think that because of this impairment that he has, it's virtually impossible for me to feel that he is prepared to testify or that he can properly testify.
"And I have researched the [section] 1368 issue in terms of a client that [sic] is unable to assist you. It doesn't seem to fit into that area. But basically, if it hadn't been for the Peal testimony, I would consider asking for an appointment of an expert under [Evidence Code section] 730. But we have got the testimony of Dr. Peal. I think it's clear we have also got the testimony of Dr. McGuire.
"I bring this up to the Court. Mr. Frye has indicated he desires to testify. It's my view that, because of this impairment, that he really can't. But we are at this particular place. And that's why I am bringing it to the Court's attention."
"[The Court:] In other words, if I understand it correctly, you recommend that he doesn't testify and he wants to testify.
"[Mr. Iversen:] Mr. Frye wants to testify.
"I think it's โ the concern I have is that there are sometimes questions of tactics and strategy that affect this opinion.
"My opinion is based not on tactical considerations, because, clearly, there are โ there is a lot of information that I would like him to convey to the jury. I believe, because of his physical and mental disability, that he is not able to do that. So I suppose I am forced into this position of saying, because of that, I think it's โ you know, he can't do it. That's different, I suppose, than the usual decisions we make, in terms of why a person testifies or doesn't testify.
"I can't find any guidance in the law in terms of this kind of situation. The ordinary situation where a defendant can't assist his counsel โ it's for reasons other than this. And you don't generally have this problem where a person can't assist in this way.
"I am bringing it to the Court's attention and asking for the Court's guidance on it. It's not something I know how to resolve."
The court replied that, notwithstanding counsel's concerns, the decision whether or not to testify was one for defendant to make. The court stated moreover that if defendant wanted to testify, he could do so. Addressing defendant directly, the trial court asked if he understood it would have to be his decision whether he wanted to testify or not, to which defendant replied, "Yes." The trial court encouraged him to give ample thought to the advice of counsel. At a second in camera hearing the next day, defendant informed the trial court that he had taken his attorneys' advice not to testify.
*53 Defendant contends the trial court erred by failing to order, sua sponte, a section 1368 competency hearing following the exchange between court and counsel at the first in camera hearing. Defendant also asserts that trial counsel was ineffective for not adequately raising the issue of defendant's competence at that time. Because the record fails to disclose substantial evidence of defendant's mental incompetence, both claims fail.
A defendant is incompetent to stand trial when he suffers a mental disorder or developmental disability rendering him "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (ง 1367; see also People v. Danielson (1992) 3 Cal.4th 691, 726, 13 Cal.Rptr.2d 1, 838 P.2d 729 (Danielson).) As a matter of due process, the trial court is required to conduct a section 1368 hearing to determine a defendant's competency whenever substantial evidence of incompetence has been introduced. (People v. Hale (1988) 44 Cal.3d 531, 539, 244 Cal.Rptr. 114, 749 P.2d 769; People v. Stankewitz (1982) 32 Cal.3d 80, 92, 184 Cal. Rptr. 611, 648 P.2d 578; People v. Pennington (1967) 66 Cal.2d 508, 518, 58 Cal.Rptr. 374, 426 P.2d 942.) Substantial evidence is evidence that raises a reasonable doubt about the defendant's competence to stand trial. (People v. Davis (1995) 10 Cal.4th 463, 527, 41 Cal.Rptr.2d 826, 896 P.2d 119 (Davis); People v. Howard (1992) 1 Cal.4th 1132, 1163, 5 Cal.Rptr.2d 268, 824 P.2d 1315 (Howard); People v. Jones (1991) 53 Cal.3d 1115, 1152, 282 Cal.Rptr. 465, 811 P.2d 757 (Jones).)
Defendant points to the trial testimony of defense experts, Dr. McGuire and Dr. Peal, as well as statements by counsel regarding his inability to pull information from memory in preparation for testifying, as substantial evidence of incompetence. However, the record does not support his contention.
Contrary to defendant's view, nothing in the testimony of Dr. McGuire or Dr. Peal raises a reasonable doubt as to defendant's ability to understand the nature of the proceedings, or to assist counsel in the conduct of his defense. Both experts emphasized his inability to tolerate stressful situations, and their testimony indicated the stress of trial would make it difficult for him to testify on his own behalf. It does not follow from such testimony that he was incompetent to stand trial; only that he might be unable to recapture memory if called to the witness stand. (Cf. People v. Rodrigues (1994) 8 Cal.4th 1060, 1110-1111, 36 Cal.Rptr.2d 235, 885 P.2d 1.)
Similarly, counsel's expressions of concern that defendant could not retain information long enough to properly prepare to testify do not constitute substantial evidence of incompetence. Counsel did not suggest at any time that defendant was incapable of assisting in his defense, or that counsel was having difficulty communicating with defendant generally. Indeed, the record indicates defendant had brought new matters to his attorneys' attention during the guilt phase of trial.
In a related claim, defendant contends counsel's failure to adequately raise the question of defendant's competency at the in camera hearing deprived him of his right to counsel under the Sixth Amendment and analogous provisions of the California Constitution. Trial counsel's representation of defendant is constitutionally deficient if it "fell below an objective standard of reasonableness" (Strickland v. Washington (1984) 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (Strickland)), and, but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. (Ibid.; People v. Kelly (1992) 1 Cal.4th 495, 519-520, 3 Cal. Rptr.2d 677, 822 P.2d 385.) Because, as we have concluded (see ante, at pp. 52-53 of 77 Cal.Rptr.2d, at 210-211 of 959 P.2d), the record does not reflect substantial evidence of mental incompetence, counsel did not render ineffective assistance by failing to raise a section 1368 motion. (Cf. Davis, supra, 10 Cal.4th at p. 527, 41 Cal.Rptr.2d 826, 896 P.2d 119; Rodrigues, supra, 8 Cal.4th at p. 1112, 36 Cal.Rptr.2d 235, 885 P.2d 1.)
Moreover, even if counsel had expressly questioned defendant's competence to stand trial, it is not reasonably probable that the result would have been different. (Strickland, supra, 466 U.S. at p. 688, 104 S.Ct. *54 2052.) As our decisions in Howard, supra, 1 Cal.4th 1132, 5 Cal.Rptr.2d 268, 824 P.2d 1315, and Rodrigues, supra, 8 Cal.4th 1060, 36 Cal.Rptr.2d 235, 885 P.2d 1, make clear, a trial court is not required to order a competency hearing based on counsel's perception that his client may be incompetent. Here, the record shows the trial court did not doubt defendant's competence to stand trial following the in camera exchange between court and counsel. Indeed, later in the proceedings and in response to a defense motion to vacate the guilt phase verdict, the trial court expressly stated that nothing raised at the midtrial hearing caused the court to have any doubts as to defendant's competency. Having no doubt regarding defendant's competence to stand trial, the court was not required by section 1368 to suspend the proceedings and conduct a hearing. (See Howard, supra, 1 Cal.4th at pp. 1163-1164, 5 Cal.Rptr.2d 268, 824 P.2d 1315; Davis, supra, 10 Cal.4th at pp. 526-527, 41 Cal.Rptr.2d 826, 896 P.2d 119; Rodrigues, supra, 8 Cal.4th at pp. 1111-1112, 36 Cal.Rptr.2d 235, 885 P.2d 1.)

E. Sufficiency Of The Evidence

1. Burglary
Defendant claims the evidence is insufficient to support his convictions for burglary and first degree murder under the theory of felony-murder burglary, or the burglary-murder special-circumstance finding. Defendant's claim of insufficient evidence requires us to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Cf. People v. Alvarez (1996) 14 Cal.4th 155, 224-225, 58 Cal.Rptr.2d 385, 926 P.2d 365; People v. Clair (1992) 2 Cal.4th 629, 670, 7 Cal.Rptr.2d 564, 828 P.2d 705 (Clair); People v. Jackson (1989) 49 Cal.3d 1170, 1199-1200, 264 Cal.Rptr. 852, 783 P.2d 211 (Jackson); Johnson, supra, 26 Cal.3d at p. 576, 162 Cal.Rptr. 431, 606 P.2d 738; cf. People v. Mickey (1991) 54 Cal.3d 612, 678, 286 Cal.Rptr. 801, 818 P.2d 84 [applying same standard for reviewing sufficiency of evidence for special circumstance].) In making this determination, we view the evidence presented at trial in the light most favorable to the prosecution. (Id. at p. 678, 286 Cal. Rptr. 801, 818 P.2d 84.)
Defendant asserts the evidence is insufficient because he entered the Brandts' cabin at the personal invitation of Mrs. Brandt. Defendant's argument is based on the erroneous premise that a burglary has not occurred if a person enters a building with the owner's express consent.
Any person who enters a house or building with the intent to commit a felony or theft is guilty of burglary. (ง 459.) The entry need not be a trespass to support a burglary conviction. (People v. Talbot (1966) 64 Cal.2d 691, 700, 51 Cal.Rptr. 417, 414 P.2d 633, overruled on other grounds in People v. Ireland (1969) 70 Cal.2d 522, 540, 75 Cal.Rptr. 188, 450 P.2d 580.) Thus, a person who enters for a felonious purpose may be found guilty of burglary even if he enters with the owner's or occupant's consent. (People v. Sears (1965) 62 Cal.2d 737, 746, 44 Cal.Rptr. 330, 401 P.2d 938; People v. Deptula (1962) 58 Cal.2d 225, 228, 23 Cal. Rptr. 366, 373 P.2d 430; In re Andrew I. (1991) 230 Cal.App.3d 572, 578-579, 281 Cal. Rptr. 570.)
Notwithstanding these settled principles, defendant asserts that People v. Gauze (1975) 15 Cal.3d 709, 125 Cal.Rptr. 773, 542 P.2d 1365 (Gauze), supports his view that Mrs. Brandt's invitation to enter the cabin precludes a burglary conviction. In Gauze, the court stated that in order for burglary to occur, "`[t]he entry must be without consent. If the possessor actually invites the defendant, or actively assists in the entrance, e.g., by opening a door, there is no burglary.'" (Id. at pp. 713-714, 125 Cal.Rptr. 773, 542 P.2d 1365, quoting 1 Witkin, Cal. Crimes (1963) Crimes Against Property, ง 457, p. 419.) Defendant takes this statement out of context. Moreover, later decisions make clear that Gauze is inapposite.
In Gauze, supra, 15 Cal.3d 709, 125 Cal. Rptr. 773, 542 P.2d 1365, the defendant was convicted of burglary after he entered his own apartment with the intent to assault his roommate. The court concluded the defendant could not be guilty of burglarizing his own home, even if he entered with a felonious intent, because burglary requires an entry that invades a possessory right in a building, *55 and must be committed by someone who has no right to be in the building. (Id. at p. 714, 125 Cal.Rptr. 773, 542 P.2d 1365.) As People v. Pendleton (1979) 25 Cal.3d 371, 158 Cal. Rptr. 343, 599 P.2d 649 (Pendleton) explained, Gauze did not overrule earlier decisions finding burglary convictions proper when there was a consensual entry. (Pendleton, supra, 25 Cal.3d at p. 382, 158 Cal. Rptr. 343, 599 P.2d 649.) "The law after Gauze is that one may be convicted of burglary even if he enters with consent, provided he does not have an unconditional possessory right to enter." (Ibid.; see also People v. Salemme (1992) 2 Cal.App.4th 775, 779-781, 3 Cal.Rptr.2d 398.)
Although the evidence shows defendant was invited into the Brandts' cabin on the early evening of May 14, 1985, there is no evidence from which to reasonably infer defendant had an unconditional possessory right to enter. Indeed, Rick Evans testified that before setting up the campsite and marijuana-growing operation, he sought and obtained the Brandts' permission for the group to camp on the property. Viewing this evidence in a light most favorable to the prosecution, the jury could reasonably have found such action to be inconsistent with the notion that any member of the group enjoyed an unconditional possessory right to any of the property, including the Brandts' cabin.
Moreover, there is substantial evidence supporting defendant's burglary conviction. According to Warsing's testimony, defendant told her on the night of the murders he was planning to "just take what he could" and was going to go down and kill the Brandts. Defendant then armed himself with a shotgun, ushered Warsing down the hill to the planned visit with the Brands, and promptly committed the crimes. Ron Wilson testified that earlier the same day defendant told him Mr. Brandt "should be more careful about displaying the bundle he has or somebody would hit him in the head and take it from him." Garth Lavalee testified to the same effect. The testimony of these witnesses, in conjunction with evidence defendant had no steady income and had come to Amador County to cultivate marijuana for profit, provides ample support for the conclusion that defendant entered the Brandts' cabin with the intent to commit theft. The jury properly convicted defendant of burglary, and burglary felony murder, and found true the burglary-murder special-circumstance allegation.

2. Robbery
Defendant was convicted of first degree robbery and two counts of robbery felony murder, and the jury found true the special circumstance allegation that the murders occurred during commission of a robbery. Defendant contends the evidence is insufficient to support the convictions and special circumstance finding. More specifically, he argues that because Robert and Jane Brandt were dead at the time their property was taken, there was no evidence of a taking from the "person or immediate presence" of the victims.
Section 211 defines the crime of robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Property is in the "`"[immediate] presence"'" of the victim when it "`"is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it."'" (People v. Hayes (1990) 52 Cal.3d 577, 626-627, 276 Cal.Rptr. 874, 802 P.2d 376 (Hayes), quoting Commonwealth v. Homer (1920) 235 Mass. 526, 533 [127 N.E. 517].) As Cooper, supra, 53 Cal.3d at page 1166, 282 Cal.Rptr. 450, 811 P.2d 742 explains, the requirement that the taking be from the "`person'" or "`immediate presence'" of the victim describes a spatial relationship between the victim and the victim's property, and refers to the area from which the property is taken. Thus, the decisions addressing the "immediate presence" element of robbery have focused on whether the taken property was located in an area in which the victim could have expected to take effective steps to retain control over his property. (See, e.g., People v. Harris (1994) 9 Cal.4th 407, 422-424, 37 Cal.Rptr.2d 200, 886 P.2d 1193 [victim forcibly restrained in car outside office and home while robbers looted each location]; People v. Webster (1991) 54 Cal.3d 411, 439-442, *56 285 Cal.Rptr. 31, 814 P.2d 1273 [defendants induced victim to walk a quarter-mile away from his car, then killed him and took his car]; Hayes, supra, 52 Cal.3d at pp. 626-629, 276 Cal.Rptr. 874, 802 P.2d 376 [victim assaulted and killed 107 feet from motel office where property was taken]; People v. Bauer (1966) 241 Cal.App.2d 632, 641-642, 50 Cal.Rptr. 687 [defendant killed victim inside her apartment, then stole victim's keys and took her car parked outside].)
Here, Warsing testified at trial that after defendant shot the Brandts, he ordered Warsing to take the money from Mrs. Brandt's purse. Defendant then directed her to go into the bedroom and find the suitcase containing Mrs. Brandt's gambling change. While Warsing was in the bedroom looking for the suitcase, she heard defendant going through Mr. Brandt's pockets. Defendant also took vials of gold from the kitchen counter, and ripped the gold necklace off of Mrs. Brandt's neck. The prosecution also placed into evidence photographs of the Brandts' cabin showing a small rustic structure, with one bedroom, a family room, and kitchen. From this evidence the jury could have reasonably inferred that had the Brandts not been shot by defendant, they could have taken effective steps to retain control of their property.
Defendant offers no authority for the proposition that a perpetrator who succeeds in killing his victim before taking the victim's personal property cannot be guilty of robbery. Defendant's claim of insufficient evidence is premised on a misunderstanding of the immediate presence element of robbery. So long as defendant formed the intent to take the Brandts' possessions before killing them, he was properly convicted of robbery. (Cf. People v. Kelly, supra, 1 Cal.4th at pp. 528-529, 3 Cal.Rptr.2d 677, 822 P.2d 385; People v. Green (1980) 27 Cal.3d 1, 52-54, 164 Cal.Rptr. 1, 609 P.2d 468.) From the same evidence supporting the jury's determination that defendant entered the Brandts' cabin with the intent to steal, recounted ante, the jury could reasonably infer defendant intended to take the Brandts' money and property before he shot them. We conclude substantial evidence supports the convictions of first degree robbery murder and robbery, as well as the robberymurder special-circumstance finding.

F. Jury Instructions
Defendant contends the trial court committed numerous errors in instructing the jury, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and analogous provisions of the California Constitution.
In reviewing the purportedly erroneous instructions, "we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (Estelle v. McGuire (1991) 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385, quoting Boyole v. California (1990) 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (Boyde).) In conducting this inquiry, we are mindful that "`a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" (Boyde, supra, 494 U.S. at p. 378, 110 S.Ct. 1190, quoting Cupp v. Naughten (1973) 414 U.S. 141, 146-147, 94 S.Ct. 396, 38 L.Ed.2d 368; see also People v. Burgener (1986) 41 Cal.3d 505, 538, 224 Cal.Rptr. 112, 714 P.2d 1251 (Burgener) [under California law, correctness of jury instructions determined from entire charge of the court].)

1. Preliminary instruction regarding the information
During jury selection, the trial court read to one group of prospective jurors the charges against defendant set forth in the information. The court then stated, "Now, Ladies and Gentlemen, the information I've just read to you is a mere formal charge. It's not offered and not to be considered by you as such."
Defendant contends that the trial court's omission of the word "evidence" from this instruction was confusing to the jury and prejudicial because a copy of the information was given to the jury for use during deliberations.
Although the court misspoke by dropping the word "evidence" from its initial instruction *57 to one group of prospective jurors, it correctly charged the members of the jury prior to their deliberations that "[t]he Information is a mere formal charge. It's not evidence and is not to be considered as such." It is not reasonably likely the jury was confused by the trial court's mistake during jury selection.

2. Burden of proof
Citing In re Winship (1970) 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (Winship), and its progeny, defendant claims a number of the instructions shifted the burden of proof in violation of the due process clause, which "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (Id. at p. 364, 90 S.Ct. 1068.)
Defendant first complains the trial court's numerous references to "innocence" during the course of charging the jury placed on him the burden of establishing his innocence of the charged crimes.
The trial court instructed jurors not to be biased against defendant because he has been charged with a crime or brought to trial, nor to infer from these circumstances that defendant is more likely to be guilty than innocent. The court also instructed, in connection with the principle that motive is not an element of the charged crimes, that "[a]bsence of motive may tend to establish innocence." Regarding flight after commission of a crime, the court explained that evidence of flight is not sufficient to establish guilt, but if proved, "may be considered by you in light of all other proved facts in deciding the question of [] guilt or innocence.... You may consider evidence that there may be reasons which are consistent with innocence."
Defendant's assertion to the contrary, the trial court's reference to "innocence," did not shift any burden of proof. Prior to its deliberations, the jury was instructed pursuant to CALJIC No. 2.90 on the presumption of innocence and its corresponding burden on the prosecution to prove defendant guilty beyond a reasonable doubt. The trial court emphasized the point when instructing on other principles of law applicable to the case. For example, during the course of instructing on unconsciousness, the trial court informed jurors that if, after considering all the evidence they had a reasonable doubt that the defendant was conscious at the time the crime was committed, they must find him not guilty. Moreover, in the prosecutor's closing remarks, she explained to the jury that the People had the burden of proof on each and every count. Viewing the instructions as a whole, and in light of the record at trial, we conclude it is not reasonably likely the jury understood the challenged instructions to mean defendant had the burden of establishing his innocence. (People v. Osuna (1969) 70 Cal.2d 759, 767-768, 76 Cal.Rptr. 462, 452 P.2d 678.)
Defendant next faults the trial court's instruction on admissions. Jennifer Warsing testified at trial that defendant told her on the evening of the murders, "The devil is here. I'm going to do something bad." Because of this testimony, the trial court instructed the jury on the principles of law pertaining to admissions. Using the standard instruction, CALJIC No. 2.71, the court defined the term "admission" as a statement tending to prove guilt, and informed the jurors that if they found defendant did not make the statement, they must reject it, but if they found defendant made the statement and it is true in whole or in part, they may consider the part found to be true. The court concluded by warning the jury that it should view evidence of an oral admission by defendant with caution.
Defendant contends the trial court's instruction constituted impermissible burdenshifting in that it left the jury wondering by what standard of proof the People had to establish the statement was made.
This claim lacks merit for several reasons. First, we cannot discern from defendant's argument how the complained-of instruction shifted the prosecutor's burden of proving every element of the charged crimes beyond a reasonable doubt to defendant, or how the due process principles of Winship and its progeny are otherwise implicated here.
*58 Even if, as defendant asserts, the jury was left at sea as to the quantum of proof necessary to find defendant made the statement attributed to him by Warsing, he was not prejudiced by it. CALJIC No. 2.71 is a cautionary instruction, admonishing the jury regarding its consideration of any incriminating statements ascribed to the defendant by a witness at trial. (People v. Livaditis (1992) 2 Cal.4th 759, 784, 9 Cal.Rptr.2d 72, 831 P.2d 297; People v. Beagle (1972) 6 Cal.3d 441, 456, 99 Cal.Rptr. 313, 492 P.2d 1.) Under any standard of proof, the effect of the instruction is beneficial to defendant. The courts have long recognized the dangers and abuses inherent in evidence of verbal admissions. (See, e.g., People v. Bemis (1949) 33 Cal.2d 395, 399, 202 P.2d 82.) "`No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself.' (2 Jones, Commentaries on the Law of Evidence, 620.)" (39 Cal.2d at p. 399, 247 P.2d 313.) The trial court did not err in administering the cautionary language of CALJIC No. 2.71.
Defendant next complains the instruction that the "identity of the person who is alleged to have committed a crime is not an element of the crime" relieved the People of all burden in the case because the principal issue before the jury was identity. The quoted passage is part of the standard instruction explaining the principles of the corpus delicti rule, which provides in full that "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any confession or admission made by him outside of this trial. [ถ] The identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. The identity or degree of the crime may be established by a confession or admission." (CALJIC No. 2.72.)
Under this instruction, the jury is informed that a defendant cannot be convicted of a crime unless there is proof as to each element of the offense independent of his extrajudicial confession or admission. Once the prosecution has proved the corpus delicti of murder, however, the prosecution may use evidence of a confession or admission to establish identity. Although the jury was not specifically instructed pursuant to CALJIC No. 2.91, that "[t]he burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged," nonetheless, the challenged instruction did not relieve the prosecution from proving that defendant committed the charged crimes. It provided only that the prosecution could rely on extrajudicial admissions to prove identity once the corpus delicti had been established. (Cf. People v. Bacigalupo (1991) 1 Cal.4th 103, 129, 2 Cal.Rptr.2d 335, 820 P.2d 559 (Bacigalupo) [rejecting defendant's argument that corpus delicti instruction relieves People of burden of proving premeditation and deliberation necessary to establish first degree murder].) In light of the parties' steadfast focus on the issue of identity at trial, including the consistent position by the defense that defendant did not kill the Brandts and the extensive evidence presented by the People connecting him to the crimes, we conclude there is no reasonable likelihood the jury would have understood the prosecution had no obligation to prove defendant was the person who committed the offenses.
Defendant also finds an impermissible burden-shifting in the trial court's instruction on the use of hypotheticals posed to expert witnesses. Consistent with CALJIC No. 2.82, the trial court informed jurors they had to determine from all of the evidence that the facts assumed in the hypothetical have been proved. If they found any assumption in the hypothetical not proved, they should determine what effect the failure of proof had on the weight of the expert's opinion.
Defendant claims that because this instruction did not inform the jury who had the burden of proving or disproving hypotheticals, it allowed the jury to presume the prosecutor's hypotheticals were proven and defendant had the burden of disproving them. Defendant again confuses the elements of the crime with the evidence used to support them. The scope of the due process protections *59 articulated in Winship, supra, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, and its progeny does not extend to the latter.
Moreover, nothing in the instruction would have led the jury to evaluate the experts' testimony in the manner defendant suggests. It is within the province of the jury to determine both the truth of a hypothetical's assumed facts, and the evidentiary weight to be given to an expert's opinion that is based on the assumed facts. (Treadwell v. Nickel (1924) 194 Cal. 243, 263-264, 228 P. 25; Coonan v. Loewenthal (1900) 129 Cal. 197, 203, 61 P. 940.) When the evidence pertaining to the assumed facts is in conflict, the trial court's instruction in the language of CALJIC No. 2.82 properly guides the jury in this endeavor. Significantly, the instruction does not require the jury to disregard the expert's opinion. The failure of proof simply goes to the weight of the expert testimony. Thus, there is no burden placed on either party to prove the assumed facts or to disprove the opponent's.
Here, both the prosecution and the defense presented expert testimony at trial, and both parties posed hypothetical questions to their respective experts. The opinions of the experts were subjected to cross-examination. Under these circumstances, it is not reasonably likely the jury believed defendant had a greater burden of disproving the assumed facts relied on by the prosecutor's experts than he did to rebut any other adverse evidence.
Defendant argues finally that the felony-murder instruction constituted impermissible burden-shifting. More specifically, he challenges the trial court's statement to jurors that before they could find defendant guilty of robbery murder or burglary murder, they "must take all the evidence into consideration and determine therefrom if, at the time of the commission or attempt to commit such crime, the defendant did not form the specific intent to commit such crime." According to defendant, the wording the instruction placed on defendant the Ten of negating the specific intent to commit underlying felony.
Defendant's assertion lacks merit. The trial court explicitly informed the jury, in the language of CALJIC No. 8.21, that "[t]he specific intent to commit robbery or burglary and the commission ... of such crime must be proved beyond a reasonable doubt." The court also instructed, "If from all the evidence you have a reasonable doubt whether defendant formed such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state." Finally, the trial court explained to the jury that, "in deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure of the People to prove beyond a reasonable doubt every essential element of the charges against him...." In light of the overall charge, there is no reasonable likelihood the jury believed defendant was required to disprove the specific intent to commit the underlying felony.

3. Comment on Defendant's Failure to Testify
At defendant's request, the trial court read to the jury a modified version of CALJIC No. 2.61, which incorporated a portion of CALJIC No. 22.60. The court explained to the jury, "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure of the People to prove beyond a reasonable doubt every essential element of the charges against him.... You must neither discuss the failure of the defendant to testify nor permit it to enter into your deliberations in any way." The trial court's instruction differed slightly from the written text of defendant's requested instruction in that the trial court referred to the "failure of the defendant to testify" while the wording of defendant's proposed instruction was "the matter of defendant not testifying." Defendant faults this instruction on several grounds, asserting first that it was error for the court to characterize defendant's invocation of his Fifth Amendment right to remain silent as a "failure to testify."
The jury was not reasonably likely to have applied the challenged instruction in a way *60 that violates the Constitution. (Estelle v. McGuire, supra, 502 U.S. at p. 72, 112 S.Ct. 475.) A court is prohibited only from instructing the jury that a defendant's invocation of the Fifth Amendment right to silence is evidence of guilt. (Griffin v. California (1965) 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (Griffin); see also Clair, supra, 2 Cal.4th at p. 662, 7 Cal.Rptr.2d 564, 828 P.2d 705.) Here, the court referred to defendant's "failure to testify" in the context of directing the jurors to refrain from discussing that fact or from permitting it to enter into their deliberations. There was no error.
Defendant also complains the trial court's instruction informed jurors that he did not testify because he was relying on the state of the evidence and the People's failure of proof, thereby precluding the jury from considering much of the testimony of Drs. Peal and McGuire regarding the other reasons defendant chose not to testify, such as his organic brain damage. The challenged instruction did not limit the jury's consideration of the defense experts' testimony. Fairly read, the instruction merely articulated for the jury two reasons why a defendant might choose to invoke his right to silence, both of which emphasized his right to put the People to their proof. It did not suggest these considerations were the only factors that enter into a defendant's decision whether or not to testify. The jury was directed to refrain from speculating on the subject in any event. Here, because the trial court gave numerous instructions relating to the testimony of medical experts, it is not reasonably likely the jury understood the challenged instruction as precluding its consideration of the testimony of defendant's medical experts.

4. Instructions on second degree murder
In discussing the principles of law relating to murder, the trial court instructed on two theories of second degree murder, express and implied malice murder. (งง 189, 188.) The court first informed the jury, in relevant part, that "murder in the second degree is the unlawful killing of a human being when there is manifested an intention unlawfully to kill a human being...." The court then instructed on implied malice murder, reading a modified version of CALJIC No. 8.31 (1983 rev.) stating that "[m]urder in the second degree is also the unlawful killing of a human being as the direct causal result of an intentional act, the natural consequences of which are dangerous to life, or it is shown that the defendant consciously disregarded the high probability that the act would result in death, [ถ] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."
Defendant contends that to instruct first that the killing must be intentional and then to say that it is unnecessary to find intent to kill is so confusing to the jury that it foreclosed a verdict of second degree murder and amounted to a denial of due process. Defendant's argument is not persuasive.
Both of the trial court's instructions represented correct statements of the law. (งง 188, 189; People v. Bellinger (1989) 49 Cal.3d 1212, 1222, 264 Cal.Rptr. 841, 783 P.2d 200.) Moreover, the instructions properly and clearly informed the jury there were two alternate theories of second degree murder, each requiring different elements of proof. (Cf. People v. Bernard (1994) 27 Cal.App.4th 458, 470, 32 Cal.Rptr.2d 486 [felony murder and premeditated murder constitute two kinds of first degree murder].) The record indicates that, after first defining the elements of second degree express malice murder, the court then told the jury, "Murder in the second degree is also ...," and then explained the elements of implied malice murder. In the absence of any evidence jurors were bewildered by the notion of alternative theories of second degree murder liability, we cannot conclude on this record the trial court's instructions confused the jury. (Cf. People v. Wharton (1991) 53 Cal.3d 522, 574-575, 280 Cal.Rptr. 631, 809 P.2d 290 (Wharton) [rejecting argument that instructions defining malice aforethought and intent to kill confused the jury].)

5. CALJIC Nos. 8.71 and 8.72
Consistently with the mandate of section 1097, the trial court instructed the *61 jury in the language of CALJIC No. 8.71 (1979 rev.) that "[i]f you are convinced beyond a reasonable doubt that the crime of murder has been committed by [] defendant, but have a reasonable doubt whether such murder was of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." The court then instructed jurors pursuant to CALJIC No. 9648.72, which states, "If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder." Defendant asserts these instructions tainted the verdicts in his case by suggesting to members of the jury that they should compromise their firmly held beliefs in order to arrive at a verdict.
Defendant's argument relies on a strained reading of the challenged instructions. The thrust of these instructions was to inform jurors they must give defendant the benefit of any reasonable doubts by returning a second degree murder verdict in the one circumstance, and a manslaughter verdict in the other. Nothing in this language can reasonably be understood as encouraging jurors to forego their personally held views so that a verdict could be rendered. Moreover, the jury was specifically instructed otherwise. The trial court explained, "Both the People and the defendant are entitled to the individual opinion of each juror, [ถ] It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors. [ถ] You should not hesitate to change an opinion if you are convinced it is erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision." In light of this instruction, jurors were adequately informed not to abandon their views for the sake of a verdict. The instructions compelling verdicts of second degree murder and manslaughter if jurors had reasonable doubts when deciding between first and second degree murder, and murder and manslaughter, respectively, did not undermine this command.

6. Arming enhancement
Defendant was charged in the information with two counts of murder. The information also alleged he was armed with a firearm in the commission of these offenses. (ง 12022, subd. (a).) At trial, the court instructed the jury on the principles of law governing the arming enhancement, giving a modified version of CALJIC No. 17.15 (1979 rev.). However, for reasons not disclosed in the record, the trial court omitted the portion of the standard instruction that states, "The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true." Relying on Victor v. Nebraska (1994) 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583, defendant contends the trial court committed reversible error by failing to instruct that the People have the burden of proving the truth of the arming allegation beyond a reasonable doubt.
Despite the trial court's omission, there is no reasonable likelihood the jury misperceived the standard of proof applicable to determining the truth of the firearm enhancement allegation. As previously noted, the jury was instructed that defendant was presumed innocent, that in the case of a reasonable doubt as to his guilt he must be found not guilty, and that the prosecutor had the burden of proving defendant's guilt beyond a reasonable doubt. Jurors were also instructed that the murder charges and the degree of murder, the special circumstance allegations, and the personal use of a weapon allegations had to be proved beyond a reasonable doubt. The jury was instructed only once to utilize a different standard of proof when the court explained that defendant had the burden of proving by a preponderance of the evidence that Jennifer Warsing was an accomplice. Taken together, these instructions indicated to the jury that the prosecutor's burden throughout trial was proof beyond a reasonable doubt. (Burgener, supra, 41 Cal.3d at pp. 538-540, 224 Cal.Rptr. 112, 714 P.2d 1251; cf. People v. Louis (1977) 75 *62 Cal.App.3d 620, 625, 142 Cal.Rptr. 182 [where trial court otherwise instructed on reasonable doubt, failure to instruct that firearm enhancement must be proved beyond reasonable doubt not prejudicial].)

7. Accomplice Testimony
Defendant raises related claims regarding the trial court's instructions on accomplice testimony.

a) Failure to instruct in language of CALJIC No. 3.11
Prior to commencing deliberations, the jurors heard a number of standard instructions pertaining to accomplice testimony, including CALJIC Nos. 3.10 (defining accomplice), 3.12 (sufficiency of the evidence of corroboration), 3.14 (accomplice's criminal intent), and 3.18 (accomplice's testimony to be viewed with distrust). The trial court also instructed the jury, "You must determine whether or, not the witness Jennifer Warsing was an accomplice as I have defined that term," stating that "[d]efendant has the burden of proving by a preponderance of the evidence that Jennifer Warsing was an accomplice in the crimes charged against the defendant." Absent from this group of instructions was CALJIC No. 3.11, which informs the jury in accordance with section 1111 that a defendant cannot be convicted on the testimony of an accomplice unless such testimony is corroborated by other evidence tending to connect the defendant with the crime. Defendant asserts this omission was prejudicial error.
When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices. (People v. Gordon (1973) 10 Cal.3d 460, 469-470, 110 Cal.Rptr. 906, 516 P.2d 298 (Gordon); People v. Bevins (1960) 54 Cal.2d 71, 76, 4 Cal.Rptr. 504, 351 P.2d 776.) However, a conviction will not be reversed for failure to instruct on these principles if a review of the entire record reveals sufficient evidence of corroboration. (People v. Arias (1996) 13 Cal.4th 92, 143, 51 Cal.Rptr.2d 770, 913 P.2d 980 (Arias); Sanders, supra, 11 Cal.4th at pp. 534-535, 46 Cal.Rptr.2d 751, 905 P.2d 420; People v. Miranda (1987) 44 Cal.3d 57, 100, 241 Cal.Rptr. 594, 744 P.2d 1127 (Miranda); Gordon, supra, 10 Cal.3d at pp. 470-471, 110 Cal.Rptr. 906, 516 P.2d 298.) Corroboration need only be slight. (Fauber, supra, 2 Cal.4th at p. 835, 9 Cal.Rptr.2d 24, 831 P.2d 249; Miranda, supra, 44 Cal.3d at p. 100, 241 Cal.Rptr. 594, 744 P.2d 1127.)
Here, the testimony of prosecution witnesses provided ample evidence connecting defendant to the crimes. Ron Wilson testified that on the day of the murders, while he and defendant were having lunch at a restaurant in town, defendant said Mr. Brandt "should be more careful about showing the bundle he has or somebody would hit him in the head and take it from him." Garth Lavalee testified that Ron Wilson and defendant visited his home in May 1985, and that defendant stated the Brandts "ought to be knocked in the head for their money."
Numerous items of physical evidence introduced at trial also corroborated Warsing's testimony. For example, a denim jacket belonging to defendant was hanging on the back of one of the chairs in the Brandts' cabin when the victims' bodies were discovered. The Brandts' automobile was recovered in Winnemucca. One of the vials of gold taken from the Brandts' cabin and sold to the proprietor of Silver Mountain Coins was introduced into evidence and Rolland Lungden identified defendant as the person he saw come into the shop on two occasions in May or June of 1985 offering to sell some gold contained in such a bottle.
In light of the ample evidence connecting defendant to the crimes, we conclude he suffered no prejudice by the trial court's failure to instruct the jury that the testimony of an accomplice must be corroborated. For the same reason, we reject defendant's further contention that the trial court's failure to instruct the jury in accordance with state law violated his federal constitutional right to due process of law. (Cf. Arias, supra, 13 Cal.4th at p. 143, 51 Cal.Rptr.2d 770, 913 P.2d 980.) Defendant's characterization of the accomplice corroboration requirement as an element of the crime subject to proof *63 beyond a reasonable doubt (see Winship, supra, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; Mullaney v. Wilbur (1975) 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508) is unsupported and unpersuasive.

b) Instructing the jury on defendant's burden of proving accomplice status by a preponderance of the evidence
Defendant also challenges the instruction that defendant must prove by a preponderance of the evidence that Jennifer Warsing was an accomplice. (CALJIC No. 3.19.) Defendant urges this court to reconsider People v. Tewksbury (1976) 15 Cal.3d 953, 127 Cal.Rptr. 135, 544 P.2d 1335 (Tewksbury), from which CALJIC No. 3.19 derives. He asserts that Tewksbury is not only a misstatement of California law, but inconsistent with the due process principles subsequently articulated by the United States Supreme Court.
The court in Tewksbury recognized that, under California law, a criminal defendant may be allocated the burden of proof as to certain factual issues, among them the accomplice status of a witness. (15 Cal.3d at p. 963, 127 Cal.Rptr. 135, 544 P.2d 1335.) In determining the appropriate standard of proving accomplice status, Tewksbury found an analytical distinction between factual contentions that, if proven, would negate an element of the crime, and collateral factual issues having no direct bearing on any link in the chain of proof of any element. (Id. at pp. 963-964, 127 Cal.Rptr. 135, 544 P.2d 1335.) As to the former, a defendant is only required to raise a reasonable doubt regarding the existence or nonexistence of the fact in issue. (Id. at p. 963, 127 Cal.Rptr. 135, 544 P.2d 1335.) As to factual issues that are collateral to the question of an accused's guilt or innocence, however, it is proper to require the defendant to prove the issue by a preponderance of the evidence. (Id. at pp. 964-966, 127 Cal.Rptr. 135, 544 P.2d 1335.) The court reasoned that because a collateral factual issue is not one that must be established in the direct chain of proof of the elements of the crime, there is no constitutional requirement that it be proved by the People. (Id. at p. 965, 127 Cal.Rptr. 135, 544 P.2d 1335.) Likening the assertion that a witness is an accomplice to a hearsay challenge to the reliability of incriminating evidence, the court in Tewksbury concluded that an accused must prove accomplice status by a preponderance of the evidence. (15 Cal.3d at pp. 967-968, 127 Cal.Rptr. 135, 544 P.2d 1335.)
Defendant argues that Tewksbury was wrongly decided in that it violates both California law and federal due process principles. Defendant's argument is premised on section 1111, which provides, in relevant part, that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." According to defendant, section 1111 makes it an element of every crime in California that either the evidence supporting the conviction come from a source other than an accomplice, or the evidence of the accomplice be corroborated.
We are aware of no decision, and defendant cites to none, supporting the proposition that section 1111 establishes an issue bearing on the substantive guilt or innocence of the defendant or otherwise constitutes an element of a criminal offense. Nor are we persuaded that the statute is properly construed in the manner defendant suggests. Like the provision making hearsay evidence inadmissible (Evid.Code, ง 1200), section 1111 concerns the reliability of evidence that is used to convict an accused of a criminal offense. The rationale underlying the statutory requirement of corroboration is the danger that an accomplice will falsely implicate the defendant in order to obtain leniency or immunity for herself. (People v. Bowley (1963) 59 Cal.2d 855, 857, 31 Cal.Rptr. 471, 382 P.2d 591; People v. Wallin (1948) 32 Cal.2d 803, 808, 197 P.2d 734.) As the court in Tewksbury explained, the corroboration requirement embodied in section 1111 is harsher than the common law rule requiring only that the jury be instructed to view the testimony of an accomplice with suspicion. Although the accomplice's testimony is admissible and competent, such testimony has *64 been "legislatively determined" never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated. (Tewksbury, supra, 15 Cal.3d at p. 967, 127 Cal.Rptr. 135, 544 P.2d 1335.) Like the collateral nature of a challenge to the reliability of incriminating evidence on hearsay grounds, a challenge to the reliability of an accomplice's testimony does not require proof of factual matters in the chain of proof that is required for convicting a defendant of the charged crime. (See id. at p. 966, 127 Cal.Rptr. 135, 544 P.2d 1335.)
Defendant further contends requiring him to prove Jennifer Warsing's accomplice status by a preponderance of the evidence violates federal due process principles. This argument is undermined by the same faulty premise underlying his claim of state law error.
"[T]he Due Process Clause `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" (Martin v. Ohio (1987) 480 U.S. 228, 231-232, 107 S.Ct. 1098, 94 L.Ed.2d 267.) Because the corroboration requirement established in section 1111 has no bearing on the prosecution's proof of any element of the charged crime, there is no constitutional impediment to placing on a defendant the burden of proving, by a preponderance of the evidence, a witnesses' status as an accomplice. As the court in Patterson v. New York (1977) 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 explained, "it is normally `within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion,' and its decision in this regard is not subject to proscription under the Due Process Clause unless `it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" (Id. at pp. 201-202, 97 S.Ct. 2319 [upholding statute imposing on murder defendant burden of proving extreme emotional disturbance for reduction to manslaughter]; cf. Mullaney v. Wilbur, supra, 421 U.S. at pp. 686-687, 95 S.Ct. 1881 [statute placing on defendant charged with second degree murder burden of proving facts negating element of malice offends due process].)

c) Shifting burden of proof
Finally, defendant contends that by instructing the jury he had the burden of proving Jennifer Warsing's accomplice status, the People gained an unfair advantage because the jury was told to view Warsing's testimony with distrust only if defendant proved her status as an accomplice. This argument is unpersuasive. Courts have uniformly held that it is proper to allocate to the defendant the burden of proving that a witness is an accomplice. (See Tewksbury, supra, 15 Cal.3d at p. 963, 127 Cal.Rptr. 135, 544 P.2d 1335, and cases cited therein.)

G. Prosecutorial Misconduct
Defendant claims certain comments made by the prosecutor during opening and closing arguments at the guilt phase constituted prejudicial misconduct in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
Improper remarks by a prosecutor can "`so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" (Darden v. Wainwright (1986) 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144; Donnelly v. DeChristoforo (1974) 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431; cf. People v. Hill (1998) 17 Cal.4th 800, 819, 72 Cal.Rptr.2d 656, 952 P.2d 673.) Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair. (People v. Hill, supra, 17 Cal.4th at p. 819, 72 Cal.Rptr.2d 656, 952 P.2d 673; People v. Berryman (1993) 6 Cal.4th 1048, 1072, 25 Cal.Rptr.2d 867, 864 P.2d 40 (Berryman); People v. Price (1991) 1 Cal.4th 324, 447, 3 Cal.Rptr.2d 106, 821 P.2d 610.)
Nevertheless, as a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure any harm. The rule applies to capital cases. (Berryman, *65 supra, 6 Cal.4th at p. 1072, 25 Cal. Rptr.2d 867, 864 P.2d 40 [rejecting defendant's claim of prosecutorial misconduct both for failure to object or request admonition at trial and on the merits]; Price, supra, 1 Cal.4th at pp. 447, 460-462, 3 Cal.Rptr.2d 106, 821 P.2d 610 [declining to address whether prosecutors committed misconduct because defense did not object at trial]; People v. Montiel (1993) 5 Cal.4th 877, 914, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (Montiel) [although trial counsel objected to prosecutor's remarks at trial, the failure to request admonition failed to preserve claim of prosecutorial misconduct on appeal].)
Defense counsel did not object to any of the comments defendant now claims constituted prejudicial misconduct. Furthermore, the record fails to disclose grounds for applying any exception to the general rule requiring both an objection and a request for a curative instruction. (See People v. Hill, supra, 17 Cal.4th at pp. 820-821, 72 Cal. Rptr.2d 656, 952 P.2d 673; Stansbury, supra, 4 Cal.4th at p. 1056, 17 Cal.Rptr.2d 174, 846 P.2d 756.) Accordingly, defendant's claim of prosecutorial misconduct is barred in its entirety.
Nor does defendant's claim have merit under the appropriate standard of review. To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (Berryman, supra, 6 Cal.4th at p. 1072, 25 Cal.Rptr.2d 867, 864 P.2d 40; Clair, supra, 2 Cal.4th at pp. 662-663, 7 Cal.Rptr.2d 564, 828 P.2d 705.) In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. (Howard, supra, 1 Cal.4th at p. 1192, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)

1. Vouching for Witnesses
Prior to calling Jennifer Warsing to testify, the prosecutor read to the jury the entire text of the immunity agreement between the Amador County District Attorney and Warsing. In relevant part, the agreement indicated Warsing had cooperated with police and prosecutors in their investigation of the Brandt murders, and memorialized Warsing's assertion "that she will continue to be truthful in her statements." It also contained the proviso that "[a]lthough the District Attorney believes Jennifer Warsing was an unwilling participant and thus not an aider and abettor or accessory under the law, reasonable minds may differ when viewing the same factual situation." The agreement concluded with the following language: "Therefore, in consideration of Jennifer Warsing's promise to continue to fully cooperate with the Amador County Sheriff and District Attorney in the investigation of the death of Robert Brandt, Sr., and Lucille Brandt, to testify in court and to tell the truth, the Amador County District Attorney agrees that no charges will be filed against Jennifer Warsing concerning the killing of the Brandts."
Defendant argues that by reading the terms of the immunity agreement to the jury, the prosecutor not only vouched for Jennifer Warsing's veracity but also indicated to the jury that the district attorney's office had confirmed Warsing's credibility before calling her to the stand.
A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. (People v. Sully (1991) 53 Cal.3d 1195, 1235, 283 Cal.Rptr. 144, 812 P.2d 163 (Sully); People v. Anderson (1990) 52 Cal.3d 453, 479, 276 Cal.Rptr. 356, 801 P.2d 1107.) Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. (United States v. Roberts (9th Cir. 1980) 618 F.2d 530, 536-537.) However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching. (People v. Medina (1995) 11 Cal.4th *66 694, 757, 47 Cal.Rptr.2d 165, 906 P.2d 2 (Medina); see also People v. Williams (1997) 16 Cal.4th 153, 256, 66 Cal.Rptr.2d 123, 940 P.2d 710 (Williams).)
Here, in accordance with the obligation to disclose to the jury any inducements made to a prosecution witness to testify (People v. Morris (1988) 46 Cal.3d 1, 24-34, 249 Cal. Rptr. 119, 756 P.2d 843), the prosecutor read the precise terms of the Amador County District Attorney's immunity agreement with Warsing. Although the prosecutor was not necessarily required to present a verbatim recitation of the terms of the agreement (see Fauber, supra, 2 Cal.4th at p. 823, 9 Cal. Rptr.2d 24, 831 P.2d 249), her reading of the entire document did not constitute misconduct. First, neither the phrasing nor the content of Warsing's agreement to testify truthfully suggested a pretrial determination by the district attorney that Warsing would be telling the truth, or otherwise portrayed the district attorney's office as privy to information bearing on Warsing's veracity that was not admitted at trial. The agreement recites only that Warsing promised to tell the truth in exchange for the district attorney's promise to refrain from charging her with any crimes relating to the Brandts' murders. (Cf. Williams, supra, 16 Cal.4th at p. 257, 66 Cal.Rptr.2d 123, 940 P.2d 710; Fauber, supra, 2 Cal.4th at p. 822, 9 Cal.Rptr.2d 24, 831 P.2d 249.) Moreover, although the prosecutor urged the jury to accept Warsing's version of events, she made no reference to the immunity agreement after initially reciting its terms.
Defendant argues nevertheless that in addition to reading the immunity agreement, the prosecutor made certain statements regarding the veracity of Warsing and two other prosecution witnesses during closing argument that constituted impermissible vouching. At one point in her closing argument, the prosecutor reminded jurors, in accordance with settled law, that if they believed Warsing to be an accomplice they should view her testimony with caution. She commented that this did not mean they had to like Warsing; but even if they did not like her, they "have to realize by now that Jennifer Warsing is telling the truth about the thing that she witnessed on that night in the Brandt cabin." Contrary to defendant's assertion, the prosecutor's statement did not implore jurors to forego their independent assessment of the evidence and accept the prosecutor's word that Warsing was being truthful. The comment "you must realize by now [Warsing is telling the truth]" was simply a call to reflect on all of the evidence presented at trial. It is not reasonably likely the jurors would have understood it to reflect any personal knowledge or information by the prosecutor.
Nor did the prosecutor commit misconduct while reviewing the testimony of prosecution witnesses during closing argument. The record indicates the prosecutor challenged defendant's statement, recorded on videotape and played for the jury, that he did not remember killing the Brandts by recalling for the jury that Warsing never indicated defendant could not remember the Brandts' murders, and commenting that Warsing "would have no reason not to tell you that if it were true." Likewise, in reviewing the testimony of prosecution witnesses Ron Wilson and Garth Lavalee, the prosecution stated, "If you have any doubt about the accuracy of those statements, consider first that you have got two witnesses who are recalling the defendant saying similar things and who would have no reason to make any of that up." Although the prosecutor's comments invited the jury to consider the witnesses' motives in testifying, there is no impropriety in attempting to persuade jurors to draw inferences based on the evidence. (See People v. Johnson (1992) 3 Cal.4th 1183, 1226, 14 Cal.Rptr.2d 702, 842 P.2d 1.) For the same reason, the prosecutor's use of rhetorical questions, for example, why "would [Warsing] be making this stuff up?," was not impermissible.
Finally, there was nothing improper about the prosecutor's statements at the conclusion of closing argument telling jurors that "[Warsing's] stories, her testimony, her statements to police officers, have been just remarkably consistent, given without hesitation. There is no way in the world she would have been able to do that if she was covering up for things she had done." We *67 find these assertions to be proper comment on the evidence adduced at trial and reasonable inferences flowing from such evidence, and not, as defendant contends, improper vouching on the part of the prosecutor.

2. Shifting burden of proof
While summarizing the defense experts' testimony during her closing argument, the prosecutor remarked, "Incidentally, you were told you were going to hear from neuropsychologist Linda Wagner. She did not show up at trial. She did not testify. Defense stated there was no reason for it. But, despite that, you may reasonably infer, if that psychologist had some real helpful information to the defense, you would have heard from her."
Defendant contends that these comments shifted the burden of proof to the defense in violation of the due process principles articulated in Winship, supra, 397 U.S. at page 364, 90 S.Ct. 1068.
A similar claim was rejected by the Ninth Circuit Court of Appeals in U.S. v. Mares (9th Cir.1991) 940 F.2d 455. In that case, the defendants were charged with various crimes involving the distribution of heroin. During closing argument, the prosecutor invited the jury to consider the defendants' explanation about meeting a man at a fast food restaurant where they had not eaten anything. "Listen to how they explain that, and if they don't come up with an explanation that sounds credible or that meets with your approval, ask yourselves why, and if they don't mention it at all, why not." (Id. at p. 461, italics omitted.)
On appeal, one of the defendants in Mares argued, inter alia, that the prosecutor's comments shifted the burden of proof to him. The court rejected the contention, noting that parties typically challenge the other side to explain to the jury questionable facts and inferences. In holding the prosecutor's comments to be proper, the court found it significant that the prosecutor did not argue the defendants' failure to offer an adequate explanation warranted a guilty verdict. Additionally, the jury was instructed that counsel's arguments were not evidence and that the defendants were not required to prove their innocence. (U.S. v. Mares, supra, 940 F.2d at p. 461.)
We find the reasoning of Mares persuasive and conclude that the prosecutor's reference to the defense team's failure to call Dr. Wagner was proper. Here, the prosecutor's remark was a comment on a weakness in defendant's theory of the case, in no way suggesting defendant had the burden of proving his innocence. To the contrary. She told jurors the People had the burden of proof on each and every count. Moreover, the trial court instructed the jury defendant was presumed innocent until his guilt was proven, and that this presumption Placed on the prosecution the burden of proving him guilty beyond a reasonable doubt. In light of the context of the prosecutor's remarks, and the instructions, it is unlikely the jury was encouraged to draw any negative inferences from the prosecutor's reference to the failure to call a defense witness alluded to in opening argument. (Cf. People v. Bradford (1997) 15 Cal.4th 1229, 1340, 65 Cal.Rptr.2d 145, 939 P.2d 259 (Bradford).)
Defendant also criticizes the trial court for engaging in impermissible burdenshifting and enhancing the risk that the jurors would understand the prosecutor's comments in closing argument to mean defendant was required to present evidence in his defense.
In the presence of the jury, the trial court asked defense counsel if they had any witnesses they would like to call to the jury's attention. Defendant argues that because he was not obligated to present any evidence, it was error for the court to suggest that the defense must call witnesses. Defendant's characterization of the court's inquiry is unsupported by the record. The court posed the question to both the defense and the prosecution for the sole purpose of determining whether any of the jurors were acquainted with the individuals who might be called to testify and clearly indicated to jurors the reason for the request. The trial court did not commit error in seeking this information. Nor did the statement enhance the possibility the prosecutor's remarks during closing argument shifted the burden of proof to defendant. As the record shows, prior to deliberations, *68 the jury was instructed the defendant may choose to rely on the state of the evidence and on the failure of the People to prove beyond a reasonable doubt every essential element of the charges against him.
Defendant also complains that when the trial court defined "reasonable doubt" as a "comparison and consideration of all the evidence," it led jurors to believe they would be comparing evidence presented by both sides. Because he need not present evidence, defendant argues, it was error to define "reasonable doubt" in such a way as to suggest otherwise. The trial court did not err. The definition of reasonable doubt read to the jury was identical to the standard reasonable doubt instruction CALJIC No. 2.90 (1979 rev.), which in turn was drawn verbatim from section 1096. We have consistently upheld that instruction. (People v. Freeman (1994) 8 Cal.4th 450, 501, 34 Cal.Rptr.2d 558, 882 P.2d 249 (Freeman).) Nor did the trial court's reference to a "comparison" of the evidence enhance the risk that the prosecutor's comments in closing argument shifted the burden of proof. As previously noted, jurors were instructed that defendant may choose to rely on the state of the evidence.

3. Victim Impact Evidence
In her guilt phase opening statement, the prosecutor described the Brandts as "kind and trusting people." Defendant contends that the prosecutor should not have been permitted to introduce such "victim impact" evidence because it was not relevant to the case. Relying on the United States Supreme Court's decision in Payne v. Tennessee (1991) 501 U.S. .808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (Payne), defendant argues that although there is no constitutional bar to victim impact evidence, it must be relevant and not "so unduly prejudicial that it renders the trial fundamentally unfair." (Id. at p. 825, 111 S.Ct. 2597.)
Defendant's reliance on Payne, supra, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, in this setting is misplaced. In Payne, the United States Supreme Court held that victim impact evidence does not offend the Eighth Amendment's guarantee of an individualized and reliable penalty determination. (Id. at p. 825, 111 S.Ct. 2597; People v. Wrest (1992) 3 Cal.4th 1088, 1107-1108, 13 Cal. Rptr.2d 511, 839 P.2d 1020.) Here, the challenged statements were made at the guilt phase of trial, a stage of the proceedings that does not implicate the same considerations regarding the deliberative role of the capital sentencing jury underlying the court's decision in Payne.
Furthermore, as we recently explained in People v. Millwee (1998) 18 Cal.4th 96, 137, 74 Cal.Rptr.2d 418, 954 P.2d 990, a prosecutor is free to relate the People's theory of the case and to tie the law and evidence together for the jury in a comprehensible, story-like manner. A prosecutor may properly identify the traits that made the victim vulnerable to attack when such characteristics are relevant to the charged crimes, and has no obligation "to shield the jury from all favorable inferences about the victim's life or to describe relevant events in artificially drab or clinical terms." (Id. at p. 138, 74 Cal. Rptr.2d 418, 954 P.2d 990.)
Consistent with the evidence and theory of the People's case, the prosecutor properly implied defendant took advantage of the victims' trust because he was familiar with their possessions and knew they would not be expecting a violent confrontation during a friendly visit in their home. There was no misconduct.

4. Personal Opinion
Defendant argues the prosecutor committed misconduct by giving her personal opinion on issues that were for the jury to decide. More specifically, he contends the prosecutor's statement during closing argument that "the long road of the trial is almost done, in this phase anyway," impermissibly communicated to the jury her belief that the penalty phase of trial would occur because a guilty verdict was inevitable.
A prosecutor may not give a personal opinion or belief as to the defendant's guilt if it will suggest to the jury the prosecutor has information bearing on guilt that has not been disclosed at trial. (People v. Padilla (1995) 11 Cal.4th 891, 946, 47 Cal.Rptr.2d 426, 906 P.2d 388 (Padilla); People v. *69 Adcox (1988) 47 Cal.3d 207, 236, 253 Cal. Rptr. 55, 763 P.2d 906.) However, a prosecutor is permitted to offer an opinion on the state of the evidence. (Padilla, supra, 11 Cal.4th at p. 945, 47 Cal.Rptr.2d 426, 906 P.2d 388.) This is precisely what occurred here. There was no misconduct.
Defendant further contends that during closing argument the prosecutor committed misconduct by referring to evidence outside the record when offering her opinion of Dr. Thorton's credibility. In reviewing the testimony of defendant's forensic expert, Dr. Thorton, who was critical of the way the Department of Justice processed the crime scene, the prosecutor acknowledged that the department might not have given the investigation the attention it deserved. She then stated, "But don't forget what the Department of Justice did do in this case. They did collect the shotgun evidence they found, as well as many other items which may become relevant in this case, which you didn't hear about." The prosecutor then described for the jury what steps the Department of Justice took in processing the crime scene, stating, "Although it did not yield anything of particular value in this case the way it turned out, it was done; and, of course, potentially, it could have been very important."
The prosecutor committed misconduct by explicitly referring to evidence outside the record. (People v. Bain (1971) 5 Cal.3d 839, 848, 97 Cal.Rptr. 684, 489 P.2d 564; People v. Perez (1962) 58 Cal.2d 229, 245-246, 23 Cal.Rptr. 569, 373 P.2d 617.) Notwithstanding the prosecutor's misstep, however, we conclude there is no reasonable probability the jury was influenced by the prosecutor's reference to undisclosed evidence to defendant's detriment. (Medina, supra, 11 Cal.4th at p. 758, 47 Cal.Rptr.2d 165, 906 P.2d 2.) In her closing remarks, the prosecutor offered a number of other reasons why Dr. Thorton's testimony should be discounted, all of which were based on evidence adduced at trial. For example, she argued that the opinion of the People's expert, Mr. Blake, was superior to that of Dr. Thorton because it was based on a more thorough investigation of the available evidence. Moreover, in instructing the jury, the trial court admonished that "statements made by the attorneys are not evidence." For these reasons, although the prosecutor's reference to evidence outside the record was improper, it did not constitute reversible misconduct.

5. Comment on defendant's silence
During the prosecutor's closing remarks, she reviewed for the jury the portions of the taped conversation between defendant and Jennifer Warsing at the Amador County jail. She stated that the recording "is notable for what the defendant does not say to Jennifer Warsing when he has the chance. There are no loud and repeated protestations of innocence, for example, like you might expect if he, indeed were innocent. He does say he didn't do it, he didn't kill those people. [ถ] But think how you would expect somebody to react, what you would expect somebody to say who was truly innocent and knew he was talking to somebody who could prove that. You would expect that person to be begging the other person to tell the truth. `Tell the truth and get me out of here.'"
Defendant contends that, by pointing out to the jury that defendant never protested his innocence on tape, the prosecutor directly commented on defendant's Fifth Amendment privilege against self-incrimination in violation of state law and the `Fifth and Fourteenth Amendments to the United States Constitution.
In Griffin, supra, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the United States Supreme Court declared that the Fifth Amendment prohibits the prosecutor from commenting, either directly or indirectly, on the defendant's failure to testify in his defense. (Id. at p. 613, 85 S.Ct. 1229; Bradford, supra, 15 Cal.4th at p. 1339, 65 Cal. Rptr.2d 145, 939 P.2d 259, and cases cited therein.) The danger of such comment is that it tenders to the jury the failure to testify as evidence of guilt. (Griffin, supra, 380 U.S. at pp. 614-615, 85 S.Ct. 1229.) However, it does not violate the Fifth Amendment right to remain silent for the prosecutor to comment on the testimony or evidence adduced at trial, or on defendant's failure to bring forth material evidence or *70 pertinent witnesses. (Medina, supra, 11 Cal.4th at p. 755, 47 Cal.Rptr.2d 165, 906 P.2d 2, and cases cited therein.)
In light of the record, we conclude that the complained-of remarks did not violate the rule of Griffin, supra, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. Fairly read, the prosecutor's statement to the jury concerned defendant's failure to vigorously protest his innocence during a conversation with his alleged accomplice. The prosecutor's comments cannot be construed as a direct or indirect reference to defendant's failure to testify in his defense at trial. Nor is the jury reasonably likely to have viewed the prosecutor's statement as an invitation to draw an impermissible inference of guilt from defendant's failure to testify. (Medina, supra, 11 Cal.4th at p. 756, 47 Cal.Rptr.2d 165, 906 P.2d 2.)

6. Belittling of defense counsel
Defendant contends the prosecutor committed misconduct by denigrating defense counsel on two occasions during closing argument. Responding to defense counsel's closing argument in which he intimated that other individuals, including prosecution witness Ron Wilson, might have murdered the Brandts, the prosecutor stated that "[c]asting suspicion in [a] trial like that is completely irresponsible. It's irresponsible of the defense to make that accusation against somebody who has to live in this area, without anything whatsoever to back it up." The prosecutor also faulted defense counsel for arguing that Jennifer Warsing was lying about witnessing these murders, characterizing the defense view as "ludicrous" and "a smoke screen."
A defendant's conviction should be based on the evidence adduced at trial, and not on the purported improprieties of his counsel. (People v. Sandoval (1992) 4 Cal.4th 155, 183, 14 Cal.Rptr.2d 342, 841 P.2d 862.) When a prosecutor denigrates defense counsel, it directs the jury's attention away from the evidence and is therefore improper. (Id. at pp. 183-184, 14 Cal.Rptr.2d 342, 841 P.2d 862.) In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter. (U.S. v. Lopez-Alvarez (9th Cir. 1992) 970 F.2d 583, 597.)
Here, although the prosecutor called defense counsel "irresponsible" for raising suspicions about Ron Wilson, the point of her criticism was counsel's lack of evidentiary support for such a claim. Because the focus of her comment was on the evidence adduced at trial, rather than on the integrity of defense counsel, it was proper. Nor was it objectionable for the prosecutor to characterize defense counsel's challenge to Warsing's credibility as "ludicrous" and "a smoke screen." The record shows that the prosecutor made this charge in the context of reviewing the evidence pertaining to the time of day the murders took place. She argued that there was no evidence tying the murders to the earlier time frame on which defense counsel had based its challenge to Warsing's veracity. Read in the context of her broader argument, the prosecutor's remarks were a fair response to defense argument challenging Warsing's testimony, and reflected the prosecutor's belief in the inadequacy of the evidence relied on by the defense. Her statement did not constitute misconduct. (Cf. Medina, supra, 11 Cal.4th at pp. 758-759, 47 Cal.Rptr.2d 165, 906 P.2d 2 [not improper for prosecutor to criticize defense counsel's suggestion that police witnesses were lying].)

7. Cumulative errors
Defendant contends finally that the asserted prosecutorial errors, standing alone or in combination, deprived him of the right to a fair trial. As we recently recognized in Hill, although single instances of misconduct may not require reversal of a conviction, the cumulative effect of a pattern of such conduct may. (People v. Hill, supra, 17 Cal.4th at pp. 844-847, 72 Cal.Rptr.2d 656, 952 P.2d 673.) Contrary to defendant's premise, however, all but one of the cited statements constitute fair comment on the evidence. The single instance of misconduct committed by the prosecutor when she referred to evidence outside the record during closing argument *71 does not evidence a pattern of misconduct warranting reversal.

H. Ineffective Assistance of Counsel
Defendant claims his trial counsel provided inadequate representation, depriving him of the right to counsel guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 15, of the California Constitution. He contends cocounsel Richard Hawk's performance was deficient in that Hawk subverted the defense team. He also faults the defense team for their failure to develop and present a coherent defense strategy, and their failure to file suppression motions seeking to exclude various statements by defendant.
"Every person accused of a criminal offense is entitled to constitutionally adequate legal assistance." (People v. Pope (1979) 23 Cal.3d 412, 424, 152 Cal.Rptr. 732, 590 P.2d 859 (Pope); see also People v. Ledesma (1987) 43 Cal.3d 171, 215, 233 Cal.Rptr. 404, 729 P.2d 839 (Ledesma).) To establish a claim of inadequate assistance, a defendant must show counsel's representation was "deficient" in that it "fell below an objective standard of reasonableness .... [ถ] ... under prevailing professional norms." (Strickland, supra, 466 U.S. at p. 688, 104 S.Ct. 2052; In re Jones (1996) 13 Cal.4th 552, 561, 54 Cal.Rptr.2d 52, 917 P.2d 1175.) In addition, a defendant is required to show he or she was prejudiced by counsel's deficient representation. (Strickland, supra, 466 U.S. at p. 688, 104 S.Ct. 2052; Ledesma, supra, 43 Cal.3d at p. 217, 233 Cal.Rptr. 404, 729 P.2d 839.) In determining prejudice, we inquire whether there is a reasonable probability that, but for counsel's deficiencies, the result would have been more favorable to the defendant. (Strickland, supra, 466 U.S. at p. 687, 104 S.Ct. 2052; In re Sixto (1989) 48 Cal.3d 1247, 1257, 259 Cal.Rptr. 491, 774 P.2d 164.)
In evaluating a defendant's claim of deficient performance by counsel, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (Strickland, supra, 466 U.S. at p. 689, 104 S.Ct. 2052; In re Jones, supra, 13 Cal.4th at p. 561, 54 Cal. Rptr.2d 52, 917 P.2d 1175), and we accord great deference to counsel's tactical decisions. (In re Fields (1990) 51 Cal.3d 1063, 1069-1070, 275 Cal.Rptr. 384, 800 P.2d 862 (Fields).) Were it otherwise, appellate courts would be required to engage in the "`perilous process'" of second-guessing counsel's trial strategy. (Pope, supra, 23 Cal.3d at p. 426, 152 Cal.Rptr. 732, 590 P.2d 859.) Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (People v. Fosselman (1983) 33 Cal.3d 572, 581, 189 Cal.Rptr. 855, 659 P.2d 1144 (Fosselman); see also People v. Tello (1997) 15 Cal.4th 264, 62 Cal.Rptr.2d 437, 933 P.2d 1134; People v. Avena (1996) 13 Cal.4th 394, 418, 53 Cal.Rptr.2d 301, 916 P.2d 1000 (Avena).)
With these principles in mind, we consider defendant's contentions.[2]

1. Alleged subversion of the defense team
Defendant asserts that Richard Hawk provided inadequate representation by taking actions at cross-purposes with lead counsel, which subverted the defense team effort. His first complaint concerns Hawk's declaration of a doubt as to defendant's competency to proceed to the penalty phase of trial without informing lead defense counsel Judd Iversen of his intention to do so.
The record indicates that following the guilt phase, Hawk worked directly with defendant while Iversen talked with prospective witnesses and generally prepared for the upcoming penalty phase proceedings. It was during this time that Hawk grew concerned over defendant's mental state. Acting on these concerns, on the day the penalty phase *72 of trial was scheduled to begin, Hawk expressed a doubt to the court regarding defendant's competency to proceed, pursuant to section 1368. Iversen was initially upset that Hawk had raised the competency issue without discussing the matter with him first. However, after meeting with defendant and defendant's psychiatrist, Iversen came to share Hawk's belief that defendant was not competent to proceed. The trial court determined there was substantial evidence of incompetence and ordered a hearing, at which both Iversen and Hawk expressed a doubt as to whether defendant could assist in his defense in a rational manner.
On the basis of the appellate record, We cannot conclude that the complained-of actions demonstrate a subversion of counsel's collective effort on defendant's behalf, or otherwise constitute deficient performance. Hawk's declaration of a doubt regarding defendant's competency apparently caught Iversen by surprise. However, there is nothing in the record to indicate that Hawk's failure to communicate his intention to raise the competency issue prior to actually doing so was to undermine the defense effort. Contrary to defendant's characterization of the incident, the record shows only that, as a result of the division of labor between his two attorneys, one of them declared a doubt regarding defendant's competency without first clearly communicating his concerns to his colleague. Although good communication with cocounsel is no doubt an important component of an effective defense team effort, we cannot conclude on this record that Hawk's lapse constituted deficient performance, particularly when cocounsel ultimately found his colleague's action warranted.
Defendant also faults Hawk's stipulation to the admission of a document Iversen had objected to as irrelevant. During Hawk's questioning of a prosecution witness regarding the molestation of Warsing's then six-year-old son, Iversen objected to the prosecutor's attempt to have the police report of the incident admitted into evidence, arguing that the report was irrelevant. The court reserved its ruling on whether to admit the report pending a decision by defense counsel whether they wanted it. When the court took the matter up later, Iversen confirmed he had objected to the evidence, but turned the question over to Hawk, who stipulated to admitting the report. Hawk later used the report during closing argument to show jurors why Jennifer Warsing was a person who could not be trusted.
Defendant characterizes this incident as the "spectacle of one counsel being forced to object to cocounsel." However, the evidentiary disagreement regarding the police report, as it appears in the record, demonstrates little more than the give-and-take between cocounsel jointly charged with controlling the course of their client's case. On this record, we cannot say cocounsel's divergence of views was a subversion of the defense team effort by one attorney, as defendant claims, or that the incident otherwise establishes deficient performance. Hawk's reference to the report in closing argument evidences a valid tactical reason for wanting the report admitted, which did not prejudice the defense effort.

2. Failure to present a coherent defense strategy
Defendant contends that both Iversen and Hawk rendered inadequate representation by failing to conduct his defense according to a coherent strategy. To support his claim of a defense in disarray, defendant points to the following actions by his trial counsel: (1) taking inconsistent positions in closing argument; (2) failing to make good on promises made to the jury during opening statement; (3) insulting the jurors by demeaning their community; and (4) conducting meaningless cross-examination of prosecution witnesses.
Contrary to defendant's assertions, the record discloses defense counsel did employ a coherent defense strategy throughout trial. Evident in the opening and closing statements to the jury is a defense strategy attacking the credibility of Jennifer Warsing whose testimony and statements formed the backbone of the prosecution's case. For example, during his closing remarks, Iversen repeatedly posed the question of Warsing's credibility to the jury, inquiring, "Can you believe Jennifer Warsing? Because she is the glue that holds the case together," "Can *73 you trust Jennifer?" and "How can you be expected to believe Jennifer Warsing?" Moreover, counsel's vigorous cross-examination of Warsing and other prosecution witnesses indicates a deliberate and consistent effort attacking both Warsing's credibility and her version of the events surrounding the Brandts' murders. Counsel also elicited testimony relating to the physical evidence in an effort to cast further doubt on Warsing's story. To this end, a large part of the defense case was built on the testimony of Dr. John Thorton, a forensic expert whose opinion of how the crime occurred differed from Warsing's account. The defense also used Dr. Thorton's testimony in an attempt to show that the Department of Justice had made significant errors processing the crime scene.
Counsel's efforts on defendant's behalf did not ultimately succeed, but it does not follow that counsel lacked a coherent defense strategy, or that counsel was incompetent for pursuing the chosen strategy. "Lack of success does not reflect incompetence of counsel." (People v. Cox (1991) 53 Cal.3d 618, 662, 280 Cal.Rptr. 692, 809 P.2d 351 (Cox); People v. Reeves (1966) 64 Cal.2d 766, 773, 51 Cal.Rptr. 691, 415 P.2d 35.) Moreover, nothing in the record indicates the actions cited by defendant were anything other than the informed strategic decisions of counsel. (Fosselman, supra, 33 Cal.3d at p. 581, 189 Cal.Rptr. 855, 659 P.2d 1144.)
Defendant claims counsel was ineffective for taking inconsistent positions in closing argument by arguing first that defendant did not commit the murders, and then that the jury should convict him of lesser included offenses based on defendant's mental state. The record shows that throughout closing argument, counsel repeatedly maintained that defendant did not murder the Brandts. Counsel's remark that "We said, beginning in the opening statement โ and I say today โ our defense is Jerry Frye did not commit the act," is illustrative. Later, counsel acknowledged there was evidence supporting instructions on lesser included offenses, and summarized the evidence regarding defendant's impaired mental state for the jury. In his review, however, counsel reminded the jury that a mental state defense "is not the defense that we put forward" and expressed concern that the jury would think he was "talking out of both sides of my mouth."
Even if this closing argument could be viewed as advocating inconsistent positions, we cannot conclude on this record that it fell outside the range of reasonably competent representation. Once the prosecutor had raised the issue of lesser included offenses to the jury, defense counsel may have had valid tactical reasons for offering an assessment of the evidence on this point, rather than ignoring it and focusing solely on an outright acquittal. Defendant asserts that counsel's inconsistent arguments undermined the defense team's credibility with the jury. However, given the substantial amount of evidence concerning defendant's mental and neurological impairments, it is equally likely that counsel's failure to express a defense position on the issue of lesser included offenses would have threatened its credibility. The appellate record does not disclose the reasons for counsel's decision to present argument on lesser included offenses. Nor are we inclined to second-guess counsel's strategy. (Pope, supra, 23 Cal.3d at p. 426, 152 Cal.Rptr. 732, 590 P.2d 859.) Defendant's claim of deficient performance is therefore rejected.
Defendant also finds counsel ineffective for failing to deliver on two promises made to the jury during the opening statement, by informing the jury defendant would testify when he ultimately did not take the stand, and by laying the groundwork for a mental defense through the testimony of expert witnesses but failing to base the defense on defendant's mental state. According to defendant, counsel's broken promises evidence a defense in disarray.
The record confirms that during opening statements, counsel told the jury defendant would testify and wanted to take the witness stand to tell what he remembered. Jurors were also told they would hear from several expert witnesses, including Dr. McGuire, a neurologist, and a psychologist, Dr. Linda Wagner, who would testify defendant suffered neurological and psychiatric impairments affecting his ability to recapture *74 memory and process words. However, as previously recounted, towards the end of the defense case, counsel perceived defendant was having difficulty remembering information. The court advised defendant that, notwithstanding counsel's concerns, the decision whether or not to testify was his, and if he wanted to testify, he could. The next day, defendant informed the court he had taken his attorneys' advice not to testify on his own behalf.
On this record, we cannot conclude counsel rendered deficient representation by advising defendant against taking the witness stand notwithstanding having told the jury in opening statement that defendant would testify. In light of defendant's initial desire and willingness to testify, counsel's statement was an appropriate exercise of his decision-making responsibilities at trial. (Cf. People v. Hines (1997) 15 Cal.4th 997, 1032, 64 Cal. Rptr.2d 594, 938 P.2d 388 [counsel not ineffective for informing jury during opening statement defendant would testify, given defendant's indication to counsel of willingness to do so].) As the trial progressed and counsel observed defendant's increasing inability to remember, counsel's advice against testifying also fell within the realm of tactical considerations. Given defendant's decision to heed his attorneys' advice and forego his right to testify, and in the absence of anything in the record evidencing the lack of a reasonable basis for counsel's advice not to take the witness stand, we view the challenged acts as appropriate tactical decisions, subject to great deference on appellate review. (Fields, supra, 51 Cal.3d at pp. 1069-1070, 275 Cal.Rptr. 384, 800 P.2d 862.)
As to defendant's assertion counsel laid the groundwork for a mental defense but failed to present one, the record indicates otherwise. As previously recounted, although the defense consistently maintained defendant did not commit the murders, counsel also summarized for the jury the evidence supporting conviction of a lesser included offense, arguing defendant did not possess the requisite mental state for the charged offense of murder. In support of this argument, counsel relied extensively on the testimony of defense experts Dr. McGuire and Dr. Peal. As counsel explained, "[w]e brought on Dr. McGuire and Dr. Peal for different reasons with regard to [defendant] testifying. Certainly, some of their testimony can be used [to support a conviction of a lesser included offense]."
The record does not reveal that counsel lacked a rational tactical purpose for raising a mental defense in the context of addressing lesser included offenses. Accordingly, we cannot conclude counsel's decision to raise a mental defense in the manner presented fell outside the range of professionally reasonable representation.
Defendant further contends counsel was ineffective because he insulted the jurors during closing remarks by referring to their community as "a little Podunk area." This claim is unsupported by the record.
A portion of Hawk's closing argument focused on discrepancies in the physical evidence presented by the prosecution and the mismanagement of the crime scene processing by the Department of Justice. In making these points, counsel explained that he frequently calls on Dr. John Thorton for his expert opinion in matters of physical evidence because of Thorton's integrity. Comparing Thorton to members of the Department of Justice who processed the crime scene in the case, counsel said of the latter, "Those guys don't care. They didn't care one way or the other. They are up here in a podunk rural area and they wanted to go back to Sacramento City. They didn't spend any more time in the woods than they had to."
Counsel's resort to the vernacular in an attempt to cast doubt on the adequacy of the crime scene investigation and the credibility of the prosecution's physical evidence constitutes appropriate argument to the jury. Viewed in the context of counsel's entire argument, the complained-of remarks could not reasonably be construed as an insult to the jurors' community.
Defendant contends finally that counsel provided deficient representation by conducting meaningless cross-examination of prosecution witnesses. The cross-examination of witnesses is a matter falling within *75 the discretion of counsel, and rarely provides an adequate basis on appeal for a claim of ineffective assistance of counsel. (Williams, supra, 16 Cal.4th at pp. 216-217, 66 Cal. Rptr.2d 123, 940 P.2d 710; Cox, supra, 53 Cal.3d at p. 662, 280 Cal.Rptr. 692, 809 P.2d 351.) Because defendant fails to disclose what evidence, if any, counsel might have elicited had he subjected prosecution witnesses to more rigorous cross-examination, his claim of inadequate assistance does not succeed.

3. Failure to file suppression motions
Defendant argues counsel was ineffective for failing to file motions to exclude defendant's statements to police following his arrest in South Dakota. He also faults counsel for not seeking the exclusion of a tape-recorded conversation between defendant and Jennifer Warsing. Defendant asserts that the suppression motions were likely to have been granted and that, because he did not testify, the challenged statements would not have been admissible for impeachment purposes. We address his specific claims, mindful that "[t]he Sixth Amendment does not require counsel `"to waste the court's time with futile or frivolous motions."'" (People v. Memro (1995) 11 Cal.4th 786, 834, 47 Cal. Rptr.2d 219, 905 P.2d 1305 (Memro).)

a) Defendant's statements to police in South Dakota
The record indicates that around 2:30 a.m. on July 6, 1985, Belle Fourche police responded to a report of domestic violence at the Hanna Apartments where defendant and Jennifer Warsing resided together. One of the four responding officers, Officer Jepsen, testified at trial that the woman who lived in the apartment directly below defendant's residence told the officers she believed the disturbance was coming from the apartment above hers. All four officers went upstairs to the top landing and noticed light coming from the back of defendant's apartment. Officer Smith opened the screen door, pointing out to the other officers what appeared to be blood on the inside door. Smith then knocked on the closed door and Warsing answered, her face injured and swollen. When Smith asked Warsing who had hurt her, Warsing stepped back and pointed to defendant lying on the couch. The four officers stepped into the apartment to see who she was pointing at.
Concerned with the safety of his fellow officers as well as his own, Officer Smith watched defendant lying on the couch for several minutes. Smith then approached defendant, shook him to get his attention, and asked his name. Seeing blood on the bed and other signs of injury, the officers believed they had probable cause to arrest defendant for assault. He was then taken to the police station four blocks away.
At the station, Officer Jepsen sat outside in the patrol car with defendant waiting for an interview room to become available. According to Jepsen's testimony, defendant's breath smelled of alcohol, his eyes were bloodshot and his speech was slurred. In filling out the booking sheet, Jepsen noted these observations and indicated that defendant seemed despondent or depressed.
After approximately 10 minutes of waiting in the patrol car with Jepsen, defendant identified himself as Jerry Frye and said he was wanted in California for a double murder. Shortly thereafter, police confirmed defendant's identity and brought him into an interview room where a videotape camera was running. He was advised of his Miranda rights (Miranda v. Arizona, supra, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694), waived them, and agreed to talk with officers on videotape. Defendant told officers that he did not know if he killed the Brandts or not, but Warsing had told him he did, and that he had had alcoholic blackouts in the past. The videotape of defendant's interview was shown to the jury at trial.
At approximately 6 a.m. after the interview with police, defendant was transported from Belle Fourche to the jail facility in nearby Deadwood. Officers Smith and Evans accompanied him. Smith testified that defendant talked en route and admitted he had killed the Brandts. He asked the officers if they thought he would receive the death penalty. Opining it was cruel to make a man sentenced to death sit on death row so long, *76 defendant asked them to pull over and shoot him to take him out of his misery.
In several related arguments, defendant contends counsel was ineffective for failing to seek suppression at trial of the statements he made to police following his arrest in South Dakota. He asserts that because his Sixth Amendment right to counsel had attached with the filing of a complaint against him in Amador County on May 24, 1985, police were forbidden from questioning him subsequent to his arrest on July 6.
The Sixth Amendment right to counsel attaches at the time adversary judicial proceedings are initiated against the accused, such as when the defendant is indicted or arraigned. (McNeil v. Wisconsin (1991) 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158; United States v. Gouveia (1984) 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146; Clair, supra, 2 Cal.4th at p. 657, 7 Cal.Rptr.2d 564, 828 P.2d 705.) Moreover, a suspect facing custodial interrogation by police may assert a right to counsel flowing from the Fifth Amendment's protection against compelled self-incrimination. (Edwards v. Arizona (1981) 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (Edwards); Miranda v. Arizona, supra, 384 U.S. at pp. 474, 479, 86 S.Ct. 1602.) In either setting, the right to counsel may be waived. (Edwards, supra, 451 U.S. at p. 484, 101 S.Ct. 1880; Michigan v. Jackson (1986) 475 U.S. 625, 630, 106 S.Ct. 1404, 89 L.Ed.2d 631.) For a waiver to be valid, it must be a voluntary, knowing and intelligent relinquishment of the right to counsel. (Patterson v. Illinois (1988) 487 U.S. 285, 292, 108 S.Ct. 2389, 101 L.Ed.2d 261.) When an accused relinquishes the right to counsel after having received Miranda warnings, that will generally establish a knowing and intelligent waiver. (Michigan v. Harvey (1990) 494 U.S. 344, 348-349, 110 S.Ct. 1176, 108 L.Ed.2d 293; Patterson v. Illinois, supra, 487 U.S. at p. 292, 108 S.Ct. 2389.) Such advisements will not establish a valid waiver of the right to counsel, however, if police initiate questioning of an accused or a custodial suspect after a request for counsel has been made. (Michigan v. Jackson, supra, 475 U.S. at p. 636, 106 S.Ct. 1404; Edwards, supra, 451 U.S. at pp. 484-485, 101 S.Ct. 1880.) Under these circumstances, any statements obtained are inadmissible as substantive evidence at trial. (Michigan v. Harvey, supra, 494 U.S. at p. 350, 110 S.Ct. 1176.)
The record shows that after his arrest, defendant was advised of his right to counsel and waived the right. (Cf. Michigan v. Harvey, supra, 494 U.S. at pp. 348-349, 110 S.Ct. 1176.) There is no evidence that defendant's waiver was made unknowingly or unintelligently. Furthermore, there is nothing in the record to indicate defendant requested the assistance of counsel prior to speaking to police, and he does not contend otherwise. (Cf. People v. Crittenden (1994) 9 Cal.4th 83, 130-131, 36 Cal.Rptr.2d 474, 885 P.2d 887 [no invocation of right to counsel].) Because the record provides an insufficient factual foundation for a motion to suppress based on a Sixth Amendment violation, we cannot conclude counsel's failure to file such a motion fell outside the range of reasonably competent representation. The constitutional right to effective assistance of counsel does not require counsel to file motions lacking in factual support. (Cf. Memro, supra, 11 Cal.4th at p. 834, 47 Cal.Rptr.2d 219, 905 P.2d 1305.)
Defendant next argues counsel was ineffective for failing to seek exclusion of defendant's videotaped statement to Belle Fourche police on the ground that defendant was incapable of understanding the Miranda warnings. Defendant argues that because he was intoxicated at the time he was advised of his Miranda rights, he was incapable of understanding the warnings.
On this record, we reject defendant's assertion that a motion to suppress the videotaped interview would have succeeded. To have prevailed, defendant would have had to establish his consumption of alcohol so impaired his reasoning that he was incapable of freely and rationally choosing to waive his rights and speak with the officers. (Cf. People v. Mayfield (1993) 5 Cal.4th 142, 204, 19 Cal.Rptr.2d 836, 852 P.2d 331 (Mayfield) [concluding defendant failed to carry burden of showing confession involuntary due to ingestion of drugs]; In re Cameron (1968) 68 Cal.2d 487, 498, 67 Cal.Rptr. 529, 439 P.2d *77 633.) Having reviewed the videotaped interview, we find no evidence supporting the conclusion defendant was so impaired. (Cf. Jackson, supra, 49 Cal.3d. at p. 1189, 264 Cal.Rptr. 852, 783 P.2d 211.) The voluntary consumption of alcohol, standing alone, does not establish an impaired capacity. (Ibid.; People v. Hendricks (1987) 43 Cal.3d 584, 591, 238 Cal.Rptr. 66, 737 P.2d 1350; People v. Taylor (1980) 112 Cal.App.3d 348, 361, 169 Cal.Rptr. 290.)
Even if a reasonably competent attorney would ordinarily be expected to challenge the statement on the ground that consumption of alcohol had so impaired defendant's reasoning that he was incapable of freely and nationally choosing to waive his Miranda rights, the appellate record fails to disclose why defendant's counsel did not file a motion to suppress on this basis. (Pope, supra, 23 Cal.3d at p. 428, 152 Cal.Rptr. 732, 590 P.2d 859.) Nor can we conclude counsel lacked a reasonable tactical reason for not doing so. For example, counsel may have reasonably believed defendant's demeanor on the videotape was consistent with the defense position that defendant did not posses the requisite mental state to kill the Brandts. Counsel may also have considered the videotape a forceful vehicle for showing the jury a confused, brain-damaged individual susceptible to another person's insistence that he had murdered the Brandts, although unable to recall having done so himself. In light of the record on appeal, we cannot conclude counsel's decision to forego a challenge to the videotaped statement constituted deficient representation.
Defendant lastly faults his counsel for failing to seek suppression of his statements to police following the unlawful entry by officers into his home to arrest him for assaulting Jennifer Warsing.
When a defendant claims ineffective assistance of counsel based on his counsel's failure to bring a motion to suppress evidence on Fourth Amendment grounds, the defendant is required to show that the Fourth Amendment claim had merit. (Wharton, supra, 53 Cal.3d at p. 576, 280 Cal.Rptr. 631, 809 P.2d 290; Kimmelman v. Morrison (1986) 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305.) We therefore must determine whether defendant would have prevailed on a suppression motion based on the warrantless entry by Belle Fourche police.
Warrantless entry presumptively violates the constitutional proscription against unreasonable searches and seizures. (Payton v. New York (1980) 445 U.S. 573, 583-590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (Payton).) The presumption of unlawfulness can be overcome, however, by a limited number of carefully circumscribed exceptions to the warrant requirement. (Welsh v. Wisconsin (1984) 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732; Payton, supra, 445 U.S. at pp. 585-590, 100 S.Ct. 1371; Wharton, supra, 53 Cal.3d at pp. 576-577, 280 Cal.Rptr. 631, 809 P.2d 290.) One exception is the presence of "exigent circumstances." When police are confronted by "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property" (People v. Ramey (1976) 16 Cal.3d 263, 276, 127 Cal.Rptr. 629, 545 P.2d 1333), the failure to comply with the warrant requirement is justified. (Ibid.) A warrantless entry may also be justified when voluntary consent is given. (Schneckloth v. Bustamonte (1973) 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854; Memro, supra, 11 Cal.4th at p. 847, 47 Cal.Rptr.2d 219, 905 P.2d 1305.) Such consent may be obtained from a third party who possesses common authority over the premises. (United States v. Matlock (1974) 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242; People v. Haskett (1982) 30 Cal.3d 841, 856, 180 Cal.Rptr. 640, 640 P.2d 776.)
Here, the record indicates Belle Fourche police had not obtained a warrant prior to entering defendant's apartment and placing him under arrest for assault. However, when the officers arrived at the Hanna Apartments in the early morning hours in response to a report of domestic violence and knocked on defendant's door, they saw Warsing with a bruised and swollen face and observed what appeared to be blood on the outside of the door. When one of the officers asked Warsing who had injured her, she stepped outside the door and pointed to defendant inside the apartment. In light of the facts known to the officers at the time, they could reasonably have concluded that immediate action was necessary. Had they left *78 the scene to obtain a warrant, there was a significant risk that Warsing would have suffered additional harm. Even if several officers had remained on the premises with Warsing while a warrant was being secured, the likely delay could have posed a safety risk to not only Warsing but the remaining officers as well. We conclude that, under these circumstances, the officers' warrantless entry into the apartment was objectively reasonable and the "exigent circumstances" exception to the warrant requirement applies to justify the entry here. (Cf. People v. Higgins (1994) 26 Cal.App.4th 247, 251-255, 31 Cal.Rptr.2d 516 [exigent circumstances doctrine justifies warrantless entry in domestic violence setting presented by facts of case]; People v. Wilkins (1993) 14 Cal.App.4th 761, 772, 17 Cal.Rptr.2d 743 [same].) Therefore, counsel was not ineffective for not having challenged the admission of defendant's statements on that basis.
A successful motion to suppress based on the warrantless entry was further foreclosed by Warsing's implied consent to the officers' entry into the apartment. It may be inferred from the fact Warsing and defendant resided together in the apartment that she possessed authority to consent to the officers' entry. (United States v. Matlock, supra, 415 U.S. at p. 171, 94 S.Ct. 988; People v. Smith (1966) 63 Cal.2d 779, 799-800, 48 Cal.Rptr. 382, 409 P.2d 222.) Moreover, consent to enter may be express or implied. (4 Witkin & Epstein, Cal.Criminal Law (2d ed. 1988) ง 2306, pp. 2704-2705.) Here, the record shows that when officers standing outside the open door of the apartment asked Warsing who had hurt her, she stepped back and pointed to defendant lying on the couch inside, letting officers step into the apartment to see who she was pointing at. Such actions provide sufficient indication of her consent to the entry. (Cf. People v. Harrington (1970) 2 Cal.3d 991, 995, 88 Cal.Rptr. 161, 471 P.2d 961 [defendant who stepped aside and held out his arm as officer walked through the front door impliedly consented to officer's entry]; People v. Martina (1985) 166 Cal. App.3d 777, 791, 212 Cal.Rptr. 45 [consent implied when defendant opened front door wider and stepped back for officer to enter].) In light of Warsing's consent to the entry by police, a motion to suppress defendant's statements would not have prevailed. Counsel was therefore not ineffective for failing to raise such a motion.

b) Statements made to Jennifer Warsing
At approximately the same time Belle Fourche police were reading defendant his Miranda warnings and obtaining a statement from him, officers were returning to the Hanna Apartments to arrest Warsing who had been permitted to return after giving a statement regarding the earlier assault. They then contacted authorities in Amador County, advising them defendant and Warsing were in custody in South Dakota.
On July 7, 1985, Amador County officers arrived at the county jail in Deadwood, South Dakota, to which defendant and Warsing had been transported. Defendant and Warsing agreed to be interviewed by the California officers. The next day, however, defendant refused to speak with them because he wanted to talk with Warsing first. Officer Mark Anderson informed defendant that he could not make such arrangements until they returned to California and opined that on their return, defendant would probably be appointed an attorney, who would not want him to talk to police. According to Anderson's testimony, defendant replied that he did not care what his attorney said and that "he was going to talk to us anyway." Defendant then asked what Warsing was being charged with. Anderson testified defendant was visibly irritated to learn there were no charges against Warsing relating to the murders, telling him, "she is as guilty as I am. She is an accessory before and after the fact." Prior to leaving South Dakota, defendant wrote a letter to Warsing which Amador County officers delivered to her.
Defendant did not challenge extradition and was returned to California on July 10, 1985. The next day, police made arrangements for defendant to talk with Warsing in the visiting portion of the jail. They conversed by telephone through a glass partition; Prior to commencing their conversation, they were advised that it would be recorded. The tape of their conversation *79 was played for jurors who were given a transcript to follow.
Warsing cooperated with police throughout their investigation of the Brandts' murders. In October 1985, she entered into a written immunity agreement with the Amador County District Attorney. In that agreement, she promised to continue to cooperate with the police and to testify truthfully at trial in exchange for a promise that no charges would be filed against her in connection with the Brandts' murders and a grant of immunity for her testimony at defendant's trial.
Defendant claims trial counsel provided deficient representation by failing to move to suppress the recording of his conversation with Warsing. Because he believes the police reunited him with Warsing for the express purpose of eliciting incriminating statements from him in the absence of counsel, in violation of his rights under the Sixth Amendment (Massiah v. United States (1964) 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (Massiah)), defendant asserts a motion to suppress his recorded statements on Massiah grounds would have prevailed; and because he did not testify, the statements could not have been admitted for impeachment purposes.
The Sixth Amendment forbids the state from deliberately eliciting incriminating statements from the defendant in the absence of counsel. (Massiah, supra, 377 U.S. at p. 206, 84 S.Ct. 1199; Maine v. Moulton (1985) 474 U.S. 159, 172, 106 S.Ct. 477, 88 L.Ed.2d 481 (Moulton).) This constitutional guarantee precludes the government from taking any action to prevent an individual from invoking the right to counsel in any post-indictment confrontations between suspect and state. (Moulton, supra, 474 U.S. at pp. 170, 176, 106 S.Ct. 477.) Such a "knowing exploitation by the State of an opportunity to confront the accused without counsel" (id. at p. 176, 106 S.Ct. 477) renders any incriminating statements inadmissible as evidence against the defendant at trial. (See Massiah, supra, 377 U.S. at p. 207, 84 S.Ct. 1199; In re Wilson (1992) 3 Cal.4th 945, 952, 13 Cal.Rptr.2d 269, 838 P.2d 1222 (Wilson).)
Defendant asserts his case is closely analogous to the facts of Massiah, supra, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. In Massiah, the defendant and a codefendant were charged with various crimes for transporting a quantity of narcotics aboard a merchant marine vessel. (Id. at p. 202, 84 S.Ct. 1199.) After retaining an attorney, the defendant pled not guilty and was released on bail, along with his codefendant. Unbeknownst to the defendant, the codefendant agreed to act as an informant, and permitted the police to install a hidden radio transmitter in his car. (Id. at pp. 202-203, 84 S.Ct. 1199.) Defendant and the codefendant carried on a lengthy conversation while a police officer listened over his radio (id. at p. 203, 84 S.Ct. 1199). Defendant made several incriminating statements which were presented at trial through the officer's testimony.
In reversing the conviction, the United States Supreme Court held the defendant's Sixth Amendment right to counsel was violated when the government deliberately elicited incriminating statements from him in the absence of counsel. (Massiah, supra, 377 U.S. at p. 206, 84 S.Ct. 1199.) The Massiah court recognized that the right to counsel guaranteed by the Sixth Amendment applied in settings other than trial itself, to both "`indirect and surreptitious interrogations'" as well as those conducted in the jailhouse. (Id. at p. 206, 84 S.Ct. 1199.)
Contrary to defendant's argument, there are differences between the facts of his case and those presented in Massiah. In Massiah, the government informant and the defendant had been jointly charged and released on bail. Operating on the reasonable belief that he and his codefendant shared the same predicament, it was highly likely the defendant would reveal information to his confederate that he would not have wanted to reveal to police. (Cf. Moulton, supra, 474 U.S. at p. 177, fn. 13, 106 S.Ct. 477 [codefendant informant's conversation with defendant about upcoming trial was certain to elicit statements defendant would not intentionally reveal to police agents]; United States v. Henry (1980) 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (Henry) [defendant highly susceptible to ploy of cellmate informant whom he perceived as sharing common plight].) In this case, by contrast, defendant *80 was aware at the time of his conversation with Warsing that she had not been charged with any crimes in connection with the Brandt murders. He was also told the conversation would be recorded. Under these circumstances, it is unlikely their conversation would elicit statements defendant would not have revealed to the police directly. (Moulton, supra, 474 U.S. at p. 177, 106 S.Ct. 477.) Defendant's statement to Officer Anderson telling him he would talk to police regardless of what his attorney advised further confirms what may be inferred from the record.
In determining the merits of a Massiah claim, the essential inquiry is whether the government intentionally created a situation likely to induce the accused to make incriminating statements without the assistance of counsel. (Cf. Henry, supra, 447 U.S. at p. 274, 100 S.Ct. 2183; Moulton, supra, 474 U.S. at p. 176, 106 S.Ct. 477; People v. Gonzalez (1990) 51 Cal.3d 1179, 1240-1241, 275 Cal.Rptr. 729, 800 P.2d 1159 (Gonzalez).) This court's decision in In re Neely (1993) 6 Cal.4th 901, 915, 26 Cal. Rptr.2d 203, 864 P.2d 474, culled from the case law the following requirements for establishing a Massiah claim involving use of a police informant. To prevail on such a claim, the defendant must show (1) that the informant acted as a government agent at the behest of the police in accordance with a preexisting agreement and with the expectation of receiving a benefit or advantage, and (2) that the informant deliberately elicited incriminating statements.
There is no evidence Warsing was acting as a government agent when police arranged for defendant to speak with her in the jail's visiting facility. Although Warsing's cooperation with police throughout their investigation may have been motivated in large part by her desire to avoid having criminal charges filed against her, there is no evidence of a working relationship between Warsing and the Amador County police at the time Warsing's conversation with defendant took place. Nor is there evidence that police asked Warsing to obtain information from defendant in exchange for a promise not to charge her in connection with the Brandts' murders. (Cf. Wilson, supra, 3 Cal.4th at p. 952, 13 Cal.Rptr.2d 269, 838 P.2d 1222; Gonzalez, supra, 51 Cal.3d at p. 1241, 275 Cal.Rptr. 729, 800 P.2d 1159.) The immunity agreement was formalized long after the conversation, and the record discloses no evidence of any other agreements or understandings between Warsing and the authorities from which to infer the government sought to obtain evidence against defendant by "knowingly circumventing [his] right to have counsel present in a confrontation between the accused and a state agent." (Cf. Moulton, supra, 474 U.S. at p. 176, 106 S.Ct. 477, fn. omitted.)
Moreover, the record does not support defendant's assertion that Warsing elicited incriminating statements from him. Our review of a transcript of the tape-recorded conversation discloses that Warsing neither questioned defendant about the murders nor encouraged him to discuss the pending charges. (Cf. Kuhlmann v. Wilson (1986) 477 U.S. 436, 459-460, 106 S.Ct. 2616, 91 L.Ed.2d 364 [no Massiah violation when informant does not ask questions or solicit information]; Henry, supra, 447 U.S. at pp. 271-272, 100 S.Ct. 2183.) Nor can defendant's statements be characterized as incriminating. Throughout the conversation, he maintained he did not commit the crimes. (Cf. In re Neely, supra, 6 Cal.4th at pp. 912-913, 26 Cal.Rptr.2d 203, 864 P.2d 474 [Sixth Amendment violation occurred where codefendant acting on behalf of police elicited statements from defendant suggesting they fabricate a story regarding their involvement in crimes].) In light of the foregoing principles and the record before us, we cannot conclude counsel was constitutionally inadequate for failing to seek suppression of defendant's taped conversation with Warsing on Massiah grounds.

I. Hawk's Suspension from the Practice of Law
On September 23, 1985, a hearing panel of the State Bar completed disciplinary proceedings against Richard Hawk relating to his representation of a different client in a criminal matter. (Hawk v. State Bar, supra, 45 Cal.3d at pp. 593, 597, 247 Cal.Rptr. 599, *81 754 P.2d 1096.) This court reviewed the recommendation of the review department of the State Bar court that Hawk be suspended for four years. (Id. at p. 592, 247 Cal.Rptr. 599, 754 P.2d 1096.) While our decision was pending, and prior to the completion of jury selection in defendant's case, the prosecutor raised a concern with the trial court about the disciplinary proceedings against Hawk. Noting the possibility that Hawk would be suspended during defendant's trial, the prosecutor suggested the trial court obtain a statement from defendant regarding his understanding of the situation and his desire to proceed to trial with Hawk as his counsel notwithstanding the possible suspension. In response, Iversen indicated that defendant strongly desired to have Hawk represent him, and that Hawk was presently licensed to practice law, making it inappropriate to inquire into defendant's thoughts on the matter. Nevertheless, the court asked defendant whether he agreed to proceed to trial with Hawk under the circumstances, and defendant stated he did. The court took no further action.
In a decision rendered by this court on June 9, 1988, Hawk was found to have failed to comply with rule 5-101 of the State Bar Rules of Professional Conduct, which prohibits an attorney from acquiring an interest adverse to a client, when he took a promissory note secured by a deed of trust in real property to secure payment of a fee. Hawk was suspended from the practice of law for four years, with actual suspension of six months. (Hawk v. State Bar, supra, 45 Cal.3d at pp. 602-603, 247 Cal.Rptr. 599, 754 P.2d 1096.)
On June 23, 1988, following the guilt phase, the trial court conferred with counsel to set the dates for a competency hearing. During this conference, the prosecutor sought additional information on Hawk's pending suspension, concerned that the disciplinary order would affect the upcoming proceedings in defendant's case. The judge indicated his understanding that, in agreement with the State Bar, Hawk had sought a 90-day stay of the order of suspension, and that he would join in that request so Hawk could complete defendant's case. Later in the discussion, after the trial judge informed Hawk of his intention to write a letter requesting the suspension be stayed, the prosecutor indicated the People were prepared to join in the request for the stay. The following colloquy between Hawk and the prosecutor then took place:
"Mr. Hawk: You are going to write me a letter?
"Ms. Graves: The judge can indicate that in his letter.
"The Court: May I include that in the letter?
"Ms. Graves: Yes."
This court granted the parties' request to stay the order of suspension, making it effective 90 days after finality of the opinion. (Hawk v. State Bar, supra, 45 Cal.3d at p. 603, 247 Cal.Rptr. 599, 754 P.2d 1096.)
Defendant raises several claims related to Hawk's suspension.

1. Ineffective assistance of counsel
Defendant first contends he was denied his right to the effective assistance of counsel because he was represented at trial by an attorney found to have committed acts requiring his suspension from the practice of law. Defendant asserts that permitting Hawk to represent him in a capital trial under these circumstances is inconsistent with notions of fundamental fairness and heightened reliability in capital cases.
Defendant does not point to any evidence that Hawk's pending suspension affected his performance on defendant's behalf. (Strickland, supra, 466 U.S at p. 688, 104 S.Ct. 2052.) Instead, he urges this court to adopt the reasoning of the Illinois Supreme Court in People v. Williams (1982) 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136, and find ineffectiveness of counsel on the basis of Hawk's suspension alone.
In People v. Williams, supra, 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136, the state high court initially affirmed the defendant's conviction and death sentence, rejecting his claim of ineffective assistance of counsel. Before acting on the defendant's petition for rehearing, however, the court heard a disciplinary *82 action against the defendant's counsel which resulted in the attorney's disbarment for reasons unrelated to his representation of the defendant. As a result of information learned during the disbarment proceedings, the court granted the defendant's petition for rehearing, and reversed his conviction. (Id., 67 Ill.Dec. 97, 444 N.E.2d at pp. 137-138.)
In granting the defendant a new trial in "the interests of justice" (People v. Williams, supra, 67 Ill.Dec. 97, 444 N.E.2d at p. 143), the court in Williams stressed the unique circumstances under which counsel was operating at the time he represented the defendant, and recounted a number of instances of counsel's inaction at trial. (Ibid.) The court acknowledged that it had originally found such errors did not constitute a violation of the defendant's right to counsel. As the court explained, however, in light of facts learned during the disbarment proceedings, the court could no longer say with confidence that counsel's professional judgments were rendered with full knowledge of the applicable law and facts. (Ibid.)
Defendant's reliance on People v. Williams, supra, 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136 is misplaced. In Williams, information apparently came to light in the unrelated disbarment proceeding that undermined the court's confidence in the general competence of William's counsel. (Id., 67 Ill.Dec. 97, 444 N.E.2d at p. 143.) Here, by contrast, defendant does not point to any actions by Hawk that, when viewed in light of his pending suspension, would constitute deficient performance. The "unique circumstances" (ibid.) underlying the court's decision in Williams to reverse the defendant's conviction and sentence in that case are not present here. (Cf. People v. Sanchez (1995) 12 Cal.4th 1, 41-43, 47 Cal.Rptr.2d 843, 906 P.2d 1129 (Sanchez) [finding reasoning of People v. Williams, supra, 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136 inapplicable].) Contrary to defendant's assertion, we do not read Williams to stand for the broad proposition that the mere fact of counsel's disbarment or suspension, standing alone, constitutes ineffective assistance of counsel or otherwise compromises the constitutional validity of a criminal conviction. Nor does our own precedent permit such a conclusion. (See In re Johnson (1992) 1 Cal.4th 689, 699, 4 Cal.Rptr.2d 170, 822 P.2d 1317 [declining to presume that suspended attorney lacks professional competence].)
Defendant asserts that even if permitting Hawk's representation to continue pending suspension did not violate the federal Constitution, it violated article 1, section 15 of the California Constitution under the reasoning of In re Johnson, supra, 1 Cal.4th 689, 4 Cal.Rptr.2d 170, 822 P.2d 1317. In In re Johnson, the defendant retained counsel to represent him in a criminal matter, unaware that the attorney had been suspended from the practice of law following conviction of a crime of moral turpitude. The attorney resigned from the State Bar while representing the defendant. The defendant argued his criminal conviction and sentence should be reversed because his attorney's relinquishment of his license to practice law in the state with disciplinary proceedings pending denied him the state constitutional right to assistance of counsel. (1 Cal.4th at p. 694, 4 Cal.Rptr.2d 170, 822 P.2d 1317.)
This court agreed and reversed his conviction. At the same time, however, we made clear that a court will not presume incompetence of counsel or the deprivation of the state constitutional right to counsel merely on the basis of the attorney's suspension from the practice of law following conviction of a crime of moral turpitude. (In re Johnson, supra, 1 Cal.4th at p. 696, 4 Cal.Rptr.2d 170, 822 P.2d 1317.) A suspension under these circumstances does not constitute a judgment on counsel's professional competence. (Id. at p. 699, 4 Cal.Rptr.2d 170, 822 P.2d 1317; cf. People v. Ngo (1996) 14 Cal.4th 30, 38, 57 Cal.Rptr.2d 456, 924 P.2d 97 [attorney's suspension for noncompliance with continuing legal education requirement does not in itself deny defendant effective assistance of counsel]; Sanchez, supra, 12 Cal.4th at p. 44, 47 Cal.Rptr.2d 843, 906 P.2d 1129 [disciplinary proceedings pending during attorney's representation of criminal defendant do not automatically render counsel's performance deficient].)
*83 Neither the facts nor the reasoning of In re Johnson compels reversal of defendant's conviction. Although an order of suspension was imposed on Hawk while he was actively representing defendant, the execution of that order was stayed until well after the proceedings against defendant had been completed. Unlike the attorney in In re Johnson, Hawk had not resigned from the State Bar while he represented defendant, and was therefore duly licensed to practice law. More importantly, however, defendant does not point to anything in the record demonstrating that Hawk's pending suspension resulted in deficient performance or otherwise prejudiced his defense. In light of this, and under the reasoning of In re Johnson, we cannot conclude Hawk provided inadequate representation simply because, for unrelated reasons, he was ordered suspended from the practice of law following completion of defendant's trial. (Cf. Sanchez, supra, 12 Cal.4th at pp. 43-45, 47 Cal.Rptr.2d 843, 906 P.2d 1129 [no evidence defendant prejudiced by counsel's pending discipline].)

2. Conflict of interest
Defendant next claims the circumstances surrounding the 90-day stay of the order suspending Hawk from the practice of law created an impermissible conflict of interest mandating reversal of his conviction and sentence.
The right to effective assistance of counsel secured by the Sixth Amendment to the federal Constitution and article 1, section 15 of the California Constitution includes the right to representation free from conflicts of interest. (People v. Bonin (1989) 47 Cal.3d 808, 833, 254 Cal.Rptr. 298, 765 P.2d 460 (Bonin).) A conflict of interest deprives the defendant of the undivided loyalty and advocacy guaranteed by both provisions. (See Maxwell v. Superior Court (1982) 30 Cal.3d 606, 612, 180 Cal.Rptr. 177, 639 P.2d 248; Glasser v. United States (1942) 315 U.S. 60, 75-76, 62 S.Ct. 457, 86 L.Ed. 680.) To establish a federal constitutional violation, a defendant who fails to object at trial must show that an actual conflict of interest "adversely affected his lawyer's performance." (Cuyler v. Sullivan (1980) 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333, fn. omitted; id. at p. 350, 100 S.Ct. 1708; People v. Kirkpatrick (1994) 7 Cal.4th 988, 1009, 30 Cal. Rptr.2d 818, 874 P.2d 248.) To show a violation of the corresponding right under our state Constitution, a defendant need only demonstrate a potential conflict, so long as the record supports an "informed speculation" that the asserted conflict adversely affected counsel's performance. (Cox, supra, 53 Cal.3d at p. 654, 280 Cal.Rptr. 692, 809 P.2d 351; People v. Mroczko (1983) 35 Cal.3d 86, 104-105, 197 Cal.Rptr. 52, 672 P.2d 835; People v. Dancer (1996) 45 Cal.App.4th 1677, 1685, 53 Cal.Rptr.2d 282.)
Defendant asserts a conflict arose from Hawk's interest in retaining his license, causing him to ingratiate himself with the prosecutor in order to secure the prosecutor's assistance in securing postponement of his suspension until the conclusion of trial. As a result, defendant contends, Hawk refrained from vigorously and effectively representing defendant at trial.
After reviewing the record in light of the principles set forth above, we find counsel's performance did not run afoul of state or federal constitutional standards. First, the record fails to support either "informed speculation" of a conflict or an actual conflict between the interests of defendant and his counsel. Contrary to defendant's characterization of Hawk's interaction with the prosecutor as an attempt to win her favor, the record shows Hawk was consistently and repeatedly at odds with the prosecutor, both before the request to stay the suspension and after the granting of the stay. For example, while testifying as a witness during defendant's competency hearing, Hawk stated the prosecutor had developed an irrational dislike of him to the point "she might need some help." Moreover, there is no indication Hawk ever sought or contemplated the prosecutor's intervention on his behalf. The prosecutor's involvement was limited to joining in the trial court's written request to postpone the finality of Hawk's suspension order. Hawk's expression of surprise when the prosecutor announced her intention to take this action belies defendant's assertion of a conflict. Aside from *84 the fact the prosecutor joined the trial court's request to postpone Hawk's suspension, nothing in the record supports a finding of an actual or potential conflict of interest between defendant and his counsel.
Nor does the record support the conclusion that the pending suspension or the attempt to have the suspension postponed adversely affected Hawk's performance. We have already concluded that none of the alleged instances of deficient performance by Hawk fell outside the range of reasonable professional assistance. (See ante, at pp. 71-72 of 77 Cal.Rptr.2d, at pp. 229-230 of 959 P.2d.) The mere assertion, without citation to the record, that Hawk refrained from providing vigorous and effective representation because of divided loyalty between his client and the prosecutor is insufficient to establish a violation of the right to conflict-free counsel.

3. Failure of the trial court to inquire into the purported conflict
Defendant contends finally that he was deprived of the right to conflict-free representation by the trial court's failure to inquire into the possible conflict of interest between defendant and his counsel, and by the court's failure to elicit from defendant a knowing and intelligent waiver of any conflict.
When a trial court is aware, or should be aware, of a possible conflict of interest between a criminal defendant and defense counsel, the court is required to inquire into the circumstances of the possible conflict and take whatever action may be appropriate. (Jones, supra, 53 Cal.3d at p. 1136, 282 Cal.Rptr. 465, 811 P.2d 757.) A trial court's failure to carry out its duty to conduct such an inquiry, or to take action based on the results of its inquiry, denies the defendant the right to due process. (Wood v. Georgia (1981) 450 U.S. 261, 271-273, 101 S.Ct. 1097, 67 L.Ed.2d 220.) A conviction will be reversed on the ground the trial court failed to satisfy its duty to inquire into a possible conflict, or to adequately respond to its inquiry, only where the defendant demonstrates that an actual conflict of interest existed, and that the conflict adversely affected counsel's performance. (Jones, supra, 53 Cal.3d at p. 1137, 282 Cal.Rptr. 465, 811 P.2d 757; Bonin, supra, 47 Cal.3d at pp. 837-838, 254 Cal.Rptr. 298, 765 P.2d 460.)
Applying these principles to the record on appeal, we conclude that the trial court took appropriate action under the circumstances. While conferring with the parties prior to jury selection in the case, the court was informed about the pending disciplinary proceedings and the possibility Hawk would be suspended before the completion of defendant's trial. At the prosecutor's request, the court asked defendant whether he wished to proceed with Hawk as his counsel in light of the possible suspension, and defendant responded affirmatively. The potential problem posed by the pending disciplinary proceedings involved the possibility that Hawk would not be able to continue to represent defendant for the entire trial. The court responded to this potential problem in an appropriate manner by giving defendant the opportunity to decline Hawk's representation, which defendant refused to do.
A similar contention was raised and rejected in People v. Jones, supra, 53 Cal.3d 1115, 282 Cal.Rptr. 465, 811 P.2d 757. The defendant in Jones claimed that his fee arrangement, giving counsel a financial interest in the defendant's rental property, created a financial motive for his counsel to see that the defendant was sentenced to death, and that the trial court should have conducted an inquiry into this possible conflict and obtained a waiver. (Id. at p. 1136, 282 Cal. Rptr. 465, 811 P.2d 757.) We concluded that the defendant's ill feelings over the fee arrangement with his counsel created the possibility of a breakdown in the attorney-client relationship, and that the trial court had satisfied its duty by giving the defendant the option of discharging his retained counsel. However, this potential problem did not obligate the trial court to further obtain defendant's waiver of a conflict of interest. (Id. at p. 1137, 282 Cal.Rptr. 465, 811 P.2d 757.)
Like the trial court's response to the possible problems created by the fee arrangement in Jones, the possibility of Hawk's midtrial suspension imposed a duty on the trial court *85 to offer defendant the opportunity to discharge Hawk prior to the commencement of trial, but did not trigger the trial court's duty to inquire into a conflict of interest between defendant and counsel, or to obtain a waiver of conflict-free counsel from defendant. No error occurred by the trial court's failure to inquire into a possible conflict of interest.

III. COMPETENCY HEARING
On the first day of the scheduled penalty phase, Hawk expressed a doubt regarding defendant's competency to proceed to the next stage of trial. Based on counsel's observations, the trial court declared a doubt as to defendant's competence and suspended the proceedings pursuant to section 1368. In accordance with section 1369, the court appointed three experts to examine defendant.
The competency hearing commenced before a separate jury empaneled solely to decide defendant's ability to proceed. Iversen and Hawk were relieved of their appointments for purposes of the hearing and testified for defendant. Iversen related that when he first began working with defendant in September 1986, defendant was aware that he was in jail and knew the charges against him, and could carry on a conversation and answer questions. As the guilt phase progressed, however, Iversen began to question defendant's ability to assist in his defense because of defendant's difficulty remembering. After the guilt verdict was rendered, defendant became angry and developed a certain degree of paranoia, he was unable to talk meaningfully with counsel in preparation for the penalty phase. Although Iversen sensed defendant wanted to cooperate with him, he believed defendant's inability to process information and answer questions, and his emotional outbursts and paranoia were the result of the head injury and numerous bouts of meningitis he suffered.
Iversen acknowledged that defendant had been functioning "in the real world" since 1978, and that defendant had not been diagnosed as psychotic, schizophrenic or delusional. He also stated that defendant knew who "the players" were at trial and the possible penalties. However, Iversen believed that due to defendant's memory lapses and his difficulty in communicating his thoughts, coupled with his inability to control his anger, he was unable to rationally assist in his defense and therefore incompetent to proceed.
Hawk also believed defendant was incapable of rationally assisting him in preparing for the penalty phase. His doubt regarding defendant's competency arose when it became apparent that defendant could not move past the guilty verdict and therefore could not appreciate what lay ahead in the proceedings. Although defendant had difficulty throughout the trial absorbing and retrieving information, after the guilty verdict was rendered, these problems became more acute. He also became suspicious of the jury, the court, and the prosecutor to the point of paranoia. After consulting with defendant's psychiatrist, Hawk was of the view that these problems stemmed from the brain damage defendant suffered as a result of the car accident and the meningitis.
Defendant's psychiatrist, Dr. Peal, also testified for defendant. He had spent more than 50 hours over a 3-year period examining and treating defendant. In the course of the guilt phase trial, Dr. Peal advised defense counsel that defendant could not successfully testify on his behalf as called for in the defense strategy. In Dr. Peal's view, defendant's poor memory, poor emotional control, and the extreme tension posed by such a situation prevented him from assisting counsel in preparing him to testify. The tension defendant would experience over the prospect of testifying also posed a risk of stroke due to his history of meningitis. According to Dr. Peal, although defendant's difficulties with memory and emotional control were apparent during the guilt phase, these problems became more accentuated as the penalty phase approached. Following the verdict of guilt, defendant's ability to perceive, understand and accept that the guilt phase was over became impaired, thus preventing him from controlling his emotions and exercising rational judgment. In Dr. Peal's opinion, these difficulties stemmed from defendant's generalized brain damage.
Dr. Peal was aware that neurological testing on defendant revealed no mental defects, *86 and that defendant's intelligence was within normal range. In response to the prosecutor's inquiry, Peal stated he did not use standardized questioning in evaluating defendant and that he could not recall the particular questions or answers that led him to conclude defendant was incompetent to proceed.
The prosecution presented the testimony of Dr. White, a psychiatrist, who conducted a lengthy interview of defendant, covering his life history, the circumstances leading to his arrest, the trial, and his current situation in the county jail. According to Dr. White, defendant was very cooperative and eager to discuss his situation, and stuck to the topic at hand. She also reviewed defendant's medical records, and the trial testimony of Drs. Peal and McGuire. Based on all of this information, Dr. White concluded that although there was a possibility of mild impairment of brain function, defendant's mental processes were within a broad range of normal. She found nothing in the reports to indicate any significant interference with his mental functioning after the car accident or prior to the surgery that corrected his susceptibility to meningitis.
Dr. White testified that during her interview with defendant, when the issue of the present crimes arose, he became distraught and expressed great concern over what he felt was an unjust verdict. Dr. White observed that defendant appeared to be having a great deal of emotional difficulty accepting the verdict because he felt he was innocent of the murders. Although defendant told Dr. White he did not know if he could follow his attorney's advice, he understood the nature of the advice, i.e., to admit his culpability and express his remorse. Although Dr. White found that defendant was not delusional, she did characterize as paranoid defendant's belief that the jury's guilty verdict was the result of a conspiracy to convict him. Dr. White concluded defendant was competent to stand trial, but qualified her conclusion with an opinion that defendant's mental state might deteriorate as a result of the psychological stress of a possible death verdict, and that he could become incompetent in the future.
The prosecution also presented the testimony of Dr. Hutchinson, a clinical psychologist. In describing his interview with defendant, Dr. Hutchinson reiterated many of Dr. White's observations, including defendant's knowledge of "the players" at trial and his awareness of why he was being evaluated and what his attorneys were advising him to do at the penalty phase. Hutchinson likewise found defendant angry and indignant at being convicted and resistant to his counsel's strategy in that it amounted to admitting guilt for crimes he believed he did not commit. Dr. Hutchinson administered a standardized competency test, evaluating defendant in a number of areas in accordance with standards promulgated by the National Institute of Mental Health. In rating defendant in the various areas on a scale of 1 to 5, 1 representing total incapacity and 5 representing capable, Dr. Hutchinson assigned defendant an overall score of 4.89. In Dr. Hutchinson's opinion, defendant realized and understood where he stood in the proceedings, although he did not like where he found himself. Defendant also had the ability to assist his counsel in conducting the best possible defense under the circumstances. Dr. Hutchinson concluded defendant was competent to proceed to trial.
The prosecution also presented the testimony of a lay witness, Deputy Sheriff Dennis Kirkland, who first met defendant in 1985 and was seeing him every day during the competency hearing. According to Kirkland, defendant was a cooperative inmate and related well to other prisoners. In conversing with defendant, Kirkland observed that defendant responded appropriately. Kirkland witnessed defendant's expression of disbelief and disgust on hearing the guilty verdicts being read, but had observed no significant changes in defendant's demeanor since then.
The jury returned a verdict finding defendant competent to stand trial, which the trial court affirmed in a subsequent ruling.

A. Sufficiency of the Evidence
Defendant contends his convictions were compromised by his incompetency in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. *87 Defendant's claim is asserted broadly, but we may infer by his citation to People v. Samuel (1981) 29 Cal.3d 489, 174 Cal.Rptr. 684, 629 P.2d 485 (Samuel), which sets forth the standard for reviewing the sufficiency of the evidence supporting a jury's verdict of competency, that defendant also challenges the jury's determination that he was competent to stand trial.
An accused who is mentally incompetent cannot be tried or adjudged to punishment. (ง 1367, Samuel, supra, 29 Cal.3d at p. 494, 174 Cal.Rptr. 684, 629 P.2d 485.) "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial...." (Riggins v. Nevada (1992) 504 U.S. 127, 139, 112 S.Ct. 1810, 118 L.Ed.2d 479 (cone. opn. of Kennedy, J.).) California law defines a mentally incompetent defendant as a person who, as a result of mental disorder or developmental disability, "is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense." (ง 1367.) In reviewing a jury's determination that a defendant is competent to proceed to trial, we give due deference to the trier of fact, and therefore view the record in the light most favorable to the verdict. However, the verdict must be supported by substantial evidence. (Samuel, supra, 29 Cal.3d at p. 505, 174 Cal.Rptr. 684, 629 P.2d 485.) In determining the substantiality of the evidence, we look to the record as a whole. (Id. at p. 504, 174 Cal.Rptr. 684, 629 P.2d 485.) Evidence that is "`"reasonable in nature, credible, and of solid value"'" is substantial evidence. (Id. at p. 505, 174 Cal.Rptr. 684, 629 P.2d 485; see also People v. Marshall (1997) 15 Cal.4th 1, 31, 61 Cal.Rptr.2d 84, 931 P.2d 262 (Marshall).)
Viewing the record in the light most favorable to the jury's verdict of competency, we conclude the record contains substantial evidence to support it. Two of the three courtappointed experts who testified at the competency hearing, Drs. White and Hutchinson, found defendant competent to stand trial. Dr. White, a psychiatrist, formed her opinion following a lengthy interview with defendant and after having reviewed defendant's medical records and the trial testimony of defensession psychiatrist, Dr. Peal. Dr. Hutchinson likewise conducted a face-to-face interview with defendant and administered a standardized test evaluating defendant's capabilities in a variety of areas. Deputy Sheriff Kirkpatrick, who had first met defendant shortly after his arrival at the Amador County jail and saw; defendant every day during the competency trial, observed no significant changes in defendant's behavior or ability to communicate following the jury's guilty verdicts.
Nor does the evidence of incompetence presented by defendant at the competency hearing negate the reasonable, credible evidence supporting the jury's verdict of competency. Defendant's psychiatrist, Dr. Peal, offered his expert opinion that defendant was incompetent to stand trial. Although Dr. Peal had been treating and evaluating defendant for several years, he acknowledged that he could not recall the questions he asked defendant or the responses defendant gave. Furthermore, the lay testimony of defense counsel, Iversen and Hawk, regarding defendant's inability to assist them in his penalty phase defense was contradicted by the opinions of two experts whose clinical evaluation of defendant led them to the contrary conclusion.

B. Defendant's Mental Competency at Trial
Defendant asserts broadly that his conviction must be reversed because he was incapable of meaningfully participating in the proceedings and of assisting counsel. To the extent defendant's claim is premised on the same evidence of asserted mental incompetence cited in support of his argument that the trial court erred by failing to order a competency hearing at the time of the in camera hearing during the guilt phase, defendant's claim is rejected for the reasons previously stated in this opinion. (See ante, at pp. 51-54 of 77 Cal.Rptr.2d, at pp. 209-212 of 959 P.2d.)
The only other evidence of asserted incompetence concerns the circumstances surrounding defendant's request to waive the right to attend the penalty proceedings. The record indicates that during the afternoon *88 of the first day of the penalty phase, defense counsel indicated defendant's desire to absent himself from the proceedings. Although counsel stated he felt it was in defendant's best interest to attend, counsel also expressed concern that defendant was having difficulty maintaining verbal control and that an angry outburst would have a deleterious effect on the jury. Defendant stated as follows:
"Your Honor, I don't have anything but contempt for this jury and this prosecutor and some of the members of this community. And I am not real pleased with your decisions or your rulings. [ถ] And I โ I just can't handle all of this, you know. It's just driving me up the wall, [ถ] I don't want to jeopardize anything that I might have with the jury, any kind of anything. But I have got so much anger in me, I can't hardly stand it even being โ sitting here. [ถ] I don't know what to do about this. I would prefer not to even be here. And I don't know what is going on anymore."
When a competency hearing has already occurred and the defendant has been adjudged competent to proceed, a trial court must conduct a second competency hearing only if there is a substantial change in circumstances or new evidence casting serious doubt on the validity of the competency verdict. (Marshall, supra, 15 Cal.4th at p. 33, 61 Cal.Rptr.2d 84, 931 P.2d 262; Jones, supra, 53 Cal.3d at p. 1153, 282 Cal.Rptr. 465, 811 P.2d 757.)
Here, defendant's anger with the jury that convicted him and frustration over his predicament were understandable in light of the situation facing him, as was counsel's concern that defendant might have an outburst that would prejudice him in front of the jury. Such evidence does not constitute a change in circumstances warranting a second competency determination, however. Nor does it otherwise comprise substantial evidence of mental incompetence. An angry and emotional reaction to a verdict of guilt does not indicate an inability to understand the nature of the criminal proceedings, or to rationally assist counsel. (Davis, supra, 10 Cal.4th at p. 527, 41 Cal.Rptr.2d 826, 896 P.2d 119; Danielson, supra, 3 Cal.4th at p. 726, 13 Cal.Rptr.2d 1, 838 P.2d 729.)

C. Allocation of the Burden of Proof of Incompetency
At the close of evidence in the competency hearing, the trial court instructed the jury on the applicable law. In accordance with section 1369, subdivision (f), the court told jurors that "[t]he defendant is presumed to be mentally competent and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent as a result of mental disorder or developmental disability."
Adopting the reasoning of Justice Blackmun in his dissenting opinion in Medina v. California (1992) 505 U.S. 437, 456, 112 S.Ct. 2572, 120 L.Ed.2d 353, defendant claims that the trial court's instruction violates his right to due process of law. Defendant's claim is unsupported by existing law (id. at pp. 449-452, 112 S.Ct. 2572; People v. McPeters (1992) 2 Cal.4th 1148, 1169, 9 Cal.Rptr.2d 834, 832 P.2d 146); Medina (1990), 51 Cal.3d 884-885, 274 Cal.Rptr. 849, 799 P.2d 1282 [burden allocation in section 1369 does not violate due process clause of California Constitution]) and we find no justification for reconsidering the issue here.

D. Response to the Jury's Request to Reread Testimony
During deliberations, the jury foreman sent several notes to the trial court. One communication read as follows. "We wish to hear testimony by Iversen, Hawk, we can't remember dealing with Jerry Frye and his friends and the chronology of the events on the day of the murder." After receiving this and two other notes from the jury requesting the rereading of certain testimony, the trial court met with the parties outside the presence of the jury to discuss how it would respond. The court was unable to recall any testimony covering the chronology of events on the day of the murder, and proposed to indicate this to the jury with counsel's agreement. With no further discussion, counsel for both sides agreed with this proposal.
Defendant now contends that, contrary to the trial court's recollection, there was testimony *89 "dealing with defendant and his friends and the chronology of events on the day of the murder." According to defendant, the jury requested to rehear a portion of Iversen's testimony during cross-examination by the prosecutor. When the prosecutor sought confirmation that defendant had furnished important information to defense counsel throughout the course of the guilt phase, Iversen explained that the problem was not whether defendant had provided counsel with information, but when and how complete it was. As an example of what he meant, Iversen related that while preparing defendant to testify on his own behalf, he asked him to draw a diagram of the area around the Brandts' cabin. In the diagram, defendant drew a secluded place near the cabin where Ron Wilson had prepared an elaborate area to grow marijuana. Iversen viewed Ron Wilson as an important witness because Wilson was at the campsite on the day of the murders and appeared to have befriended defendant earlier that same day. But, it was not until he asked defendant to draw the diagram that defendant provided this information to counsel, even though Iversen had been representing defendant for nearly two years at the time.
Defendant claims that the trial court's failure to reread this testimony violated both the jury's right under section 1138 to be apprised of the evidence, and defendant's right to due process of law, to trial by jury, and to a reliable penalty determination.
Pursuant to section 1138, the jury has a right to rehear testimony and instructions on request during its deliberations. (People v. Wader (1993) 5 Cal.4th 610, 661, 20 Cal.Rptr.2d 788, 854 P.2d 80 (Wader); People v. Pride (1992) 3 Cal.4th 195, 266, 10 Cal.Rptr.2d 636, 833 P.2d 643 (Pride).) Although the primary concern of section 1138 is the jury's right to be apprised of the evidence, a violation of the statutory mandate implicates a defendant's right to a fair trial conducted "`substantially [in] accord[ance] with law.'" (People v. Weatherford (1945) 27 Cal.2d 401, 420, 164 P.2d 753 (Weatherford); People v. Butler (1975) 47 Cal.App.3d 273, 280, 120 Cal.Rptr. 647 (Butler).)
The People argue that because counsel did not object to the trial court's response, defendant has waived the claim on appeal. In prior decisions of this court, we have found a waiver of the defendant's claim of a violation of section 1138 because of counsel's acquiescence in the trial court's failure to comply with the statutory mandate. (See, e.g., Rodrigues, supra, 8 Cal.4th at p. 1193, 36 Cal. Rptr.2d 235, 885 P.2d 1; Price, supra, 1 Cal.4th at p. 414, 3 Cal.Rptr.2d 106, 821 P.2d 610.) Defendant argues, however, that the reasoning of People v. Litteral (1978) 79 Cal. App.3d 790, 145 Cal.Rptr. 186 (Litteral), and Butler, supra, 47 Cal.App.3d 273, 120 Cal. Rptr, 647, in which the court rejected a waiver argument, is applicable here. As the court in Butler reasoned, "Although the mandate of Penal Code section 1138 is an important protection for a party, it is the right of the jury wh
ich is the primary concern of the statute; its provisions do not delegate to the trial judge, the parties, or their attorneys the right to determine the jury's wishes. Hence the relative inaction of defense counsel in the case at bench cannot attenuate the jurors' fundamental right to be apprised of the evidence upon which they are sworn conscientiously to act." (47 Cal.App.3d at pp. 283-284, 120 Cal.Rptr. 647.)
We need not resolve defendant's claim on the basis of counsel's acquiescence, however. A conviction will not be reversed for a violation of section 1138 unless prejudice is shown. (Cf. People v. Jennings (1991) 53 Cal.3d 334, 384-385, 279 Cal.Rptr. 780, 807 P.2d 1009 [finding error based on violation of section 1138 harmless beyond a reasonable doubt]; People v. Ainsworth (1988) 45 Cal.3d 984, 1020, 248 Cal.Rptr. 568, 755 P.2d 1017 [applying state standard of review to find similar error harmless]; Weatherford, supra, 27 Cal.2d at pp. 418-420, 164 P.2d 753 [same].) Assuming a violation of section 1138 has occurred, we conclude the error did not prejudice defendant under either the federal or state standard of review.
In the testimony defendant claims the jury wanted reread, Iversen was describing an incident that illustrated what he had referred to on direct examination as the "popcorn phenomenon." Iversen had used this phrase *90 earlier in the competency hearing to describe the communication difficulties he was having with defendant during the course of his representation. As Iversen explained, he would ask questions about subjects defendant should know something about, and would get some information from him. Then, in talking with defendant a month or two later, defendant would "pop out" with something that was very important or relevant to the previous questions. In addition to the incident concerning the diagram of Ron Wilson's marijuana plot, Iversen gave several other examples of what he meant by the "popcorn phenomenon," including defendant's failure to identify a minister who had visited him in the South Dakota jail until well into the guilt phase. In light of the cumulative nature of the testimony the jury requested to rehear and the substantial evidence of defendant's competence to stand trial, we conclude the trial court's failure to reread testimony pursuant to section 1138 does not constitute prejudicial error.
Defendant argues that the circumstances presented here are similar to the trial court's prejudicial refusal to reread testimony in Lateral, supra, 79 Cal.App.3d 790, 145 Cal.Rptr. 186. The case is distinguishable, however. In Litteral, the trial court failed to inquire what parts of the testimony the jury wished to rehear. Without knowing the substance of the testimony the jury wished to hear, the reviewing court could not say what effect was created by the trial court's refusal to reread the testimony. (Id. at p. 797, 145 Cal.Rptr. 186.) Here, by contrast, defense counsel's testimony on direct examination concerned the same subject matter as the evidence the jury assertedly sought in its request to rehear testimony. Because there was no request to rehear the direct examination testimony, we may infer the jury was apprised of the evidence and acted on it accordingly.

IV. PENALTY PHASE ISSUES

A. Defendant's Presence At The Penalty Phase
Immediately following the trial court's independent determination that defendant was competent to proceed to trial, defense counsel communicated to the court defendant's desire to absent himself from further proceedings in the courtroom. Counsel indicated that in his view it was in defendant's best interest to be present. However, he also expressed concern that defendant appeared to be having difficulty maintaining verbal control and was likely to have a flare-up in front of the jury that would have a deleterious effect on their opinion of him.
Noting the importance of being present at trial and that "[t]he Code requires it," the trial court invited defendant to express his views. Defendant stated, in relevant part:
"I don't want to jeopardize anything that I might have with the jury, any kind of anything. But I have got so much anger in me, I can't hardly stand it even being โ sitting here.
".................................
"I don't know what to do about all this. I would prefer not to even be here. And I don't know what is going on anymore.
"I don't want to sit here and look at these people when I know they screwed me around. I didn't get a fair trial in this County. This is a bunch of bullshit.
"I can't deal with it this moment. If I have to sit here and listen to all the crap going on, I don't know what I am going to do. I don't want to jeopardize any kind of hope I might have with these people of getting anything by saying something or cussing somebody out or something like that.
"I don't know if I can control myself to do that or not. And I am afraid of that. I don't want to do that. I don't want to be in this courtroom no more. I don't like it no more. This is bullshit."
Reiterating to defendant the importance of being present at the proceedings, particularly in a capital case, the trial court denied defendant's request to absent himself from the courtroom. However, at defense counsel's request, the trial court permitted defendant to speak directly to the penalty phase jury without being subject to cross-examination by the prosecutor. In his allocution to the members of the jury, defendant expressed his belief that they had failed to adequately consider the evidence against him *91 at the guilt phase and to take his case seriously. Defendant stated he was angry.
Defendant claims the trial court erred in refusing to grant his request to absent himself from the proceedings. He argues that because his presence at the penalty phase posed the risk of an uncontrollable emotional outburst in front of the jury, and did in fact lead to an angry outburst and a display of resentment in his allocution, the trial court's denial of his request to waive his presence at the penalty phase compromised the fundamental fairness of the proceeding and the reliability of the death verdict.
In relevant part, section 977 provides that "[i]n all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence." (ง 977, subd. (b)(1).) Notwithstanding the unqualified command of section 977 that a felony defendant be personally present at trial, section 1043 permits a trial which commenced with the defendant's presence to proceed in the defendant's absence in certain specified cases, including "[a]ny prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent." (ง 1043, subd. (b)(2).) We recently construed these provisions in People v. Jackson (1996) 13 Cal.4th 1164, 1211, 56 Cal. Rptr.2d 49, 920 P.2d 1254, concluding that, in light of the plain statutory language, a capital defendant cannot voluntarily waive his personal presence at the proceedings enumerated in section 977. (People v. Jackson, supra, 13 Cal.4th at p. 1211, 56 Cal.Rptr.2d 49, 920 P.2d 1254.) Applying People v. Jackson, supra, 13 Cal.4th 1164, 56 Cal.Rptr.2d 49, 920 P.2d 1254, the court in Mayfield, supra, 14 Cal.4th at pages 738-739, 60 Cal.Rptr.2d 1, 928 P.2d 485, found the defendant's waiver of personal presence at a crime scene view that included the taking of testimony constituted statutory error, albeit nonprejudicial error.
As a constitutional matter, a criminal defendant accused of a felony has the right to be present at every critical stage of the trial. (Illinois v. Allen (1970) 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353.) The right derives from the confrontation clause of the Sixth Amendment to the federal Constitution and the due process clauses of the Fifth and Fourteenth Amendments, and article I, section 15 of the California Constitution. (United States v. Gagnon (1985) 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486; Lewis v. United States (1892) 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011; Bradford, supra, 15 Cal.4th at pp. 1356-1357, 65 Cal. Rptr.2d 145, 939 P.2d 259.) As the North Carolina Supreme Court has observed "the essential characteristic of defendant's constitutional right to presence is just that, his actual presence during trial." (State v. Buchanan (1991) 330 N.C. 202, 410 S.E.2d 832, 842.)
A defendant may waive the constitutional right to be present (Mayfield, supra, 14 Cal.4th at p. 738, 60 Cal.Rptr.2d 1, 928 P.2d 485, and cases cited therein; Campbell v. Wood (1994) 18 F.3d 662, 671-672), or can lose the right to be present through disruptive behavior in the courtroom (Illinois v. Allen, supra, 397 U.S. at p. 353, 90 S.Ct. 1057; Sully, supra, 53 Cal.3d at p. 1239, 283 Cal.Rptr. 144, 812 P.2d 163.) However, and contrary to the thrust of defendant's argument, these qualifications to the right to be present do not confer an affirmative right to be absent from trial. Nor are we aware of any decision recognizing a concomitant right of the defendant not to be present or to otherwise avoid being confronted with the witnesses against him. (Cf. United States v. Moore (1972) 466 F.2d 547, 548 [Rule 43 of Federal Rules of Criminal Procedure (18 U.S.C.) establishing procedures for court to continue to conduct felony trial when defendant not present does not vest right of absence in defendant.]; United States v. Fitzpatrick (2d Cir.1970) 437 F.2d 19, 27 [same].)
Moreover, it was not the trial court's ruling, but defendant's own actions that led to his asserted outburst at the jury. Both a jury and the trial court had determined defendant was competent to stand trial, and the record discloses sufficient evidence supporting that finding. (See ante, at pp. 84-87 of 77 Cal.Rptr.2d, at pp. 242-245 of 959 P.2d.) Nor does the record suggest that the substance of defendant's allocution so threatened *92 the dignity and order of the proceedings that, as a matter of law, defendant should have been removed from the proceedings. (ง 1043, subd. (b)(1); cf. People v. Majors (1998) 18 Cal.4th 385, 415, 75 Cal.Rptr.2d 684, 956 P.2d 1137.) Under these circumstances, it is appropriate to place on the defendant, rather than the court, the burden of conducting himself at trial in a manner which comports with his best interests.
Nor did the trial court's ruling requiring defendant's presence at the penalty phase compel defendant to be a witness against himself in violation of his state and federal constitutional guarantee against self-incrimination. Defendant asserts that because his demeanor in court could be considered by the jury when it made its penalty determination (Wharton, supra, 53 Cal.3d at p. 596, 280 Cal.Rptr. 631, 809 P.2d 290), he could not, consistently with Fifth Amendment principles, be compelled to sit through the penalty phase when he was likely to have an outburst in front of the jury. However, the constitutional guarantee against self-incrimination is a prohibition against compelling an accused to give statements that are testimonial in nature. (United States v. Wade (1967) 388 U.S. 218, 222, 87 S.Ct. 1926, 18 L.Ed.2d 1149.) "[T]he prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." (Holt v. United States (1910) 218 U.S. 245, 252-253, 31 S.Ct. 2, 54 L.Ed. 1021.) The Fifth Amendment is not implicated here. (Cf. United States v. Moore, supra, 466 F.2d at p. 548 [no Fifth Amendment violation resulting from requiring defendant's presence during trial].)

B. Denial of Request for Continuance
At the beginning of the penalty phase, defense counsel renewed a motion to continue that had been filed with the court prior to defendant's competency hearing, stating he was not prepared to proceed because of defendant's medical condition. Citing Dr. White's report, which had been placed into evidence at the competency hearing and which described defendant's present state of anxiety and emotional distress, counsel asked the court to permit the proceedings to be continued to allow defendant's medical condition to be treated. Counsel did not indicate how long a continuance he would need. The court denied the motion.
Defendant claims the denial was an abuse of discretion. According to defendant, counsel sought a continuance to help prepare defendant to give a statement to the jury. Defendant argues that because the trial court had repeatedly denied defendant permission to allocute, and then unexpectedly reversed itself without giving counsel adequate time to help prepare something for defendant to say, the trial court violated defendant's right to due process and rendered counsel ineffective in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and analogous provisions of the California Constitution.
No abuse of discretion appears for several reasons. First, defendant's characterization of the basis for counsel's request for a continuance, i.e., to help defendant prepare for his allocution, is unsupported by the record. What the record does show is that prior to opening statements at the penalty phase, the court heard and ruled upon several matters outside the presence of the jury. Among these matters was a request for additional time for defendant to receive treatment for the extreme anxiety and emotional distress he was experiencing and to prepare for the penalty phase. Following the denial of the request for continuance, counsel asked that the court reconsider its earlier ruling denying a request that defendant be permitted to give a speech to the jury rather than testify subject to cross-examination. The trial court agreed to reconsider its earlier ruling and granted the request. Counsel then stated, "What I would ask, Judge, is, when we finish these motions, we have a brief period of time to talk to [defendant]," to which the court replied, "Certainly." Contrary to defendant's argument, counsel asked for and was granted a "brief period" to talk with defendant before he gave his allocution to the jury.
*93 Moreover, under applicable principles, the trial court acted within its discretion in denying the motion to continue. A continuance will be granted for good cause (ง 1050, subd. (e)), and the trial court has broad discretion to grant or deny the request. (People v. Grant (1988) 45 Cal.3d 829, 844, 248 Cal.Rptr. 444, 755 P.2d 894; Ungar v. Sarafite (1964) 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921.) In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request. (376 U.S. at p. 589, 84 S.Ct. 841; People v. Jeffers (1987) 188 Cal.App.3d 840, 850, 233 Cal.Rptr. 692.) One factor to consider is whether a continuance would be useful. (People v. Beeler (1995) 9 Cal.4th 953, 1003, 39 Cal.Rptr.2d 607, 891 P.2d 153.)
Here, counsel asked the trial court to continue the penalty phase to allow treatment of defendant's medical condition, including his high anxiety and emotional distress. Counsel supported the motion with the report of Dr. White who had recommended medicating defendant for a period of time. However, the record does not disclose Dr. White's view as to how long it would be before defendant's condition would improve. In light of this, and aware that these problems were accentuated as the penalty phase approached, the trial court could reasonably infer that a postponement for treatment was not likely to result in any positive change in defendant's mental state. Because nothing in the record shows that a continuance would have been useful, we conclude the trial court acted within its discretion in denying the request for an open-ended continuance to treat defendant's alleged mental condition. (Cf. Pride, supra, 3 Cal.4th at pp. 254-255, 10 Cal.Rptr.2d 636, 833 P.2d 643 [court did not abuse discretion in denying request for continuance to investigate defendant's background for possible psychiatric defense that might not be fruitful].)

C. Exclusion Of Testimony Regarding Defendant's Prior Conviction
In the defense case in mitigation, a number of witnesses testified on defendant's be-half, including defendant's uncle, Albert Dixon. In response to questioning by defense counsel, Dixon stated he was present when defendant was arrested in Florida for sexual assault. The prosecutor objected to counsel's asking whether Dixon knew the person who brought the criminal charges against defendant.
At a side bar conference following the prosecutor's objection, defense counsel made an offer of proof, stating that Dixon was prepared to testify as follows. The complainant in the sexual assault case against defendant was Patricia Ketchum, the wife of defendant's cousin. On the day the offense took place, Dixon, Dixon's wife, defendant, defendant's cousin and Ketchum sat together in a restaurant bar drinking heavily. During this time, Ketchum was making sexual advances towards Dixon. After the party left the restaurant, defendant went with Ketchum to her home. On leaving Ketchum's house, defendant found Dixon and told him what had happened. Dixon and defendant then met with Ketchum's husband. Afterwards, Dixon called the police and defendant was arrested.
Defense counsel argued that the events in the bar were a prelude to what took place at Ketchum's house, and that the testimony would provide corroboration for Dr. Peal's guilt phase testimony regarding what defendant told him about the incident. Counsel urged that the circumstances preceding the sexual assault would also show the complainant's state of mind and conduct. Counsel further contended defendant's conversation with Dixon and the victim's husband following the sexual assault was relevant to defendant's state of mind, and explains why he chose to plead guilty rather than litigate the charges. In response, the prosecutor argued the proffered testimony was not relevant to the circumstances of the criminal offense, particularly since only the documents of conviction had been introduced. She suggested that if the proffered testimony was admitted, the People would seek leave to bring in police officers from Florida and other witnesses to testify regarding the circumstances of the offense.
*94 The trial court found events in the bar preceding the sexual assault and defendant's conversation with Dixon and the complainant's husband following the incident irrelevant to the circumstances underlying the sexual assault charge itself. Accordingly, the trial court sustained the prosecutor's relevancy objection, and prohibited defense counsel from pursuing that line of questioning.
Later, during closing remarks to the jury, the prosecutor commented on defendant's Florida conviction as follows. "I do want to make it clear that I am not dismissing as insignificant the defendant's prior conviction for felony sexual battery.... It is a crime, a non-consensual assault involving the application of force and violence; although not resulting in serious injury." The prosecutor characterized the prior felony as "a serious offense" and "a crime of violence" and urged the jury to view the prior conviction as an indication of a pattern of violence on defendant's part, and as evidence of defendant's failure to be deterred from continued criminal activity.
Defendant contends his death sentence must be reversed because the court's ruling prevented him from introducing relevant mitigating evidence regarding his prior criminal record, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Defendant also argues that the trial court's refusal to permit the proffered testimony precluded him from introducing rebuttal evidence to counter the prosecutor's evidence of an aggravating factor, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and analogous provisions of the California Constitution.
The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence, that is, evidence regarding "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Lockett, supra, 438 U.S at p. 604, 98 S.Ct. 2954, fn. omitted; see also Skipper, supra, 476 U.S. at p. 4, 106 S.Ct. 1669; People v. Fudge (1994) 7 Cal.4th 1075, 1117, 31 Cal.Rptr.2d 321, 875 P.2d 36.) The constitutional mandate contemplates the introduction of a broad range of evidence mitigating imposition of the death penalty. (See Payne, supra, 501 U.S. at pp. 820-821, 111 S.Ct. 2597; People v. Whitt (1990) 51 Cal.3d 620, 647, 274 Cal.Rptr. 252, 798 P.2d 849; cf. Lockett, supra, 438 U.S. at pp. 602, 604, 98 S.Ct. 2954 [noting that concept of individualized sentencing, including the traditionally wide range of factors taken into account by sentencer, insures a greater degree of reliability in capital sentencing determinations].) The jury "must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." (Jurek v. Texas (1976) 428 U.S. 262, 271, 96 S.Ct. 2950, 49 L.Ed.2d 929.)
At the same time, however, the United States Supreme Court has made clear that the trial court retains the authority to exclude, as irrelevant, evidence that has no bearing on the defendant's character, prior record or the circumstances of the offense. (Lockett, supra, 438 U.S. at p. 604, fn. 12, 98 S.Ct. 2954; see, e.g., People v. Jackson, supra, 13 Cal.4th at p. 1230, 56 Cal.Rptr.2d 49, 920 P.2d 1254 [no error in excluding evidence of defendant's offer to stipulate to facts underlying prior conviction for rape because not relevant to character]; People v. Zapien (1993) 4 Cal.4th 929, 989, 17 Cal.Rptr.2d 122, 846 P.2d 704 [trial court acted within discretion in barring evidence having no bearing on defendant's background or circumstances of offense].) Thus, in a proper exercise of its discretion, the trial court determines the relevancy of mitigation evidence in the first instance. (People v. Carpenter (1997) 15 Cal.4th 312, 404, 63 Cal.Rptr.2d 1, 935 P.2d 708 (Carpenter); Fauber, supra, 2 Cal.4th at p. 856, 9 Cal.Rptr.2d 24, 831 P.2d 249; cf. Kordenbrock v. Scroggy (E.D.Ky.1988) 680 F.Supp. 867, 889 [relevance is the threshold inquiry in assessing claim of Skipper error].)
In McKoy v. North Carolina (1990) 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369, the court provided further guidance on the nature of the relevancy inquiry at the penalty phase. The court observed that the concept of relevance as it pertains to mitigation *95 evidence is no different from the definition of relevance as the term is understood generally. (Id. at p. 440, 110 S.Ct. 1227.) "`Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value....'" (Ibid., quoting State v. McKoy (1988) 323 N.C. 1, 372 S.E.2d 12, 45 (dis. opn. of Exum, C.J.); see also Evid.Code, ง 210 [relevant evidence is evidence having tendency in reason to prove or disprove any disputed fact of consequence to determination of action].)
As a threshold matter, we observe that defendant's claim of error is based, in part, on a mischaracterization of the proffered testimony. In his appellate brief, defendant describes the proffer as including Dixon's observation that Ketchum, the complainant, made sexual advances to defendant in Dixon's presence at the bar on the date of the offense. However, as the People correctly pointed out at oral argument, the record shows Dixon was prepared to testify Ketchum was making sexual advances to him, not to defendant. For example, in response to the court's inquiry whether the proffered testimony reflected Dixon's personal knowledge, defense counsel explained, referring to Dixon, "He was in the bar with her. He was drinking with her. She made sexual advances to him." Counsel also stated, "... Patricia Ketchum, the complaining witness, was the one who made a pass at this witness." To the extent defendant's claim of error is premised on the assertion the trial court erroneously excluded evidence of the complainant's sexual advances towards defendant, it is unsupported by the record and, therefore, rejected. Moreover, the trial court did not err in ruling that evidence of the complainant's sexual advances towards Dixon was irrelevant to the circumstances of the sexual offense committed by defendant. Such evidence clearly has no bearing on any aspect of defendant's record or character. (Cf. People v. Johnson, supra, 47 Cal.3d at p. 1249, 255 Cal.Rptr. 569, 767 P.2d 1047 [focus in capital sentencing determination is on character and record of individual offender].) However, we otherwise agree with defendant that the trial court erred in excluding Dixon's testimony as irrelevant.
Although the proffer of testimony regarding defendant's familiarity with the victim and their heavy consumption of alcohol preceding the sexual assault does not appear strongly relevant to defendant's character or record, the evidence nonetheless has some tendency to show defendant was not as morally culpable as the conviction for sexual assault in the abstract might suggest. (ง 190.3, subd. (k); People v. Easley (1983) 34 Cal.3d 858, 878, fn. 10, 196 Cal.Rptr. 309, 671 P.2d 813, (Easley).) Similarly, although the events following the sexual assault are of questionable relevance to the circumstances of the prior offense, they are not devoid of all relevance to the capital jury's sentencing determination, having some tendency to show defendant's character for assuming responsibility for wrongdoing.
In addition, the proffered testimony has some tendency in reason to counter the prosecution's argument that defendant's prior conviction demonstrated a pattern of violence on his part. When a defendant is precluded from introducing evidence rebutting the prosecution's argument in support of the death penalty, fundamental notions of due process are implicated. (See Skipper, supra, 476 U.S. at p. 5, fn. 1, 106 S.Ct. 1669; see also id. at p. 9, 106 S.Ct. 1669 (cone. opn. of Powell, J.) [rejecting majority's reliance on Eighth Amendment principles, and finding due process to be sole basis for reversing defendant's sentence].) The due process clause prohibits a defendant from being sentenced to death "on the basis of information which he had no opportunity to deny or explain." (Gardner, supra, 430 U.S. at p. 362, 97 S.Ct. 1197.)
Although the court erred in excluding the proffered testimony as irrelevant, reversal is not required because the error was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; cf. People v. Whitt, supra, 51 Cal.3d at pp. 647-648, 274 Cal.Rptr. 252, 798 P.2d 849; People v. Lucero (1988) 44 Cal.3d 1006, 1031-1032, 245 Cal. Rptr. 185, 750 P.2d 1342.)
*96 The record shows the predominant focus of the People's case in aggravation was the circumstances of the capital crimes. Although in closing argument the prosecutor urged the jury to give the prior conviction "some significance," she qualified her statement by adding, "But I again say I believe, most importantly, most fundamentally, it is the circumstances of the crimes for which the defendant has been convicted that makes this a case where death has to be invoked because, when you weigh those circumstances against the evidence that the defendant has offered in mitigation, there is just no comparison." Because the excluded testimony was only marginally relevant to the prior conviction, which was itself a peripheral factor in the case in aggravation, there is no reasonable possibility the trial court's error in excluding it could have affected the outcome. (Chapman v. California, supra, 386 U.S. at pp. 23, 24, 87 S.Ct. 824.) We therefore conclude the error was harmless beyond a reasonable doubt.

D. Prosecutorial Misconduct At The Penalty Phase
Defendant claims several instances of prosecutorial misconduct at the penalty phase warranting reversal of his sentence. The record discloses no objection to any of the purportedly objectionable statements, nor any equests for an admonition or curative instruction. Defendant has therefore failed to preserve his claim on appeal. (People v. Davenport (1995) 11 Cal.4th 1171, 1209,47 Cal.Rptr.2d 800, 906 P.2d 1068 (Davenport); People v. Sims (1993) 5 Cal.4th 405, 465, 20 Cal.Rptr.2d 537, 853 P.2d 992; People v. Raley (1992) 2 Cal.4th 870, 917, 8 Cal. Rptr.2d 678, 830 P.2d 712.)
Nor does the claim have merit. In closing argument, the prosecutor stated, "The murders of Lucille Jane Brandt and Robert Brandt, Sr., were as senseless and cold-blooded as murders come. Those two 75-year-old people posed absolutely no threat to a man who was some 40 years younger than they." Defendant asserts that the prosecutor's remarks require reversal of his death sentence for several reasons. First, he contends, the reference to the Brandts' advanced age was `Victim impact information" that should not have been admitted. However, defendant offers no reason why the prosecutor's statement was "so unduly prejudicial that it renders the trial fundamentally unfair." (Payne, supra, 501 U.S. at p. 825, 111 S.Ct. 2597.) Nor do we discern any. As the People point out, the prosecutor's reference to the victims' ages was made in the context of a comparison with defendant's own age and superior strength. The remark was a proper comment on the evidence.
Defendant also argues that the prosecutor's statement describing the murders "as senseless and cold-blooded as murders come" was an improper personal opinion. A prosecutor is prohibited from stating her own belief with regard to the appropriateness of the death penalty if the opinion is based on evidence not presented at trial. (People v. Ghent (1987) 43 Cal.3d 739, 772, 239 Cal.Rptr. 82, 739 P.2d 1250.) However, it is permissible to interject her own view if it is based on facts of record. (Ibid.) Here, the statement did not purport to draw on information in the prosecutor's possession, such as her own experience involving other capital murder prosecutions. (Cf. People v. Bandhauer (1967) 66 Cal.2d 524, 529, 58 Cal. Rptr. 332, 426 P.2d 900 [misconduct for prosecutor to state his opinion that in all his many years of practice defendant was most depraved character he had ever seen].) Nor is it reasonably likely the jury would have understood her statement to be based on evidence outside the record. (People v. Rowland (1992) 4 Cal.4th 238, 280-281, 14 Cal. Rptr.2d 377, 841 P.2d 897.) There was no misconduct.
Defendant also finds the interjection of impermissible personal opinion in the following remarks made at the conclusion of the prosecutor's closing argument. "But if you find that the aggravating circumstances substantially outweigh the mitigating circumstances โ and I believe in this case they substantially outweigh those circumstances โ and if you believe the death penalty is what this case calls for, as I do, then I ask you to reflect that judgment in your verdict...." Defendant's complaint is *97 with the prosecutor's use of the word "I." However, the prosecutor's reference to the first person does not constitute misconduct so long as her opinion is based on the evidence adduced at trial. (Padilla, supra, 11 Cal.4th at pp. 945-946, 47 Cal.Rptr.2d 426, 906 P.2d 388; Adcox, supra, 47 Cal.3d at p. 237, 253 Cal.Rptr. 55, 763 P.2d 906.) In the complained-of remarks, the prosecutor offered the jury her opinion on the relative weight of the aggravating and mitigating factors adduced at the penalty phase. (Anderson, supra, 52 Cal.3d at p. 479, 276 Cal.Rptr. 356, 801 P.2d 1107.) No misconduct occurred.
Defendant next complains that the prosecutor committed Griffin error, first, when she asked the jury during closing argument, "Is that all he can offer us?" and later, when she said, "Did he express remorse? Did he explain his version of what happened that night? Did he ask for mercy? Did he ever take responsibility at all for his crimes? Obviously he did none of those things."
Under Griffin, a prosecutor is prohibited from commenting on the accused's invocation of his Fifth Amendment right to silence. (380 U.S. at p. 615, 85 S.Ct. 1229.) A comment on defendant's silence creates the risk that the jury will be inclined to treat the defendant's silence as evidence of guilt. (Id. at p. 614, 85 S.Ct. 1229; People v. Modesto (1967) 66 Cal.2d 695, 713, 59 Cal.Rptr. 124, 427 P.2d 788.) The record shows that defendant was granted permission to give an allocution to the penalty jury. Because defendant did not remain silent at the penalty phase, the prosecutor's comments could not possibly have invited the jury to draw any adverse inference based on an invocation of the Fifth Amendment right against self-incrimination. (People v. Brown (1988) 45 Cal.3d 1247, 1260-1261, 248 Cal.Rptr. 817, 756 P.2d 204.)
Nor was the prosecutor's argument regarding defendant's lack of remorse improper under state law. Because "the presence or absence of remorse is a factor `"universally" deemed relevant to the jury's penalty determination'" (People v. Marshall (1996) 13 Cal.4th 799, 855, 55 Cal.Rptr.2d 347, 919 P.2d 1280), the prosecutor is entitled to argue defendant's lack of evidence of remorse. Defendant argues nonetheless that the reasoning of this court's decision in People v. Coleman (1969) 71 Cal.2d 1159, 80 Cal.Rptr. 920, 459 P.2d 248 (Coleman) is applicable here. Under Coleman, a prosecutor is not permitted to argue that the defendant's failure to confess should be deemed evidence of lack of remorse. (Id. at pp. 1168-1169, 80 Cal.Rptr. 920, 459 P.2d 248; see also People v. Fierro (1991) 1 Cal.4th 173, 243-244, 3 Cal.Rptr.2d 426, 821 P.2d 1302 [neither failure to confess nor claim of innocence should be argued as lack of remorse].) The court in Coleman reasoned that because a defendant is under no obligation following a guilty verdict to confess to the crime, and is permitted to assert his possible innocence as a factor mitigating the penalty, it is fundamentally unfair for a prosecutor to argue that the defendant's failure to confess after a guilty verdict shows a lack of remorse. (Coleman, supra, 71 Cal.2d at p. 1168, 80 Cal.Rptr. 920, 459 P.2d 248.)
Contrary to defendant's argument, there was no unfairness resulting from the prosecutor's comments regarding defendant's lack of remorse. In making her argument to the jury, the prosecutor did not cite defendant's failure to confess or his claim of innocence as evidence of lack of remorse. Rather, she pointed out the dearth of mitigation evidence on this issue. Her statements constituted permissible comment on the state of the evidence. No misconduct occurred.
Defendant finally contends the prosecutor committed misconduct by arguing aggravation of penalty on the basis of mitigating evidence.
During closing argument, the prosecutor recounted for the jury evidence that defendant had the capacity to work after his automobile accident, having worked in Sacramento, Belle Fourche, and other places. She also reiterated the evidence that defendant had earned his GED while in prison in Florida, and that his intelligence level was in the normal range. Opining that defendant had the capacity to conform, and that he had done so while incarcerated in Florida and in the Amador County jail, the prosecutor stated, "[T]he defendant and defense counsel *98 will, no doubt, argue the fact that he accomplished these things in prison should be considered by you as a factor in mitigation, as an indication that he can be productive as a prisoner; but I would suggest to you that that argument cuts both ways, because it also shows that he had the brains, the mental ability, to make it."
Defendant contends the prosecutor's argument constituted prejudicial misconduct because it transformed defendant's case for mitigation under section 190.3, factor (k) into aggravating evidence in violation of the rule in People v. Boyd (1985) 38 Cal.3d 762, 215 Cal.Rptr. 1, 700 P.2d 782.
Among the factors the jury is required to consider in making its capital sentencing determination is evidence of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (190.3, factor (k).) Noting that the language of factor (k) refers to evidence extenuating the gravity of the crime, and not to evidence which enhances it, the court in Boyd held that a prosecutor is prohibited from arguing that evidence presented by a defendant under factor (k) should be considered in aggravation. (People v. Boyd, supra, 38 Cal.3d at pp. 775-776, 215 Cal.Rptr. 1, 700 P.2d 782; People v. Lucas (1995) 12 Cal.4th 415, 494-495, 48 Cal.Rptr.2d 525, 907 P.2d 373; cf. People v. Edelbacher (1989) 47 Cal.3d 983, 1033, 254 Cal.Rptr. 586, 766 P.2d 1 [improper for prosecutor to expressly argue factor (k) evidence of defendant's background and history could be aggravating factor].) A prosecutor does not violate the rule of Boyd, however, by arguing that defendant's factor (k) evidence fails to carry any extenuating weight when evaluated in a broader factual context. (Jones, supra, 15 Cal.4th at p. 187, 61 Cal. Rptr.2d 386, 931 P.2d 960; People v. Rodriguez (1986) 42 Cal.3d 730, 788-790, 230 Cal. Rptr. 667, 726 P.2d 113.)
The prosecutor's remarks cannot be characterized as suggesting to the jury that the section 190.3, factor (k) evidence should be viewed as aggravating. Rather, her comments placed the evidence of a productive prison life in a different perspective in an attempt to minimize the inference that defendant deserved life in prison instead of the death penalty. Urging the jury to find that the evidence lacked weight did not overstep the boundaries of proper argument in support of the death penalty. (Jones, supra, 15 Cal.4th at p. 187, 61 Cal.Rptr.2d 386, 931 P.2d 960; People v. Caro (1988) 46 Cal.3d 1035, 1062-1063, 251 Cal.Rptr. 757, 761 P.2d 680.)
Because we reject defendant's characterization of the prosecutor's statements as an attempt to transform mitigation into aggravation, we likewise reject his federal constitutional argument. The jury was not prohibited from considering defendant's evidence in mitigation of sentence. (Zant v. Stephens (1983) 462 U.S. 862, 865, 103 S.Ct. 2733, 77 L.Ed.2d 235; Lockett, supra, 438 U.S. at p. 604, 98 S.Ct. 2954.) Contrary to defendant's assertion, the prosecutor's attempt to minimize the weight of his mitigating evidence did not violate either the Eighth Amendment or the due process clause.

E. Instructional Issues
Defendant claims the penalty phase instructions given by the trial court violated various rights under the federal Constitution. In reviewing his contentions, we consider the instructions and arguments as a whole to determine whether there is a "`reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (Estelle v. McGuire, supra, 502 U.S. at p. 72, 112 S.Ct. 475, quoting Boyde, supra, 494 U.S. at p. 380, 110 S.Ct. 1190; People v. Benson (1990) 52 Cal.3d 754, 801, 276 Cal.Rptr. 827, 802 P.2d 330.)

1. Aggravation and Mitigation
The trial court instructed the jury in accordance with former section 190.3, factor (k) that "a mitigating circumstance is any fact, condition, or event, which as such, does not constitute a justification or excuse for the offense in question but which may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." Defendant contends that by failing to inform the jury it could also consider and give effect to mitigating evidence relevant to defendant's character or record, the trial *99 court's instruction confined the jury's consideration of mitigating evidence solely to factors extenuating the gravity of offense, in violation of the rule in Eddings, supra, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1.
The Eighth Amendment requires that a capital sentencing jury be permitted to consider and give effect to all relevant mitigating evidence, that is, to evidence relating to circumstances extenuating the gravity of the crime, and any other aspect of defendant's character and record. (Eddings, supra, 455 U.S. at pp. 110-112, 102 S.Ct. 869; Lockett, supra, 438 U.S. at pp. 602-609, 98 S.Ct. 2954; People v. Payton (1992) 3 Cal.4th 1050, 1070, 13 Cal.Rptr.2d 526, 839 P.2d 1035.) Relying on Lockett, supra, this court found a factor (k) instruction based on the literal language of former section 190.3, like the one given by the trial court here, "potentially confusing" because it spoke only of circumstances extenuating the gravity of the crime. (People v. Easley, supra, 34 Cal.3d at p. 878, 196 Cal.Rptr. 309, 671 P.2d 813.) Later, however, in Boyde, supra, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316, the United States Supreme Court found that instructing the jury in the language of section 190.3 presents no constitutional infirmity unless it is reasonably likely that the jurors were misled about the scope of their consideration of defendant's mitigating evidence. (494 U.S. at pp. 378-381, 110 S.Ct. 1190; People v. Pensinger (1991) 52 Cal.3d 1210, 1263, 278 Cal.Rptr. 640, 805 P.2d 899.)
Applying the principles established in Boyde to the present case, we find it unlikely the jury believed it was precluded from considering the evidence proffered by defendant relating to his background and record.
Contrary to defendant's assertion, the trial court's instructions as a whole adequately informed the jury it was free to consider not just the circumstances extenuating the present offense but any aspect of defendant's character or record in making its penalty determination. Jurors were told to consider all of the evidence received during any part of the trial. They were also directed in accordance with standard instruction CALJIC No. 8.84.1 (1986 rev.) to consider, take into account, and be guided by "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."
The prosecutor's argument regarding the scope of mitigating evidence also suggests that the jury was not misled by the court's instruction in the literal language of section 190.3. Remarking to jurors that defense counsel was attempting to appeal to their compassion, the prosecutor stated, "This is a legitimate factor for your consideration. You are free, as I indicated when I read the list of factors, to consider any sympathetic or other aspect of defendant's character or record that the defendant offers as the basis for a lesser penalty than death."
Defendant argues that the prosecutor's comment to the effect that the mitigating evidence offered by defendant "cuts both ways" further buttressed the limiting effect of the unadorned section 190.3, factor (k) instruction. As previously discussed in part HID, ante, however, the prosecutor's remark placed defendant's evidence of a productive prison life in a different context in an attempt to minimize the inference of mitigation. In this respect, the comment further reinforced for jurors the proper scope of their consideration of mitigating factors.
Defendant's case at the penalty phase consisted primarily of the testimony of a friend and family members, and evidence of his good behavior while incarcerated in Florida and Amador County. For the jury to have adopted the language of the trial court's instruction in the limited manner suggested by defendant, it would have had to ignore nearly all of the evidence presented by defendant at the penalty phase. Under these circumstances, we find it unlikely the jury would have understood the challenged instruction as a command to regard the presentation of defendant's case-in-chief as "`a virtual charade.'" (Boyde, supra, 494 U.S. at p. 383, 110 S.Ct. 1190; People v. Payton, supra, 3 Cal.4th at p. 1072, 13 Cal.Rptr.2d 526, 839 P.2d 1035.)
*100 Defendant next complains that even if the jury could have given effect to the mitigating evidence, the trial court provided no guidance on how to return a life sentence. He points to the trial court's instruction to jurors in the language of CALJIC No. 8.88 that "[t]o return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison to the mitigating circumstances that it warrants death instead of life without parole." Defendant contends that the trial court should have given an instruction stating the converse, that a life verdict would be required if the aggravating evidence did not so substantially outweigh the mitigating circumstances.
We recently considered and rejected the identical claim in People v. Millwee, supra, 18 Cal.4th at pages 162-163, 74 Cal. Rptr.2d 418, 954 P.2d 990, and cases cited therein. For the reasons succinctly stated in that opinion, defendant's contention is likewise rejected here.
In a footnote and with little elaboration, defendant next contends that the trial court erred in refusing defense counsel's request for an instruction identifying for the jury which factors were mitigating. We have consistently rejected this contention on the basis that whether a factor is aggravating or mitigating is readily apparent without such labels. (People v. Millwee, supra, 18 Cal.4th at pp. 163-164, 74 Cal.Rptr.2d 418, 954 P.2d 990.) Defendant offers no persuasive argument to the contrary.
Defendant complains finally that the jury was permitted to sentence him to death without unanimously agreeing on the aggravating factors. Drawing on language in Justice Kennedy's concurring opinion in McKoy v. North Carolina, supra, 494 U.S. at page 452, 110 S.Ct. 1227, he asserts that in the absence of a unanimity requirement there is no confidence the jury making the sentencing determination was acting as the "conscience of the community." Defendant fails to acknowledge the decisions of this court that have consistently held there is no constitutional requirement that the jury unanimously agree on the aggravating factors in support of a verdict of death. (Sanchez, supra, 12 Cal.4th at pp. 80-81, 47 Cal.Rptr.2d 843, 906 P.2d 1129; Bacigalupo, supra, 1 Cal.4th at p. 147, 2 Cal.Rptr.2d 335, 820 P.2d 559, and cases cited therein.) He provides no reasons justifying our reconsideration of the issue here.

2. Failure to Countermand Antisympathy Instruction
At the guilt phase, the court instructed the jurors in the language of CALJIC No. 1.00 that they should not be influenced by pity for the defendant or swayed by mere sentiment or sympathy. Jurors were also directed to render a just verdict regardless of what the consequences may be. At the penalty phase, defense counsel proposed two instructions explaining to jurors, in relevant part, that in making their penalty determination, they were permitted to consider mercy, sentiment and sympathy for the defendant. The trial court declined to give this portion of the requested instructions.
Relying on Easley, supra, 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813, defendant contends that the trial court erred by refusing to countermand the antisympathy instruction given at the guilt phase, denying him the right to a fair trial and mandating reversal of his death sentence. Defendant's reliance on Easley, supra, 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813, is misplaced. In Easley, this court found as a matter of federal constitutional law that the trial court erred in giving a no sympathy instruction at the Penalty phase. (Id. at pp. 875-876, 196 Cal.Rptr. 309, 671 P.2d 813; see also People v. Lanphear (1984) 36 Cal.3d 163, 165-168, 203 Cal.Rptr. 122, 680 P.2d 1081.) Here, by contrast, the jury was not given an antisympathy instruction at the penalty phase. Unlike in Easley, neither the trial court nor the prosecutor suggested to the jurors that they were prohibited from considering sympathy for defendant when making their penalty determination.
Moreover, we have consistently rejected claims of error based on the trial court's failure to instruct the jury at the penalty phase to disregard the no sympathy instruction given during the guilt phase. (Avena, supra, 13 Cal.4th at pp. 436-137, 53 Cal. Rptr.2d 301, 916 P.2d 1000; People v. Gallego *101 (1990) 52 Cal.3d 115, 202, 276 Cal.Rptr. 679, 802 P.2d 169.) Nor have we found an antisympathy instruction given at the guilt phase to have had a prejudicial carryover effect at the penalty phase. (Avena, supra, 13 Cal.4th at p. 437, 53 Cal.Rptr.2d 301, 916 P.2d 1000; People v. Allison (1989) 48 Cal.3d 879, 899, fn. 11, 258 Cal.Rptr. 208, 771 P.2d 1294; Miranda, supra, 44 Cal.3d at p. 102, 241 Cal.Rptr. 594, 744 P.2d 1127.) We reach the same conclusion in this case.
Here, the record shows no reasonable likelihood the jury was misled about its obligation to take into account all of defendant's mitigating evidence, including sympathy, in making its penalty determination. (People v. Payton, supra, 3 Cal.4th at p. 1074, 13 Cal. Rptr.2d 526, 839 P.2d 1035; People v. Brown, supra, 46 Cal.3d at p. 460, 250 Cal.Rptr. 604, 758 P.2d 1135.) The no sympathy instruction was not given at the penalty phase. Nor would the jury have necessarily understood CALJIC No. 1.00 to have applied to the penalty phase in light of the specific references to guilt and innocence in other portions of that instruction. (People v. Gates (1987) 43 Cal.3d 1168, 1209, 240 Cal.Rptr. 666, 743 P.2d 301.)
Finally, nothing in the instructions given at the penalty phase could have misled the jury to believe it was prohibited from considering sympathy along with all other evidence proffered by defendant in mitigation of sentence. In its charge to the jury at the penalty phase, the trial court advised that in making its penalty determination, it must consider, among other factors, "Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death...." (CALJIC No. 8.84.1 (1986 rev.).) In this regard, jurors were told, "You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." (CALJIC No.8.84.2 (1986 rev.).) Significantly, the jury was also instructed to "disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." In light of the instructions as a whole, we conclude there is no reasonable likelihood the jury was misled about whether the scope of its consideration included sympathy for the defendant.
Defendant contends nonetheless that the refusal to specifically instruct the jurors they were no longer constrained by the guilt phase antisympathy instruction was federal constitutional error. Likening the rejection of his proposed instruction to the no sympathy instruction condemned in Easley, defendant complains he was deprived of a liberty interest within the meaning of Hicks v. Oklahoma (1980) 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175.[3] Defendant does not elaborate further.
Defendant's invocation of due process protections is misplaced. In Hicks, the United States Supreme Court recognized that a state law guaranteeing a criminal defendant procedural rights at sentencing, even if not constitutionally required, may give rise to a liberty interest protected against arbitrary deprivation by the due process clause. (Hicks v. Oklahoma, supra, 447 U.S. at p. 346, 100 S.Ct. 2227; Campbell v. Blodgett (9th Cir.1993) 997 F.2d 512, 522.) Because defendant is not entitled under state law to an instruction at the penalty phase directing the jury to disregard the anti-sympathy instruction given at the guilt phase, he cannot claim a protected liberty interest under the Fourteenth Amendment. (Cf. Holland v. State (Miss.1997) 705 So.2d 307, 351-352.)

3. Failure to label aggravating and mitigating factors
The penalty phase jury was instructed to reach its sentencing determination by weighing the factors in aggravation against the factors in mitigation. (CALJIC No. 8.88.) The applicable factors were set forth in the language of CALJIC No. 8.85, *102 which derives from section 190.3, factors (a) through (k). The trial court did not identify particular sentencing factors as aggravating or mitigating.
Although our past decisions hold otherwise, defendant contends nonetheless that the trial court should have advised the jury that certain statutory factors are relevant solely as potential mitigating circumstances. He asserts that the failure to do so invites the jury to give aggravating significance to the absence of a mitigating factor, in violation of Eighth Amendment and due process principles.
We have repeatedly held the trial court need not identify particular sentencing factors because their aggravating or mitigating nature is clear. (Carpenter, supra, 15 Cal.4th at p. 420, 63 Cal.Rptr.2d 1, 935 P.2d 708; People v. Ray (1996) 13 Cal.4th 313, 359, 52 Cal.Rptr.2d 296, 914 P.2d 846, and cases cited therein; Montiel, supra, 5 Cal.4th at pp. 944-945, 21 Cal.Rptr.2d 705, 855 P.2d 1277; see also Tuilaepa v. California (1994) 512 U.S. 967, 979, 114 S.Ct. 2630, 129 L.Ed.2d 750 [capital sentencer need not be instructed how to weigh sentencing factors].) Contrary to defendant's contention that the prefatory language "whether or not" introducing the mitigating factors (d), (e), (f), (g), (h), and (j) in section 190.3 invited the jury to convert a mitigating factor into an aggravating circumstance, we find no reasonable likelihood the jury was misled in the manner defendant suggests. (Cf. Carpenter, supra, 15 Cal.4th at p. 420, 63 Cal.Rptr.2d 1, 935 P.2d 708 [rejecting identical claim]; see also People v. Bolin (1998) 18 Cal.4th 297, 342, 75 Cal.Rptr.2d 412, 956 P.2d 374.)
Defendant further asserts the trial court should have deleted from the jury's consideration any exclusively mitigating factors unsupported by the evidence. We have consistently rejected claims identical to this one. (People v. Ramos (1997) 15 Cal.4th 1133, 1183, 64 Cal.Rptr.2d 892, 938 P.2d 950; Davenport, supra, 11 Cal.4th at p. 1230, 47 Cal. Rptr.2d 800, 906 P.2d 1068; Fauber, supra, 2 Cal.4th at p. 866, 9 Cal.Rptr.2d 24, 831 P.2d 249.) Defendant provides no reason warranting reconsideration of these decisions.

4. Failure to instruct on lingering doubt
Among the penalty phase instructions requested by the defense but refused by the trial court was defendant's special instruction No. 6, informing the jury of the specific mitigating circumstances that it should take into account in making its penalty determination, including "any residual or lingering doubt as to whether [defendant] intentionally killed Lucille and Robbie Brandt." Defendant claims that the trial court's refusal to give his lingering doubt instruction as requested was a violation of state law and the Eighth and Fourteenth Amendments to the federal Constitution. Since under state law he is entitled to raise the subject of lingering doubt at the penalty phase, defendant contends the trial court should be prohibited from refusing a defense-requested instruction to the same effect.
Although it is proper for a defendant to assert his possible innocence as a factor in mitigation (Sanchez, supra, 12 Cal.4th at p. 77, 47 Cal.Rptr.2d 843, 906 P.2d 1129), there is no constitutional entitlement to an instruction on lingering doubt. (Berryman, supra, 6 Cal.4th 1048, 1104, 25 Cal. Rptr.2d 867, 864 P.2d 40; People v. Johnson, supra, 3 Cal.4th at p. 1252, 14 Cal.Rptr.2d 702, 842 P.2d 1.) Nor was such an instruction necessary in light of other instructions given at the penalty phase that sufficiently embraced the concept of lingering doubt. (CALJIC No.8.84.2 (1986 rev.); accord People v. Hines, supra, 15 Cal.4th at p. 1068, 64 Cal.Rptr.2d 594, 938 P.2d 388 [lingering doubt instruction unnecessary in light of trial court's instruction in language of section 190.3, factor (a) regarding circumstances of the crime and section 190.3 factor (k) regarding circumstances extenuating the gravity of the crime and any sympathetic aspects of defendant's character and record offered in mitigation]; People v. Osband (1996) 13 Cal.4th 622, 716, 55 Cal.Rptr.2d 26, 919 P.2d 640 [same]; Sanchez, supra, 12 Cal.4th at pp. 77-78, 47 Cal.Rptr.2d 843, 906 P.2d 1129 [same].)

5. Failure to instruct jury to assume penalty will be carried out
Also among the penalty phase instructions refused by the trial court were *103 defendant's special instructions, Nos. 10 and 21, informing the jury that its sentencing choice, death or life in prison, will be carried out.[4] Defendant contends the trial court's refusal to give these instructions violated his various rights under the United States Constitution. Arguing there is a "common perception" that jurors do not believe persons sentenced to death will be executed or persons sentenced to life in prison will spend their entire lives in custody, he claims the refusal to give his requested instruction produced a constitutionally unacceptable risk that the jury did not make its sentencing choice with full awareness of the gravity of the task.
The requested instructions were properly refused. Special instruction No. 10 is an incorrect statement of law. (See Cox, supra, 53 Cal.3d at pp. 680-681, 280 Cal.Rptr. 692, 809 P.2d 351; People v. Thompson (1988) 45 Cal.3d 86, 130, 246 Cal.Rptr. 245, 753 P.2d 37.) Defendant is not entitled to an instruction that misstates the law. (Hawthorne, supra, 4 Cal.4th at p. 76, 14 Cal.Rptr.2d 133, 841 P.2d 118.) Although special instruction No. 21 is not misleading (see People v. Fierro, supra, 1 Cal.4th at p. 250, 3 Cal.Rptr.2d 426, 821 P.2d 1302, it was not error to refuse to give it. There is no indication in the record that the jury was at all concerned that its sentence would not be carried out or that it was otherwise confused about the issue. (Hawthorne, supra, 4 Cal.4th at p. 76, 14 Cal.Rptr.2d 133, 841 P.2d 118; Fierro, supra, 1 Cal.4th at p. 250, 3 Cal.Rptr.2d 426, 821 P.2d 1302, People v. Thompson, supra, 45 Cal.3d at p. 131, 246 Cal.Rptr. 245, 753 P.2d 37.) Nor does the record suggest the jury was unaware of the gravity of its task. To the contrary. Defense counsel stressed the magnitude of the jurors' sentencing choice when he stated in closing argument, "But we are not just saying, Die or nothing. We are saying, Die or unending punishment. Jerry Frye will be punished to the end of his days. He will receive a punishment of life without possibility of parole. That's the other option. And that is one significant option." In light of this record, we conclude the trial court did not err in refusing the proposed instructions. (Cox, supra, 53 Cal.3d at p. 681, 280 Cal. Rptr. 692, 809 P.2d 351.)

F. Challenge to the Constitutionality of California's Death Penalty Law
Offering a statistical analysis based on an examination of published appeals from murder convictions for the years 1988-1992, defendant claims the California death penalty statute on its face fails to narrow the class of death-eligible defendants in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Defendant acknowledges we have previously held that the "special circumstances" provisions of our capital sentencing scheme sufficiently narrow the class of death-eligible murderers. (People v. Baeigalupo (1993) 6 Cal.4th 457, 465-468, 24 Cal.Rptr.2d 808, 862 P.2d 808). But, he argues, in light of the broad interpretation of the lying-in-wait special circumstance and the expansive sweep of the felony-murder special circumstance, virtually all first degree murders are death eligible, and thus the special circumstances perform no narrowing function at all.
Defendant's argument notwithstanding, the special circumstances "are not overinclusive by their number or terms." (Arias, supra, 13 Cal.4th at p. 187, 51 Cal.Rptr.2d 770, 913 P.2d 980.) Nor have they been construed in an overly expansive manner. *104 (Ibid.; see also People v. Morales (1989) 48 Cal.3d 527, 557-558, 257 Cal.Rptr. 64, 770 P.2d 244 [lying-in-wait]; People v. Marshall (1990) 50 Cal.3d 907, 946, 269 Cal.Rptr. 269, 790 P.2d 676 [felony murder]; Anderson, supra, 43 Cal.3d at p. 1147, 240 Cal.Rptr. 585, 742 P.2d 1306 [felony murder].) Defendant's statistics do not persuade us to reconsider the validity of these decisions.
Defendant raises a number of other claims, admittedly for purposes of federal review. He asserts that California's capital sentencing scheme, as written and applied, violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution by its (1) failure to require written findings by the jury on the aggravating factors, (2) failure to require the jury to find aggravating factors and appropriateness of the death penalty beyond a reasonable doubt, (3) lack of requirement for intercase and intracase proportionality review, (4) creation of an impermissible barrier to consideration of mitigating evidence by use of adjectives such as "extreme" (ง 190.3, factors (d), (g)) and "substantial" (id., factor (g)) to describe potential mitigating evidence, (5) failure to perform constitutionally required narrowing function by an overly broad definition of felony murder, and (6) granting of unbounded discretion to the prosecutor.
We have rejected all of these claims, as defendant acknowledges. Written findings on aggravating factors are not required, nor must the People prove aggravating factors or the appropriateness of the death penalty beyond a reasonable doubt. (People v. Rodriguez, supra, 42 Cal.3d at pp. 777-779, 230 Cal.Rptr. 667, 726 P.2d 113.) We do not engage in intercase or intracase proportionality review. (Bacigalupo, supra, 1 Cal.4th at pp. 151-152, 2 Cal.Rptr.2d 335, 820 P.2d 559.) Instructing the jury in the language of section 190.3, factors (d) and (g) does not create a barrier to consideration of mitigating evidence. (People v. Turner (1994) 8 Cal.4th 137, 208-209, 32 Cal.Rptr.2d 762, 878 P.2d 521.) The felony-murder special circumstance provides a meaningful basis for narrowing death eligibility. (See People v. Marshall, supra, 50 Cal.3d at p. 946, 269 Cal.Rptr. 269, 790 P.2d 676.) The prosecutor's exercise of discretion in choosing to seek the death penalty does not amount per se to a constitutional violation. (People v. Ashmus (1991) 54 Cal.3d 932, 980, 2 Cal. Rptr.2d 112, 820 P.2d 214.) Defendant provides no reasons justifying our reconsideration of these decisions.

G. Length Of Time On Death Row
Defendant raises two claims relating to the asserted delay pending resolution of his capital appeal following imposition of his death sentence.[5]

1. Cruel and unusual punishment
Defendant claims that the length of time he has been on death row awaiting his first appeal as a matter of right (seven years) has been so excessive as to constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. He claims that the psychological brutality that results from a prolonged wait for execution does not comport with "evolving standards of decency that mark the progress of a maturing society" from which the Eighth Amendment draws it meaning. (Trap v. Dulles (1958) 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630.) In support of his constitutional claim, defendant relies on recent decisions of foreign courts concluding that the government may not carry out the execution of a condemned inmate who has faced the prospect of execution over an extended period of time. (See, e.g., Pratt & Morgan v. The Attorney General of Jamaica, Privy Council, 4 Eng. Rep. 769 (1993 P.C.) [in bank].)
The reasoning of the Ninth Circuit Court of Appeals in McKenzie v. Day, supra, 57 F.3d 1461, and of the Fifth Circuit Court *105 of Appeals in White v. Johnson (5th Cir.1996) 79 F.3d 432, persuades us that prolonged confinement prior to execution does not constitute a violation of the Eighth Amendment. In McKenzie v. Day, supra, 57 F.3d 1461, the defendant sought a stay of execution on the ground that he would likely succeed on his claim that over 20 years on death row was cruel and unusual punishment. A majority of the three-judge panel concluded the claim was unlikely to succeed, and denied the stay request. (Id. at p. 1463.) The court determined that the cause for the delay in executing the defendant was due to the defendant's having "availed himself of procedures our law provides to ensure that executions are carried out only in appropriate circumstances." (Id. at p. 1467.) In the court's view, the delay was thus "a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences." (Ibid.) As the court observed, a defendant sentenced to death need not have excessive review prior to execution, but the Constitution requires certain procedural safeguards before execution to prevent arbitrary or erroneous executions. In the court's view, the delays caused by satisfying the Eighth Amendment cannot violate it. (Id. at p. 1467.)
The Fifth Circuit applied similar reasoning in White v. Johnson, supra, 79 F.3d 432, to reject the defendant's claim that inordinate delay in carrying out an execution is cruel and unusual punishment under the Eighth Amendment. Recognizing a tension between the state's interest in deterrence and swift execution and its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards, the court found compelling reasons for the length of time between conviction and execution. (Id. at p. 439.)
Defendant's continued incarceration following imposition of the death penalty seven years ago is likewise the result of the need to assure careful review of his conviction and sentence. (Harrison v. United States (1968) 392 U.S. 219, 221, fn. 4, 88 S.Ct. 2008, 20 L.Ed.2d 1047; see also ง 1239 [automatic appeal of death judgment]; cf. People v. Hill, supra, 3 Cal.4th at pp. 1014-1016, 13 Cal.Rptr.2d 475, 839 P.2d 984 [rejecting argument that delay inherent in capital appeals process constitutes cruel and unusual punishment]; People v. Chessman (1959) 52 Cal.2d 467, 499, 341 P.2d 679 [same].) Under these circumstances, we conclude that his confinement on death row pending the outcome of his direct appeal does not constitute cruel and unusual punishment in violation of the Eighth Amendment. (Accord, State v. Smith (1996) 280 Mont. 158, 931 P.2d 1272, 1287-1288; Ex Parte Bush (Ala.1997) 695 So.2d 138, 139-140; State v. Schackart (1997) 190 Ariz. 238, 947 P.2d 315, 336.) As the court in McKenzie v. Day, supra, 57 F.3d 1461, aptly observed, "`It would indeed be a mockery of justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place.'" (Id. at p. 1466, quoting Richmond v. Lewis (9th Cir.1990) 948 F.2d 1473, 1491-1492, revd. on other grounds, Richmond v. Lewis (1992) 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411, vacated, 986 F.2d 1583 (9th Cir.1993); adopted in bank in McKenzie v. Day, supra, 57 F.3d at p. 1494.)

2. Double jeopardy
Defendant contends that his confinement on death row for an interminable number of years constitutes a punishment separate and apart from the imposition of the death penalty. He argues that because the execution of his death sentence will punish him twice for the same offense, it violates the double jeopardy clause of the Fifth Amendment to the United States Constitution and, therefore, must be reversed.
Defendant cites no decisions or other authority supporting his contention, and we find none. Nor do we find his premise sound. Confinement in prison following a judgment of death is part and parcel of the administration of the death penalty. (See, e.g., ง 1217 [male defendant sentenced to death to be incarcerated in state prison designated by State Board of Prison Directors for execution of death penalty pending decision on appeal], ง 1239 [mandating automatic *106 appeal of all death sentences].) It cannot be characterized as separate punishment as that term is understood under the double jeopardy clause.

V. DISPOSITION
For the reasons stated herein, the judgment is affirmed in its entirety.
GEORGE, C.J., and KENNARD, WERDEGAR and CHIN, JJ., concur.
MOSK, Justice, concurring.
I generally concur in the opinion of the court.
I write separately because I would reject, at the very threshold, appellant's contention that the sentence of death imposed on him in the judgment on appeal amounts to cruel and/or unusual punishment, in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution, because of the effect that it has assertedly had on him as he has awaited its execution during years in confinement. "Appellate jurisdiction," however, "is limited to the four corners of the record on appeal" (In re Carpenter (1995) 9 Cal.4th 634, 646, 38 Cal.Rptr.2d 665, 889 P.2d 985), and to "matters" that are "properly subject to judicial notice" (People v. Collie (1981) 30 Cal.3d 43, 57, fn. 10, 177 Cal.Rptr. 458, 634 P.2d 534). By its very terms, appellant's claim, which has arisen postjudgment, goes beyond the record and judicial notice. It is not trivial. But it may not be presented here.[1]
BAXTER, Justice, concurring And dissenting.
I concur fully in the majority's decision to affirm the death judgment entered against defendant for the robbery and murder of his neighbors, the Brandts, in their rural home in Amador County. However, I disagree with the majority's conclusion that the trial court erred, albeit nonprejudicially, in excluding evidence offered by defendant to mitigate his prior felony conviction for sexual battery at the penalty phase. Documentary proof that defendant had suffered such a conviction in Florida in 1977 was introduced by the People in its penalty case-in-chief.[1]
As the majority observes, the general rule that the sentencer in a capital case cannot be barred from considering favorable evidence bearing on the defendant's character and background and the capital offense is not absolute. (See Skipper v. South Carolina (1986) 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1; Lockett v. Ohio (1978) 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973.) The trial court retains the authority, and indeed has a duty, to exclude evidence having no tendency in reason to prove a fact or circumstance which the sentencer could reasonably deem to have mitigating value. (Lockett v. Ohio, supra, 438 U.S. at p. 604, fn. 12, 98 S.Ct. 2954; see Evid.Code, ง 210; McKoy v. North Carolina (1990) 494 U.S. 433, 440, 110 S.Ct. 1227, 108 L.Ed.2d 369.) Thus, to the extent defendant was entitled to present relevant mitigating evidence of the circumstances surrounding his prior felony conviction, evidence offered for this purpose was admissible only if it provided a rational basis on which jurors could impose a sentence less than death. The trial court obviously understood this principle and properly excluded the evidence at issue here.
As noted in the majority opinion, defendant offered to prove only the following carefully *107 selected facts: that he and the victim socialized with defendant's uncle and other acquaintances in a restaurant before the sexual assault; that defendant encountered the victim in her home later the same day; that defendant subsequently spoke to his uncle about the encounter and met with the victim's husband; that alcohol was consumed by the group at the restaurant; and that the victim flirted with the uncle even though her husband (who was a distant relative of defendant's) was present. The defense offered to prove these facts through the testimony of the uncle. The defense did not plan to call either of the two eyewitnesses to events occurring inside the victim's home โ defendant and the victim. The prosecution timely objected on relevance grounds. The trial court sustained the objection.
I believe exclusion of the uncle's testimony did not preclude the penalty jury from considering relevant evidence in mitigation. Obviously, the proffered evidence had no bearing on the capital offense โ a multiple murder that occurred several years later in another state and served as the primary factor urged by the People in favor of a death sentence. Indeed, the special emphasis placed by the People on the savage circumstances of the capital crime is a key reason cited by the majority for finding no prejudice in the exclusion of evidence relating to the prior conviction.
Moreover, the trial court could reasonably conclude that defendant's account of the prior crime was so censored and lacking in information about acts giving rise to the conviction that any mitigating inferences were speculative only. No evidence of any interaction between defendant and the victim at the restaurant was proffered. The defense also did not offer to describe events that took place from the time the group left the restaurant through the time the sexual assault occurred in the victim's home and was reported to third persons. Although the uncle was prepared to testify that defendant spoke about the crime, the substance of these admissions was omitted from the offer of proof.
Hence, I disagree with the majority that the uncle's testimony tended to show that defendant was "not as morally culpable" as the abstract of conviction might otherwise suggest โ a conclusion the majority does not explain. (Maj. opn., ante, at p. 95 of 77 Cal.Rptr.2d, at p. 253 of 959 P.2d.) Nor did the proffered evidence demonstrate that defendant had "assum[ed] responsibility" for the crime, or that his sexual contact with the victim did not involve "violence." (Ibid.) In my view, the offer of proof amounted to little more than a calculated attempt to insinuate that the victim somehow invited the sexual assault, while withholding critical details that might have disclosed the true extent of defendant's culpability. The trial court acted within the reasonable bounds of discretion in barring this evidence on relevance grounds.
NOTES
[1] Defendant claims the trial court's ruling prohibiting him from rebutting the prosecutor's "victim impact evidence" violated his right to due process. He cites Gardner v. Florida (1977) 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (Gardner) and Skipper v. South Carolina (1986) 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (Skipper) in support of his argument. Neither Gardner nor Skipper assists us in addressing a challenge to the admissibility of guilt phase evidence. Although these cases recognize that prohibiting a defendant from rebutting evidence proffered by the prosecution in support of the death penalty may violate due process principles, they are premised on the constitutional principle that the sentencer in a capital case may not be prohibited from considering "`"any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." '" (Skipper, supra, 476 U.S. at p. 4, 106 S.Ct. 1669, quoting Eddings v. Oklahoma (1982) 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (Eddings).) Defendant's complaint concerns the trial court's evidentiary ruling at the guilt phase, a stage in the proceedings with which neither Gardner nor Skipper is concerned. Moreover, even under the Eighth Amendment to the federal Constitution, the trial court retains the authority to exclude irrelevant evidence in the first instance. (See Lockett v. Ohio (1978) 438 U.S. 586, 604, fn. 12, 98 S.Ct. 2954, 57 L.Ed.2d 973, (Lockett).)
[2] In an effort to provide the court with a "flavor" of the alleged ineffectiveness of counsel in this case, defendant points out that Richard Hawk was the defense attorney for Juan Corona, whose murder convictions were reversed on the basis of ineffective assistance of counsel. (See People v. Corona (1978) 80 Cal.App.3d 684, 145 Cal.Rptr. 894.) Defendant also relates the details of a State Bar disciplinary action against Hawk that resulted in Hawk's suspension from the practice of law. (Hawk v. State Bar (1988) 45 Cal.3d 589, 247 Cal.Rptr. 599, 754 P.2d 1096.)
[3] His argument implicitly acknowledges the holding in California v. Brown (1987) 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934, that an antisympathy instruction at the penalty phase does not constitute a violation of the Eighth Amendment per se. (Id. at pp. 541-543, 107 S.Ct. 837; id. at p. 545, 107 S.Ct. 837 (cone. opn. of O'Connor, J.).)
[4] Special instruction No. 10 states: "You are instructed that life without possibility of parole means exactly what it says: The defendant will be imprisoned for the rest of his life. [ถ] You are instructed that the death penalty means exactly what it says: That the defendant will be executed. [ถ] For you to conclude otherwise would be to rely on conjecture and speculation and would be a violation of your oath as trial jurors."

Special instruction No. 21 states: "You are instructed that if your decision in the penalty phase of this trial is that the defendant should be put to death, the sentence will be carried out. On the other hand, if you determine that life without the possibility of parole is the proper sentence, you are instructed that the defendant will never be released from prison. Whether or not there are circumstances that might preclude either the death penalty or life without possibility of parole from being carried out, you should assume your sentence would be carried out for purposes of determining the appropriate sentence for this defendant."
[5] In the past, we have declined to consider on direct appeal claims of excessive delay that were premised on evidence and matters outside the record on appeal. (E.g., People v. Barnett (1998) 17 Cal.4th 1044, 1182-1183, 74 Cal.Rptr.2d 121, 954 P.2d 384.) In this case, however, defendant's claim is cognizable on appeal because it is narrowly framed and may be resolved without reference to external matters. (People v. Hill (1992) 3 Cal.4th 959, 1014-1016, 13 Cal.Rptr.2d 475, 839 P.2d 984.)
[1] Whether appellant's claim is "narrowly framed" (maj. opn., ante, at p. 104, fn. 5 of 77 Cal.Rptr.2d, at p. 262, fn. 5 of 959 P.2d) is open to question. Whether it "may be resolved without reference to external matters" (ibid.) is not. It may not. That is because it is, in fact, based on such "external matters," including an assertion by appellant that respondent and the superior court "took nearly seven years to obtain a [sufficient] record," and did so only after he "was compelled to force [them] to provide him with transcripts which were correct versions of what transpired in the course of his case." As such, it is not similar to the point in People v. Hill (1992) 3 Cal.4th 959, 1014, 13 Cal.Rptr.2d 475, 839 P.2d 984, which was a "frontal attack on the validity of the death penalty in all cases" predicated on the "delay inherent in the capital appeal process."
[1] The parties stipulated during the capital trial that the Florida statute under which defendant was previously convicted involved nonconsensual sexual contact accomplished by the use of "physical force and violence not likely to cause serious personal injury."